UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BENJAMIN ROBERTS,
    Plaintiff,

    v.

TRIPLANET PARTNERS, LLC, ET AL.,
    Defendants.

No. 3:12-cv-1222 (SRU)

## RULING ON PLAINTIFF'S APPLICATION FOR PREJUDGMENT REMEDY

The plaintiff, Benjamin Roberts ("Roberts" or "the plaintiff"), brought this action against his former employer, Triplanet Partners LLC ("TriPlanet"), and TriPlanet's managing members, Sophien Bennaceur ("Sophien") and Imed Bennaceur ("Imed") (collectively, "the defendants"), alleging, *inter alia*, breach of contract and violations of the Connecticut wage statute, Conn. Gen. Stat. § 31-71a.[1] Roberts avers that, in derogation of his employment agreement, the defendants failed to pay him wages and annual equity payouts, and refused to recognize his equity stake in TriPlanet. As a result, Roberts claims that he suffered millions of dollars in damages.

Before the court are Roberts' motions for prejudgment remedy (doc. # 14) and disclosure of assets (doc. # 15). An evidentiary hearing was held on March 12, 2013, at which Roberts testified on his own behalf, and Sophien testified on behalf of the defendants. For the reasons that follow, the motions are GRANTED in substantial part.

---

[1] In total, Roberts' complaint alleged the following causes of action: breach of contract (Count I); violations of the Connecticut wage statute, Conn. Gen. Stat. § 31-71a (Count II); fraudulent inducement (Count III); fraud (Count IV); declaratory judgment (Count V); securities fraud (Count VI); breach of fiduciary duties (Count VII); conversion (Count VIII); civil theft under Conn. Gen. Stat. § 52-564 (Count IX); accounting (Count X); and constructive trust (Count XI). On March 12, 2013, I granted the defendants' motion to dismiss the civil theft claim. *See* Minute Entry (doc. # 61). Although Roberts continues to pursue all remaining claims, his application for prejudgment remedy is principally based on the breach of contract and wage

**I.     Standard of Review**

Generally speaking, a prejudgment remedy is "intended to secure the satisfaction of a judgment should the plaintiff prevail." *Cendant Corp. v. Shelton*, No. 3:06-cv-854 (JCH), 2007 WL 1245310, at *2 (D. Conn. Apr. 30, 2007) (citation omitted).  Federal Rule of Civil Procedure 64 provides that prejudgment remedies available under state law are also available to litigants in federal court.  *See* Fed. R. Civ. P. 64; *Dill v. Ron's Golf Car Rental, Inc.*, No. 3:12-cv-137 (JBA) (JGM), 2013 WL 275690, at *8 (D. Conn. Jan. 24, 2013).

Under Connecticut law, a prejudgment remedy is appropriate if the court, "upon consideration of the facts before it and taking into account any defenses, counterclaims or set-offs, claims of exemption and claims of adequate insurance, finds that the plaintiff has shown probable cause that such a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought[.]" Conn. Gen. Stat. § 52-278d(a).  The "probable cause" standard has been defined as:

> [A] bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. . . .  Thus, the plaintiff does not have to prove its case by a preponderance of the evidence, but must show that there is probable cause to sustain the validity of the claim.

*Walpole Woodworkers, Inc. v. Atlas Fencing, Inc.*, 218 F. Supp. 2d 247, 249 (D. Conn. 2002) (internal quotation marks and citations omitted).  "Probable cause is a flexible common sense standard.  It does not demand that a belief be correct or more likely true than false." *TES Franchising, LLC v. Feldman*, 286 Conn. 132, 137 (2008) (internal quotation omitted).

"A probable cause hearing for the issuance of a prejudgment remedy 'is not contemplated to be a full scale trial on the merits of the plaintiff's claim.'" *Balzer v. Millward*, No. 3:10-cv-

---

statute claims.

1740 (SRU) (HFB), 2011 WL 1547211, at *1 (D. Conn. Apr. 21, 2011) (quoting *Calfee v. Usman*, 224 Conn. 29, 37 (1992)).  Rather, the "trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits."  *Id.* (internal quotation omitted). "[T]he court must evaluate not only the plaintiff's claim but also any defenses raised by the defendant."  *Haxhi v. Moss*, 25 Conn. App. 16, 20 (1991) (citation omitted).  Damages need not be established with mathematical precision, but must be based on "evidence yielding a fair and reasonable estimate."  *Savalle v. Kobyluck*, No. 3:00-cv-675 (WWE), 2001 WL 1913746, at *2 (D. Conn. Sept. 21, 2001) (internal quotations omitted).

## II.     Findings of Fact

After considering all of the evidence presented, I find the following facts for the limited purpose of deciding the instant motion for prejudgment remedy.

Prior to the events giving rise to this action, Roberts, a Connecticut resident, was employed as the Vice President and Chief Information Officer at The Hartford Insurance Group. In April 2010, while vacationing in Florida, Roberts met Sophien.  The two struck up a conversation, and Sophien shared with Roberts information about a consulting firm—TriPlanet—that Sophien had recently formed with his brother, Imed.  During that conversation, Sophien suggested that Roberts leave his current position and join TriPlanet on a full-time basis. *See* Tr. of Prejudgment Remedy Hrg. (Mar. 12, 2013), at 35-38.

Shortly thereafter, in May 2010, Roberts attended a dinner meeting with Sophien, in which the two discussed a potential role for Roberts as a "Delivery Lead" for a major project that TriPlanet was negotiating with Royal Bank of Scotland.  At that dinner, Sophien discussed granting Roberts an equity ownership interest in TriPlanet, should he decide to join the firm.  At

a subsequent meeting in July 2010, Sophien formally offered Roberts a position with TriPlanet, and the two discussed an outline of salary requirements. Sophien stated that, in addition to base salary, Roberts would also receive stock representing an equity interest in TriPlanet. Sophien drafted the initial offer and nondisclosure agreement for Roberts to consider. According to Roberts, during the negotiation process, Sophien orally confirmed to Roberts that, in addition to a base salary, Roberts would receive a 15% equity ownership interest in TriPlanet that would lead to annual equity payouts commensurate with his ownership interest. *Id.* at 38-42; Aff. of Benjamin Roberts in Supp. of Appl. for Prejudgment Remedy ¶¶ 14-15, 17 (doc. # 24) ("Roberts Aff.").

On July 28, 2010, Sophien sent Roberts a written employment agreement on behalf of TriPlanet (the "Employment Agreement"), which offered Roberts a full-time position. Consistent with Sophien's previous representations, the Employment Agreement included an annual base salary of approximately $500,000 to be paid monthly, and stated that Roberts would be granted a 15% equity interest in the company. *See* Pl.'s Ex. 5. The agreement also provided that Roberts would receive annual equity payouts, based on his ownership interest, assuming that specific targets were achieved in a timely manner. Additionally, the agreement permitted Roberts to increase his 15% stake by an additional 10% based upon his meeting certain objective goals, bringing his total potential equity interest to 25%. *Id.*; *see also* Tr. of Prejudgment Remedy Hrg. at 60-61. Roberts accepted the terms of the Employment Agreement, and resigned from his position with The Hartford.[2] *Id.* at 35-38.

---

[2] Neither party has produced an executed copy of the Employment Agreement. The defendants, however, acknowledge that a contract existed between the parties on substantially the same terms outlined in the draft agreements submitted at the hearing. *See* Tr. of Prejudgment Remedy Hrg. at 117-18, 159-60; Pl.'s Exs. 5-8.

Roberts testified that, in October 2010, he and his team successfully reached the annual targets for 2010. *Id.* at 65. Thus, Roberts claims he was entitled to receive the 15% equity payout for that year under the terms of the Employment Agreement. However, when the payout became due in February 2011, Roberts was not paid.

Roberts further testified that, in 2011, he once again reached the targeted goals for the year. Thus, Roberts claims that he also earned his annual equity pay-out for 2011. *Id.* at 65-66. Moreover, according to Roberts, Sophien was so pleased with his success in reaching the stated goals that, in May 2011, Sophien not only confirmed that Roberts was entitled to the 15% equity payout for the year, but also agreed that Roberts had earned the 10% additional ownership interest, bringing Roberts' total interest in TriPlanet to 25%. Those oral assurances were repeated to Roberts by both Sophien and Imed at various dinner meetings. *Id.* at 66-67.

In February 2012, when the annual equity payout for 2011 became due, Roberts was not paid the full amount owed, based on his claimed 25% interest in the firm. In June 2012, Roberts inquired about his equity payouts. Sophien responded via email, stating that the company had already paid Roberts approximately $2 million, which Sophien argued represented Roberts' 15% payouts for 2010 and 2011. *Id.* at 82. According to Roberts' estimates, however, Sophien had grossly understated the actual amount owed. Roberts and Sophien exchanged a series of emails, and Imed eventually contacted Roberts to assure him that he would convene a TriPlanet owners meeting to resolve any dispute over the amount Roberts was owed. *See* Roberts Aff. ¶¶ 40-43.

That meeting, however, never took place. Instead, in June 2012, Roberts was terminated from his position. The defendants have refused to pay Roberts his equity payouts or recognize his 25% equity interest in the company. *Id.* ¶¶ 45-46. Moreover, Roberts claims that the defendants also failed to pay him his regular base salary for May 2012 and for the first week of

June 2012, an amount totaling approximately $62,500.  Based on estimates of TriPlanet's profits during his tenure, Roberts claims he is owed a total of $9.36 million in unpaid equity distributions and other compensation.  *See* Pl.'s Ex. 17; Tr. of Prejudgment Remedy Hrg. at 80, 154.

Sophien testified on behalf of the defendants at the March 12, 2013 hearing.  During his testimony, Sophien acknowledged that TriPlanet had an employment agreement with Roberts on substantially the same terms outlined in the draft agreements submitted by the plaintiff.  *See* Tr. of Prejudgment Remedy Hrg. at 117-18.  Although Sophien stated that he did not believe that Roberts earned the full equity interest he now claims, he nonetheless admitted that, because he had yet to fully examine all of the relevant financial data, he was unsure whether Roberts had, in fact, met the various benchmarks outlined in the Employment Agreement that would entitle him to a 15-25% equity stake in the firm.  *See id.* at 118-19.

Sophien also challenged Roberts' estimates with respect to TriPlanet's profit margins during the relevant period—estimates upon which the plaintiff based his damages calculation.  According to Sophien, Roberts never had access to TriPlanet's internal financial records, and therefore had no knowledge of—and failed to take into account—certain variables such as employee compensation, outstanding debt, and other matters related to TriPlanet's profitability.  *See* Tr. at 107-08.  To that end, the defendants submitted their own financial summaries outlining TriPlanet's estimated profits in 2010 and 2011.  *See* Defs.' Exs. A-B.  Based on those newly-submitted summaries, Roberts produced a revised damages calculation, which estimated his total losses at $8,858,949.  *See* Pl.'s Ex. 21, at 2.

**III.    Discussion**

Roberts now seeks a prejudgment remedy in the amount of $25 million, based principally

on his claims for breach of contract and violations of the Connecticut wage statute.[3]  I address both claims below.

     A.     Breach of Contract

          *1.*     *Liability*

Under Connecticut law, the "elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Seligson v. Brower*, 109 Conn. App. 749, 753 (2008) (internal quotation marks omitted); *see also Martin v. Dupont Flooring Systems, Inc.*, No. 3:01-cv-2189 (SRU), 2004 WL 726903, at *3 (D. Conn. Mar. 31, 2004) (stating that breach of contract is an "unjustified failure to perform all or any part of what is promised in a contract") (internal quotation omitted).

Here, there is no real dispute that the parties entered into an agreement on terms substantially similar to those outlined in the draft agreements submitted by the plaintiff.  Indeed, Sophien acknowledged at the hearing that TriPlanet had an agreement with Roberts and that the agreement included provisions concerning the award of an equity ownership interest if Roberts met certain criteria.  *See* Tr. of Prejudgment Remedy Hrg. at 117-18.  Thus, the only remaining issue is whether Roberts did, in fact, meet those criteria, thus entitling him to the 25% equity stake that the defendants refuse to recognize.  But even on that front, the defendants have voiced less than full-throated opposition to the plaintiff's claims.  Sophien testified that he was merely *unsure* whether Roberts had met the targets contemplated under the Employment Agreement, because he has not yet had the opportunity to fully review all of the relevant financial data.  *See*

---

[3] Because I conclude that Roberts has met the probable cause standard for both his breach of contract and wage statute claims—and because Roberts has offered no evidence on damages other than expectation damages arising out of the alleged breach of his employment agreement— I need not address whether Roberts has met his burden with respect to his remaining tort claims.

*id.* at 118-19.

In light of the above, I conclude that Roberts has established probable cause to believe that: (1) he met the relevant performance targets; (2) he was therefore entitled to a 25% equity ownership interest in TriPlanet; and (3) the defendants failed to pay him the full amount of equity distributions for 2010 and 2011 under the terms of the Employment Agreement.  I now turn to the question of damages.

   2. *Damages*

The damages that a plaintiff claims "need not be established with precision but only on the basis of evidence yielding a fair and reasonable estimate." *Savalle*, 2001 WL 1913746, at *2 (internal quotation omitted).  Based on the evidence presented at the hearing, I conclude that Roberts has demonstrated probable cause to believe that a judgment in the amount of $8,858,949 will be rendered in his favor at a trial on the merits of his breach of contract claim.  That amount reflects Roberts' own estimates regarding TriPlanet's profits during the relevant period, while also taking into account the financial summaries the defendants produced at the hearing.  *See* Pl.'s Ex. 21; Defs.' Exs. A-B.  Specifically, I credit Roberts' newly-revised calculations and testimony regarding his claims for $62,500 in unpaid salary and $8,796,449[4] in unpaid equity distributions during the 2010-11 period, for a total of $8,858.949 in damages.

  B. <u>Connecticut Wage Statute</u>

   1. *Liability*

Connecticut's wage statute reads as follows: "When any employer fails to pay an

---

[4] Roberts admits that, in 2010, he was actually *overpaid* by approximately $63,779, based on his 15% equity stake at the time.  *See* Pl.'s Ex. 21, at 2.  In 2011, however, Roberts was paid only a fraction of his 25% equity interest, resulting in an unpaid balance of $8,860,229 for that year.  Accordingly, Roberts has demonstrated probable cause to believe that he is owed a total of $8,796,449 in unpaid partner distributions for 2010-11.

- 8 -

employee wages . . . such employee . . . may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court . . . ." Conn. Gen. Stat. § 31-72.[5]  "Wages" are defined as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation."  Conn. Gen. Stat. § 31-71a(3).  Although purely discretionary bonuses are not "wages" under the statute, the Connecticut Supreme Court has held that bonuses for which both the payment and the amount are nondiscretionary come within the ambit of section 31-71a(3).  *See Association Resources, Inc. v. Wall*, 298 Conn. 145, 176 (2010) ("[W]e conclude that . . . the bonuses in the present case were wages as defined by § 31-71e(3) because, under the employment agreement, they were entirely nondiscretionary, both as to whether they would be awarded, and the amount thereof.").  Thus, "the classification of a compensation provision as

---

[5] Because TriPlanet's principal place of business appears to be New York—and because neither Sophien nor Imed are residents of Connecticut—the defendants have argued that Connecticut's wage statute does not apply in this case.  As authority for that proposition, the defendants cite *Goldberg v. Goodwill Industries*, No. CV054009642, 2006 WL 224124 (Conn. Super. Ct. Jan. 3, 2006), in which the Superior Court noted, in dicta, that "[i]ndividuals employed outside the state of Connecticut are subject to the wage payment laws of the states in which they are employed and are not afforded the protection of the Connecticut statute."  *Id.* at *5 (internal quotation omitted).

Although I agree with the general proposition that the Connecticut wage statute does not apply to employment cases in which a nexus with the State of Connecticut is lacking, that is simply not the case at bar.  Roberts testified that the parties agreed that he would complete a substantial portion of his work responsibilities for TriPlanet from his home office in Connecticut, *see* Tr. of Prejudgment Remedy Hrg. at 90-91, and it is undisputed that the defendants directed pay checks and income tax forms to Roberts' Connecticut address.  In my view, that is sufficient to bring the plaintiff's wage claims within the Connecticut statute.  Moreover, even if Connecticut's wage statute did not apply, because TriPlanet itself is located in New York, nothing prevents Roberts from bringing the same claims under New York's wage statute—a statute that is substantively similar to Connecticut's statute.  *See Weems v. Citigroup, Inc.*, 289 Conn. 769, 780 (2008) (noting that New York's wage statute is "similar" to Connecticut's statute, and relying on New York case law to interpret Connecticut's wage statute).  Accordingly, the defendants' attempts at challenging the applicability of the wage statute are unavailing.

wages under § 31-71a(3) requires the satisfaction of 3 factors: (1) the award of compensation must be non-discretionary, (2) the amount of the compensation must be non-discretionary, and (3) the amount of the bonus must be dependent on the employee's performance." *Datto Inc. v. Braband*, 856 F. Supp. 2d 354, 371 (D. Conn. 2012) (citing *Wall*, 298 Conn. at 173-77).

Here, Roberts has clearly demonstrated probable cause that he will prevail on his claim for violation of the wage statute. First, Roberts testified credibly that the defendants failed to pay him approximately $62,500 in base salary. There can be no doubt that compensation in the form of base salary constitutes "wages" under the statute. *See* Conn. Gen. Stat. § 31-71a(3). Second, Roberts has established probable cause to believe that the unpaid equity distributions constitute a form of bonus for which both the payment and the amount are nondiscretionary under the terms of the Employment Agreement. Accordingly, those amounts, too, qualify as "wages" under the statute. *See Braband*, 856 F. Supp. 2d at 371.

    2.  *Damages*

Roberts claims he is entitled to double damages and attorneys' fees based on his wage statute claim. Section 31-72 "provides for a discretionary award of double damages, with costs and reasonable attorney's fees, to employees who are successful in actions against their employers for wages due." *Ravetto v. Triton Thalassic Technologies, Inc.*, 285 Conn. 716, 724 (2008) (internal quotation omitted). That discretion, however, is not unlimited. *See Braband*, 856 F. Supp. 2d at 370. The Connecticut Supreme Court has consistently held that "it is appropriate for a plaintiff to recover attorney's fees and double damages under [section 31-72] only when the trial court has found that the defendant acted with bad faith, arbitrariness or unreasonableness." *Ravetto*, 285 Conn. at 724 (internal quotation omitted); *see also Sansone v. Clifford*, 219 Conn. 217, 229 (1991) ("[I]n an action for wages brought pursuant to General

Statutes § 31-72, awards for double damages and attorney's fees are inappropriate in the absence of the trial court's finding of bad faith, arbitrariness or unreasonableness.") (internal quotation omitted).

Here, although Roberts has shown probable cause to believe that wages were withheld, he has not demonstrated that the defendants acted with bad faith. Rather, the evidence presented at the hearing indicated that there was a genuine disagreement among the parties regarding whether Roberts met all of the benchmarks that would entitle him to the equity payouts. Thus, I decline to grant Roberts a prejudgment remedy in an amount reflecting double damages[6] or attorneys' fees.[7]

    C.    <u>Disclosure of Assets</u>

In addition to his motion for prejudgment remedy, Roberts has also moved for the disclosure of the defendants' assets (doc. # 15), so that he may seek an order of attachment under Conn. Gen. Stat. § 52-278n.

Section 52-278n(a) provides that "[t]he court may, on motion of a party, order an appearing defendant to disclose property in which he has an interest or debts owing to him sufficient to satisfy a prejudgment remedy." Once a plaintiff has established probable cause to support a prejudgment remedy, such disclosure may be ordered by the court. *See* Conn. Gen.

---

[6] Even if Roberts were seeking double damages based solely on the $62,500 in unpaid base salary, rather than the disputed equity payouts, I would still decline to award additional damages in the context of this case. Although there is no dispute that Roberts was entitled to his base salary, by the plaintiff's own admission, Roberts was actually *overpaid* by approximately $63,779 in 2010—an amount that more than off-sets any claim he may have for the $62,500 in unpaid base salary. *See* Pl.'s Ex. 21. Thus, even if the defendants willfully failed to pay Roberts the salary to which he was entitled, under the circumstances presented here, I cannot conclude that the defendants acted unreasonably or in bad faith.

[7] Roberts has offered no evidence whatsoever to substantiate the amount he claims in attorneys' fees. For this reason, too, I decline to award attorneys' fees as part of the prejudgment

Stat. § 52-278n(c); *see also Great Am. Ins. Co. of N.Y. v. Summit Exterior Works, LLC*, No. 3:10-cv-1669 (JBA) (JGM), 2011 WL 4742218, at *4 (D. Conn. Oct. 11, 2011).

Here, for the reasons articulated above, Roberts has established probable cause to support a prejudgment remedy in the amount of $8,858,949.  Because it is unclear whether the defendants have any assets within Connecticut to satisfy the prejudgment remedy, Roberts' motion for disclosure of assets (doc. # 15) is granted.  Within 30 days of this order, the defendants shall disclose to Roberts money or property in which they have an interest, or debts owing to them, sufficient to provide security in the amount of $8,858,949.

### IV.    Conclusion

In sum, the plaintiff's motion for prejudgment remedy (doc. # 14) is GRANTED in the amount of $8,858,949.  In addition, the plaintiff's motion for disclosure of assets (doc. # 15) is also GRANTED.

It is so ordered.

Dated at Bridgeport, Connecticut, this 20th day of June 2013.

   /s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge

---

remedy.