UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------------X

BENJAMIN ROBERTS,                                   :
                                                    :
          Plaintiff,                                :
                                                    :       Index No. 3:12 CV 1222 (SRU)
          v.                                        :
                                                    :       **EFC CASE**
TRIPLANET PARTNERS LLC,                             :       **ELECTRONICALLY FILED**
SOPHIEN BENNACEUR, IMED                             :
BENNACEUR, and MOEZ BENNACEUR,                      :
                                                    :
          Defendants.                               :
------------------------------------------------------------X

## AMENDED COMPLAINT

Plaintiff Benjamin Roberts ("Roberts"), by and through his attorneys, O'Rourke &

Associates, LLC, as and for his Amended Complaint against defendants TriPlanet Partners LLC

("TriPlanet" or the "Company"), Sophien Bennaceur, Imed Bennaceur and Moez Bennaceur

(collectively, "Defendants"), respectfully alleges as follows:

## NATURE OF CAUSE OF ACTION

1.     As more particularly detailed below, Roberts' former employer, TriPlanet, and

both Sophien Bennaceur and Imed Bennaceur, as officers, majority owners and managers of

TriPlanet, failed to pay Roberts earned wages consisting of two annual equity payouts arising

from his equity ownership interest in the Company ("Annual Equity Payouts"), plus wages

earned in May and June 2012, and otherwise deprived Roberts of his equity ownership in the

Company in contravention of the terms of Roberts' employment contract with TriPlanet.  As set

forth below, Roberts has also learned, since the entry of the Prejudgment Remedy Order in this

case on June 20, 2013, that Defendant Sophien Bennaceur has conspired with his brother,

Defendant Moez Bennaceur, to fraudulently transfer assets in order to hinder, delay or defraud Roberts with respect to his pursuing his claims.

2. Accordingly, Roberts brings this action based on several grounds against the Defendants (i) to recover compensatory damages for breach of Roberts' employment contract, and wages wrongfully withheld in violation of Connecticut law, plus statutory damages thereon, and (ii) to obtain lawful recognition of his entitlement to 25% equity ownership interest in TriPlanet, or alternatively, to recover compensatory damages for his 25% equity ownership interest in TriPlanet.

3. Specifically, Roberts brings this action against TriPlanet for (i) breach of contract; (ii) violation of the Connecticut Wage Statute, including Conn. Gen. Stat. §§ 31-71a *et seq.*, and § 31-72; (iii) conversion with respect to Roberts' 25% equity ownership interest in TriPlanet; and (iv) a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Roberts is the rightful owner of 25% equity ownership interest in TriPlanet or to be compensated for the value thereof.

4. Roberts brings this action against Sophien Bennaceur, as TriPlanet's Chief Executive Officer and a majority owner of TriPlanet, and against Imed Bennaceur, as TriPlanet's Chief Technology Officer and a majority owner of TriPlanet, both of whom controlled TriPlanet and were managers acting with full management authority over the affairs of TriPlanet, for (i) violating Connecticut's Wage Statute, including Conn. Gen. Stat. §§ 31-71a *et seq.*, and § 31-72, by failing to pay wages to Roberts; (ii) violating Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78 *et seq.*, and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, by knowingly making false, manipulative and deceptive representations to Roberts concerning Roberts' rights to an equity ownership interest in TriPlanet, which representations were made for the purpose of inducing Roberts to accept an offer of employment and to continue

working for TriPlanet; (iii) fraud on the grounds that both Sophien Bennaceur and Imed Bennaceur repeatedly made false representations to, or omitted truthful information with respect to Roberts' equity ownership interest in TriPlanet with the wrongful intent of inducing Roberts to continue working for TriPlanet; (iv) breach of fiduciary duties owed to Roberts; (v) conversion on the grounds that, on behalf of TriPlanet, Sophien Bennaceur and Imed Bennaceur both acted to terminate Roberts with the intent of improperly and wrongfully retaining for their own benefit Roberts' 25% minority equity ownership interest in TriPlanet.

5.      As a result of Sophien Bennaceur's and Imed Bennaceur's breach of fiduciary duties, Roberts also seeks an accounting from TriPlanet, Sophien Bennaceur and Imed Bennaceur with respect to his equity ownership interest in the Company.  As a result of the Defendants' conversion of Roberts' equity ownership interest in TriPlanet, Roberts also seeks the imposition of a constructive trust in order to protect his interest in the Company.

6.      Roberts asserts against Sophien Bennaceur and Moez Bennaceur two causes of action, one for violation of Connecticut's Uniform Fraudulent Transfer Act, Conn. Gen. Stat. §§ 52-552b *et seq.* ("CUFTA"), and for common law fraudulent transfer, arising out of the transfer by Sophien Bennaceur of his apartment, located at 402 West Broadway, New York, New York, and valued at over $1.9 million, to his brother, Moez Bennaceur, for zero consideration, after Roberts filed a lawsuit against Sophien Bennaceur and within weeks of this Court's hearing on Roberts' Application for Prejudgment Remedy.

7.      Finally, Roberts brings this action against Sophien Bennaceur, who was at all relevant times TriPlanet's Chief Executive Officer, a majority owner of TriPlanet, and a manager who acted with full management authority over the affairs of TriPlanet, for fraudulent inducement, because Sophien Bennaceur knowingly made material misrepresentations with

regard to Roberts' compensation and entitlement to an equity ownership interest in the Company with the intent to induce him into  leaving his former highly secure and lucrative position to work for TriPlanet, causing Roberts to suffer actual damages.

## THE PARTIES

8.     Roberts maintains a principal residence located at 50 Old Redding Road in Weston, Connecticut.

9.     TriPlanet is a limited liability company organized under the laws of Delaware with a usual place of business located at 40 Wall Street, 28th Floor, in New York, New York, with additional offices in London and Tunisia.

10.    According to its website, TriPlanet is a global consulting firm specializing in the business of management and information technology consulting, recruiting, and staffing.

11.    At all relevant times, upon information and belief, Sophien Bennaceur was TriPlanet's Chief Executive Officer and a manager who acted with full management authority over the affairs of TriPlanet.  Sophien Bennaceur also made representations to Roberts that he was at all times a majority owner of TriPlanet.  Upon information and belief, Sophien Bennaceur maintains a residence in New York, New York.

12.    At all relevant times, upon information and belief, Imed Bennaceur was Chief Technology Officer and a manager who acted with full management authority over the affairs of TriPlanet.  Imed Bennaceur also made representations to Roberts that he was at all times a majority owner of TriPlanet.  Upon information and belief, Imed Bennaceur maintains a residence in Jersey City, New Jersey.

13.    Upon information and belief, Defendant Moez Bennaceur is a resident of the State of New York.

## JURISDICTION AND VENUE

14.     This Court has federal question jurisdiction over the subject matter of this action because Roberts seeks a declaratory judgment against TriPlanet, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and because Roberts contends that both Sophien Bennaceur and Imed Bennaceur, as majority owners and on behalf of TriPlanet, violated Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.

15.     This Court also has diversity jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. § 1332, because at all relevant times, Roberts resided in Connecticut, while TriPlanet was organized under the laws of Delaware with a usual place of business in New York, Sophien Bennaceur resided in New York, London and Tunisia, Imed Bennaceur resided in New Jersey, London and Tunisia, and Moez Bennaceur resides in New York, and because the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs.

16.     This Court has personal jurisdiction over TriPlanet, and both Sophien Bennaceur and Imed Bennaceur, pursuant to Connecticut's long-arm statute, Conn. Gen. Stat. § 52-59b, because TriPlanet, Sophien Bennaceur and Imed Bennaceur negotiated the terms of Roberts' employment while Roberts was a Connecticut resident, including making numerous telephone calls and sending numerous emails and other communications to Roberts in Connecticut. TriPlanet, through Sophien Bennaceur and Imed Bennaceur, also knowingly employed Roberts, a resident of Connecticut, who consistently worked from a home office in Connecticut for TriPlanet.  TriPlanet also paid Roberts wages in Connecticut, and forwarded Federal Form W-2s and 1099s to Roberts' Connecticut residence.  This Court has personal jurisdiction over Moez Bennaceur pursuant to Conn. Gen. Stat. § 52-59b(a)(3) because Moez Bennaceur engaged in a

tort outside of the State of Connecticut that caused injury to the Plaintiff in Connecticut, because

Moez Bennaceur should reasonably have expected his conduct to impact a resident of the State

of Connecticut, and because Moez Bennaceur derives substantial revenue from interstate or

international commerce.  As set forth below, all known facts indicate that Moez Bennaceur was

complicit in his brother's efforts to fraudulently transfer assets formerly belonging to Sophien

Bennaceur in an effort to hinder, delay or defraud Roberts, a Connecticut resident, from pursuing

his claims.

17.     Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b)(2), because a

substantial part of the events or omissions giving rise to the claims occurred in this judicial

district.

## FACTS COMMON TO ALL COUNTS

18.     Roberts has nearly 20 years of business and systems information experience in the

financial services industry.  From December of 2007, Roberts held the position of Vice President

and Chief Information Officer at The Hartford Insurance Group ("The Hartford").

19.     Roberts first met Sophien Bennaceur in or around April 2010.  During an initial

meeting between Roberts and Sophien Bennaceur, on or about April 8, 2010, in Miami, Florida,

Sophien Bennaceur suggested that Roberts should join his firm, TriPlanet, as an equity interest

owner.

20.     These discussions continued over the course of several months by and through

Roberts' home office in Connecticut.

21.     During a follow-up dinner meeting in May 2010, Sophien Bennaceur again

discussed at length a potential role for Roberts with TriPlanet as a "Delivery Lead" for a major

project that TriPlanet had begun to negotiate with Royal Bank of Scotland.  Sophien Bennaceur again discussed granting Roberts an equity ownership interest in TriPlanet.

22.     At a meeting on July 22, 2010, Sophien Bennaceur offered Roberts an ownership position with TriPlanet, and the two discussed an outline of salary requirements.  Sophien Bennaceur represented to Roberts that, in addition to a base salary, Roberts would also receive stock representing an equity ownership interest in TriPlanet.  The purpose of this offer was to induce Roberts to leave his lucrative and secure position with The Hartford in order to join TriPlanet.  Sophien Bennaceur drafted the initial offer and a nondisclosure agreement for Roberts to consider.

23.     During the course of these discussions, Sophien Bennaceur led Roberts to believe that he had been Chief Information Officer of SAP Americas for five years, thus lending credibility to his claims about running TriPlanet.  However, Roberts later learned, in or around April 2012, that Sophien Bennaceur had only served as Chief Information Officer for SAP Americas for five (5) months and not five (5) years.

24.     During the negotiation process, and in order to induce Roberts to leave his position with The Hartford and join TriPlanet, Sophien Bennaceur orally confirmed to Roberts that, in addition to a base salary, Roberts would receive a 15% equity ownership interest in TriPlanet that would lead to annual equity payouts commensurate with his 15% equity ownership interest.

25.     On July 28, 2010, Sophien Bennaceur forwarded to Roberts an Employment Agreement on behalf of TriPlanet ("Employment Agreement"), which offered Roberts a full-time position, referred to as "Engagement Partner," responsible for providing business and

information technology consulting and related services to TriPlanet's clients, which offer

Roberts accepted.

26.     Consistent with Sophien Bennaceur's previous representations, the Employment

Agreement included an annual gross base salary of £325,000 (approximately US $505,034 based

upon current exchange rates) to be paid in equal portions at the end of every calendar month.

The Employment Agreement also stated that Roberts would be granted a 15% equity ownership

interest in TriPlanet.  Roberts also was entitled to receive additional benefits, including

healthcare, life insurance and participation in the Company's 401K Plan.

27.     The Employment Agreement also provided that, arising from Roberts' 15%

equity ownership interest in TriPlanet, Roberts would receive Annual Equity Payouts, based on

Roberts' ownership percentage in TriPlanet, of the Company's after-tax profits, which Annual

Equity Payout was to be paid each February of the following calendar year assuming certain

specific targets were completed in a timely manner.  Specifically, the Employment Agreement

set forth the following objective annual targets to be achieved between 2010 and 2013:

     a.        For 2010, billable to client work at 75% utilization, and actual client

annual run rate revenue of £20 million (approximately US $31.079 million based upon

current exchange rates) as of December 2010;

     b.        For 2011, billable to client work at 70% utilization, and annual total client

revenue of £20 million (or US $31.079 million) or higher;

     c.        For 2012, billable to client work at 70% utilization, and annual total client

revenue of £20 million (or US $31.079 million) or higher;

     d.        For 2013, annual total client revenue of £15 million (or US $23.309

million) or higher; and

e.        Gross margin of 40% or higher.

28.    Additionally, the Employment Agreement provided Roberts with the opportunity to increase his 15% equity ownership interest in TriPlanet by an additional 10% based upon his meeting objective goals of a performance management plan ("PMP") that would be developed and agreed upon by TriPlanet's management, bringing Roberts' potential total equity ownership interest in TriPlanet from 15% to 25% ("Additional Ownership Interest").

29.    Assuming Roberts met the objective goals in the PMP and earned the 10% Additional Ownership Interest in TriPlanet, he would also be entitled to an additional 10% in Annual Equity Payouts, bringing his total Annual Equity Payout to 25% of TriPlanet's after-tax profits.

30.    Roberts accepted the terms of the Employment Agreement, which became a binding employment contract between Roberts and TriPlanet.  After accepting the terms of the Employment Agreement as set forth above, Roberts resigned from his employment with The Hartford, forfeited his stock options, benefits and retirement pension with The Hartford, and otherwise forewent other lucrative opportunities, to begin working for TriPlanet in August 2010.

31.    Shortly after his employment commencement date, Roberts and TriPlanet management, including both Sophien Bennaceur and Imed Bennaceur, developed and agreed upon the terms of a PMP that would entitle Roberts to the 10% Additional Ownership Interest.

32.    In October 2010, well before the end of 2010, Roberts and his team at TriPlanet successfully reached the objective 2010 annual targets recited in the Employment Agreement, due, in large part, to Roberts' efforts.  Accordingly, Roberts was entitled to receive, and should have received, the 15% Annual Equity Payout for 2010.

33.     In February 2011, when the first Annual Equity Payout to Roberts was due to be paid, Sophien Bennaceur assured Roberts that he was entitled to the 15% Annual Equity Payout for 2010, and that it would be paid eventually.  Throughout 2011, Sophien Bennaceur repeated his assurances to Roberts that the Annual Equity Payout for 2010 would be forthcoming.

34.     Sophien Bennaceur knew that TriPlanet would never pay Roberts the Annual Equity Payout for 2010, and was acting instead with the sole intention and purpose of inducing Roberts to continue his employment with TriPlanet, because Roberts was providing significant value to Sophien Bennaceur, Imed Bennaceur and TriPlanet.

35.     Accordingly, despite meeting the 2010 objective targets outlined in the Employment Agreement, and earning the 15% Annual Equity Payout for 2010, which was payable in February 2011, and despite repeated assurances from Sophien Bennaceur, Roberts was never paid the 15% Annual Equity Payout that he had earned and was owed to him by TriPlanet for 2010.

36.     Moreover, despite the express terms in the Employment Agreement regarding health, life insurance and 401K benefits to which Roberts was entitled, no such benefits were ever provided to Roberts.  In short, Sophien Bennaceur had made false representations to Roberts regarding his entitlement to additional non-monetary benefits for the purposes of inducing Roberts to leave The Hartford to work for TriPlanet.

37.     Again, under Roberts' exceptional leadership and work efforts, by February 2011 – a full ten (10) months before the end of the calendar year – TriPlanet reached the targeted goals for 2011 recited in the Employment Agreement, due, in large part, to Roberts' efforts. Accordingly, Roberts again had earned, and was entitled to receive and should have received, in February of 2012, his Annual Equity Payout for 2011.

38.     Sophien Bennaceur was so pleased with the outstanding success of Roberts in reaching these goals that, in or about May 2011, Sophien Bennaceur not only confirmed that Roberts was entitled to the 15% Annual Equity Payout for 2011, but he agreed on behalf of TriPlanet that Roberts had met the objective goals set forth in his PMP, and had earned the 10% Additional Ownership Interest in TriPlanet, as set forth in the Employment Agreement, increasing Roberts' total equity ownership interest in TriPlanet to 25%.

39.     These assurances regarding the increase in Roberts' equity ownership interest were repeated to Roberts by Imed Bennaceur.  However, both Sophien Bennaceur and Imed Bennaceur made these representations knowing that neither they, nor TriPlanet, would ever honor the commitment to Roberts.

40.     Again, the sole intention of Sophien Bennaceur and Imed Bennaceur in making these false representations was to induce Roberts to continue his employment with TriPlanet because Roberts was providing significant value to TriPlanet, and to both Sophien Bennaceur and Imed Bennaceur.

41.     In May 2011, Roberts met separately with the Bennaceurs' brother, Hazem, who Roberts also believed held an equity ownership interest in TriPlanet.  Hazem Bennaceur confirmed the brothers' agreement to give Roberts the 10% Additional Ownership Interest in TriPlanet based on Roberts' success in meeting the goals in his PMP and in driving TriPlanet to meet its annual targets in such a short time.  In fact, at several dinners that Roberts attended with the Bennaceur brothers after May 2011, the brothers joked with Roberts that he was now responsible for paying for 25% of the dinner bill.

11

42.     During the first quarter of 2011, Roberts repeatedly requested to see evidence of his equity ownership interest in TriPlanet, and both Sophien Bennaceur and Imed Bennaceur repeatedly represented to Roberts that those papers were in the process of being drawn up.

43.     In the third quarter of 2011, both Sophien Bennaceur and Imed Bennaceur represented to Roberts that papers evidencing Roberts' equity ownership interest were on file in TriPlanet's New York office.  However, when Roberts went to investigate the same, Roberts found no such documentary evidence of his equity ownership interest.  To the contrary, Roberts located documents suggesting that, despite constant representations and assurances that Roberts, along with Sophien Bennaceur and Imed Bennaceur, were owners of TriPlanet (along with Hazem Bennaceur), those documents made clear that Roberts' equity ownership interest had never been formalized.

44.     In February 2012, when the Annual Equity Payout for 2011 was due to be paid to Roberts, pursuant to the Employment Agreement and based on Roberts' 25% ownership in TriPlanet, Roberts again was not paid the wages he was owed by TriPlanet.

45.     Despite acknowledging to Roberts that his work efforts had significantly contributed to TriPlanet's success in reaching and exceeding the Company's objective 2011 targets and Roberts' PMP, in the spring of 2012, Sophien Bennaceur flatly denied Roberts' request to be paid the Annual Equity Payout for 2011.

46.     Sophien Bennaceur also explained to Roberts that he was adjusting the financial figures of the Company to operate on a "cash accounting basis," thereby pushing all the 2011 revenues into TriPlanet's 2012 financial year.  This was a clear and improper action to recast the 2011 financial data of the Company in an attempt to reduce the amount of the 2011 Annual Equity Payout earned by, and owed to, Roberts.

47.     In June 2012, when further questioned by Roberts about receiving the Annual Equity Payouts to which he was entitled for 2010 and 2011, Sophien Bennaceur wrote in an email to Roberts that TriPlanet had already paid Roberts an amount of approximately US $2 Million, which Sophien Bennaceur argued represented Roberts' 15% Annual Equity Payouts for 2010 and 2011.  Based upon Roberts' estimates of TriPlanet's after-tax profits for both years, however, Sophien Bennaceur grossly understated the actual amount owed to Roberts.  Sophien Bennaceur also improperly included "client recoverable" expenses in the US $2 Million claimed to have been paid to Roberts, in an attempt to skew the amounts paid to Roberts to appear greater than they were.

48.     In this email, Sophien Bennaceur also refused to acknowledge that the Annual Equity Payout for 2011 should have been increased to 25% based upon Roberts' meeting the objective goals in his PMP and earning the 10% Additional Ownership Interest in TriPlanet, as previously acknowledged by both Sophien Bennaceur and Imed Bennaceur, as well as their brother, Hazem.

49.     In fact, despite Sophien Bennaceur's claim that Roberts had been paid his Annual Equity Payouts for 2010 and 2011, the US $2 Million amount specified by Sophien Bennaceur in his email was comprised of two (2) years of Roberts' base salary (US $505,000 per year), plus two (2) years of expenses for such items as travel and relocation costs of approximately US $285,000 (80% to 90% of which were client recoverable expenses and should not be considered compensation), plus what Sophien Bennaceur claimed constituted two (2) years of Annual Equity Payments totaling a mere US $715,000, which sum falls far short of the earned Annual Equity Payment for 2010 (15%) and for 2011 (25%).

50.     Based on the invoices that were charged by TriPlanet to its clients in 2011 alone, Roberts believes that TriPlanet's annual revenues were approximately US $70 Million, which would result in substantial after-tax profits and an Annual Equity Payout in excess of US $10 Million earned by, and due to, Roberts.

51.     Sophien Bennaceur and Roberts exchanged a series of emails, in or about May 2012, relating to the wages and equity ownership interest that TriPlanet owed to Roberts for 2010 and 2011.  During this exchange, Roberts asserted his right to be paid not just an arbitrary amount of US $715,000 as his Annual Equity Payout, but rather he demanded the full amount, based on the terms of the Employment Agreement, that accurately reflected his equity ownership interest in TriPlanet for 2010 and 2011, of an amount not less than US $15 Million.

52.     At about this time, Imed Bennaceur assured Roberts that he would convene a TriPlanet owners' meeting to clarify each party's equity ownership in the Company and to resolve any dispute over sums that Roberts claimed to be owed, but despite Imed Bennaceur's assurances that such a meeting would be arranged, no such meeting took place.

53.     Instead, in response to Roberts' requests for assurances, on June 11, 2012, as Roberts was traveling from New York to TriPlanet's London offices after working for three days in Connecticut for TriPlanet, Sophien Bennaceur sent a text message to Roberts accusing him of "job abandonment," and stating that Roberts' employment with TriPlanet was terminated immediately.  Having not received this communication while en route to London, Roberts proceeded to TriPlanet's London offices to work where he was informed by the office manager that he was no longer employed by TriPlanet.  Roberts was asked to immediately return his laptops, mobile telephone, and all other TriPlanet property.

54.     During that same day, despite terminating Roberts, Sophien Bennaceur contacted Roberts via text message and requested that he come to Tunisia that afternoon to attend a series of meetings in the following days with senior Tunisian government officials and senior executives at a bank that Sophien Bennaceur was looking to acquire.  Sophien Bennaceur even attempted to convince Roberts to meet with a prospective TriPlanet client, Deutsche Bank, on June 28, 2012, after Roberts had been terminated by Sophien Bennaceur.

55.     By letter dated June 22, 2012, Roberts' employment with TriPlanet was officially terminated, effective June 11, 2012, despite the fact that Roberts had not only performed all of his contractual obligations throughout the course of his employment, but he also had reached his PMP goals to earn the 10% Additional Ownership Interest in TriPlanet.

56.     Despite Roberts' demand to be paid the full amount of his 15% Annual Equity Payout for 2010, and his 25% Annual Equity Payout for 2011, rather than the woefully underestimated US $715,000 he was paid, and to have his 25% equity ownership interest in TriPlanet recognized, Sophien Bennaceur and Imed Bennaceur refused to pay Roberts and refused to recognize or acknowledge his 25% equity ownership interest, in breach of TriPlanet's contractual obligations owed to Roberts.

57.     The Defendants also refused to pay Roberts his regular base salary for May 2012, and for the first seven (7) working days of June 2012, totaling approximately £37,000 (or US $57,496 based on current exchange rates).

58.     As a direct result of TriPlanet's breach of its contractual obligations, Roberts has suffered damages.  Moreover, as a direct result of TriPlanet's breach, Roberts has not been paid significant wages of an amount well in excess of US $15 Million, based on estimates of TriPlanet's after-tax profits for 2010 and 2011.

## COUNT I
## BREACH OF CONTRACT
### (against TRIPLANET)

59.     Roberts repeats and realleges the allegations contained in paragraphs 1 through 58 as though fully set forth herein.

60.     The Employment Agreement from TriPlanet to Roberts, the terms of which Roberts accepted, constituted a valid and enforceable contract between TriPlanet and Roberts.

61.     Roberts and TriPlanet entered into an enforceable contract under which Roberts was entitled to receive compensation including, among other things, Annual Equity Payouts for 2010 (15% of TriPlanet's after-tax profits) and 2011 (25% of TriPlanet's after-tax profits), as well as the initial 15% Ownership Interest in TriPlanet.

62.     Roberts performed – and even exceeded – all of his contractual obligations as set forth in the Employment Agreement.

63.     TriPlanet breached the terms of the Employment Agreement by failing to pay Roberts' compensation of his 15% Annual Equity Payout for 2010, and his 25% Annual Equity Payout for 2011, and by not acknowledging his 25% equity ownership interest in TriPlanet.

64.     Moreover, the Defendants have refused to pay Roberts his regular base salary for twenty-three (23) working days in May 2012, and the first seven (7) working days of June 2012 for a total of six (6) weeks of pay.

65.     As a direct result of TriPlanet's breach, Roberts has suffered damages.

## COUNT II
## VIOLATIONS OF CONNECTICUT WAGE STATUTE,
### Conn. Gen. Stat. §§ 31-71a *et seq.*
### (against ALL DEFENDANTS except MOEZ BENNACEUR)

66.     Roberts repeats and realleges the allegations contained in paragraphs 1 through 65 as though fully set forth herein.

67.     Pursuant to the Employment Agreement, Roberts was entitled to receive a base salary of £325,000 payable in 12 monthly installments.  Upon his termination, effective June 11, 2012, the Defendants failed to pay Roberts his base salary for all of May 2012, and for the first seven (7) working days of June 2012, in an amount of approximately £37,000 (or US $57,496 based on current exchange rates).

68.     Roberts' monthly base salary payments constitute "wages" in accordance with Connecticut's Wage Statute, Conn. Gen. Stat. § 31-71a.

69.     Pursuant to the Employment Agreement, Roberts also was entitled to receive compensation in addition to his annual base salary consisting of Annual Equity Payouts payable upon completion of specific, objective targets.

70.     In 2010 and 2011, Roberts and TriPlanet met and exceeded the specific objective targets, thus triggering Roberts' entitlement to Annual Equity Payouts for 2010 (15% of TriPlanet's after-tax profits), and for 2011 (25% of TriPlanet's after-tax profits) as additional compensation.

71.     The Annual Equity Payout for 2010 (15% of TriPlanet's after-tax profits), and for 2011 (25% of TriPlanet's after-tax profits), constitute "wages" in accordance with Connecticut's Wage Statute, Conn. Gen. Stat. § 31-71a.

72.     TriPlanet failed to pay these wages to Roberts, in direct violation of Connecticut's Wage Statute, including Conn. Gen. Stat. §§ 31-71a *et seq.*, and § 31-72.

73.     As the Chief Executive Officer, majority owner and a manager who acted with full management authority over the affairs of TriPlanet, as well as a person authorized by TriPlanet to pay wages to TriPlanet's employees, including Roberts, Sophien Bennaceur is

individually and personally liable to Roberts for failing to pay wages in violation of Connecticut's Wage Statute, Conn. Gen. Stat. §§ 31-71a *et seq*.

74.     As a majority owner of TriPlanet and a manager who acted with full management authority over the affairs of TriPlanet, and as a person authorized by TriPlanet to pay wages to TriPlanet's employees, including Roberts, Imed Bennaceur is individually and personally liable to Roberts for failing to pay wages in violation of Connecticut's Wage Statute, Conn. Gen. Stat. §§ 31-71a *et seq*.

75.     Indeed, despite an obligation under United States law, the Defendants have failed to provide Roberts with either a Tax Form W-2 or 1099 for wages earned in calendar year 2011, despite Roberts' repeated requests for such documentation.

76.     There are no statutory exemptions available to any of the Defendants with respect to the obligation to pay such wages to Roberts.

77.     The Defendants' failure to pay such wages to Roberts was willful, unreasonable, arbitrary and/or undertaken in bad faith.

78.     As a direct result of the foregoing, Roberts is entitled to an award of double damages and reasonable attorneys' fees, costs and disbursements, together with such other legal and equitable relief as may be deemed just and proper.

79.     The Defendants, and each of them, are jointly and severally liable to Roberts for violations of Connecticut's Wage Statute.

**COUNT III**
**FRAUDULENT INDUCEMENT**
**(against SOPHIEN BENNACEUR)**

80.     Roberts repeats and realleges the allegations contained in paragraphs 1 through 79 as though fully set forth herein.

18

81.     To induce Roberts to leave his lucrative employment at The Hartford and join TriPlanet, Sophien Bennaceur knowingly and falsely represented to Roberts that he would be granted an initial 15% equity ownership interest in TriPlanet and, upon meeting certain objective annual goals, Roberts would also be entitled to Annual Equity Payouts, based on his percentage ownership in TriPlanet, as additional compensation for his employment with TriPlanet.

82.     Sophien Bennaceur also knowingly and falsely represented to Roberts that he would be granted the 10% Additional Ownership Interest in TriPlanet, which would likewise increase his Annual Equity Payouts, bringing Roberts' total equity ownership interest in TriPlanet to 25%, if Roberts reached certain objective targets set forth in his PMP.

83.     Sophien Bennaceur also promised Roberts that, as a TriPlanet employee, he would be entitled to receive significant health, life insurance and 401K benefits.  No such benefits were ever provided to Roberts despite his requests regarding the same.

84.     Sophien Bennaceur made the foregoing misrepresentations knowing them to be false, having no intention of honoring the commitments to Roberts, with the sole intention of inducing Roberts to leave his lucrative position at The Hartford, with all the benefits Roberts received there as an employee, and to accept and continue his employment with TriPlanet, with Sophien Bennaceur and TriPlanet receiving the significant value of Roberts' work efforts.

85.     Sophien Bennaceur's false representations induced Roberts into resigning from The Hartford, signing the Employment Agreement with TriPlanet, and working for TriPlanet.

86.     Despite reaching TriPlanet's objective targets for 2010 and 2011, TriPlanet never paid Roberts the corresponding Annual Equity Payouts, or provided documentation of Roberts' 25% equity ownership interest in TriPlanet.

87.     Accordingly, in reliance on Sophien Bennaceur's representations, Roberts has suffered damages.

**COUNT IV**
**FRAUD**
**(against SOPHIEN BENNACEUR and IMED BENNACEUR)**

88.     Roberts repeats and realleges the allegations contained in paragraphs 1 through 87 as though fully set forth herein.

89.     As set forth above, Sophien Bennaceur made extensive false and misleading representations to Roberts regarding the compensation and benefits Roberts would receive at TriPlanet with the intent to induce Roberts to accept employment with TriPlanet.

90.     To induce Roberts to remain with TriPlanet and continue adding to the financial success of TriPlanet, as well as to Sophien Bennaceur and Imed Bennaceur, Sophien Bennaceur made false statements to Roberts with the sole purpose of convincing Roberts to remain with TriPlanet.

91.     To induce Roberts to remain with TriPlanet and continue adding to the financial success of TriPlanet and both Sophien Bennaceur and Imed Bennaceur, Imed Bennaceur made false statements to Roberts with the sole purpose of convincing Roberts to remain with TriPlanet.

92.     Once employed by TriPlanet, Roberts repeatedly asked both Sophien Bennaceur and Imed Bennaceur, as majority owners and managers of TriPlanet, for assurances regarding his entitlement to the Annual Equity Payouts, as well as to health, life insurance and 401K benefits that he was promised in his Employment Agreement.

93.     Moreover, Roberts repeatedly requested documentary evidence of his equity ownership interest in TriPlanet, to which both Sophien Bennaceur and Imed Bennaceur

repeatedly stated that such documents were being drawn up and existed.  No such documents evidencing Roberts' equity ownership interest in TriPlanet were ever prepared and do not exist.

94.     Sophien Bennaceur knew at the time that he made the representation that TriPlanet would never pay Roberts the actual Annual Equity Payouts and that he had manipulated the financials of the company to hide the large revenues in a later financial year, thereby avoiding payment to Roberts.

95.     Indeed, Sophien Bennaceur made the representation with the full intention of inducing Roberts to continue working for TriPlanet and making TriPlanet so financially successful.

96.     Roberts relied on Sophien Bennaceur's representations, which induced Roberts to continue his successful efforts on TriPlanet's behalf.

97.     Roberts relied on such representations by Sophien Bennaceur to his detriment because TriPlanet never paid Roberts the 2010 and 2011 Annual Equity Payouts, and TriPlanet has failed to recognize or acknowledge Roberts' 25% equity ownership interest in the Company.

98.     Imed Bennaceur also made numerous assurances to Roberts regarding Roberts' equity ownership interest in TriPlanet and his entitlement to Annual Equity Payouts, knowing full well that such representations were false.

99.     When making such assurances to Roberts, Imed Bennaceur knew that nothing had been done, or would be done, to formalize or recognize Roberts' equity ownership interest in TriPlanet as set forth in his Employment Agreement.

100.     Imed Bennaceur intentionally failed to inform Roberts that Roberts had not been formally granted an equity ownership interest in TriPlanet, even though he knew that Roberts

believed he had earned and was entitled to a 25% equity ownership interest in TriPlanet under the terms of his Employment Agreement.

101.    Imed Bennaceur intended to mislead Roberts into believing that Roberts was, in fact, an equity owner of TriPlanet to induce Roberts to continue working for TriPlanet and contributing to the financial success of the Company.

102.    Roberts relied on Imed Bennaceur's false representations and omissions, which induced Roberts to continue his successful efforts on TriPlanet's behalf.

103.    Roberts relied on such representations and omissions by Imed Bennaceur to his detriment because TriPlanet never paid Roberts the 2010 and 2011 Annual Equity Payouts, and TriPlanet has failed to recognize or acknowledge Roberts' 25% equity ownership interest in the Company.

104.    Accordingly, as a direct result of Sophien Bennaceur's and Imed Bennaceur's conduct, Roberts suffered damages, and each is jointly and severally liable to Roberts for such damages.

## COUNT V
## DECLARATORY JUDGMENT
### (against TRIPLANET)

105.    Roberts repeats and realleges the allegations contained in paragraphs 1 through 104 as though fully set forth herein.

106.    Based on the terms of the Employment Agreement, as of December 2010, Roberts was owed a 15% equity ownership interest in TriPlanet.

107.    In the spring of 2011, also based on the terms of the Employment Agreement, and having met the objective goals set forth in his PMP, Roberts earned the 10% Additional Ownership Interest in TriPlanet.  Sophien Bennaceur, Imed Bennaceur and their brother, Hazem, as owners of TriPlanet, each confirmed that Roberts had earned this additional 10% equity ownership interest in the Company.

108.    Upon Roberts' termination in June 2012, TriPlanet refused to recognize or acknowledge Roberts' equity ownership interest in the Company.

109.    Accordingly, Roberts seeks a declaratory judgment that he is currently the owner of a 25% equity ownership interest in TriPlanet.  Alternatively, Roberts seeks a declaratory judgment that he is entitled to compensation from TriPlanet for his 25% equity ownership interest in TriPlanet.

110.    This cause of action is a justiciable controversy, sufficiently definite and concrete to warrant declaratory judgment.

## COUNT VI
## VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10b-5
### (against SOPHIEN BENNACEUR and IMED BENNACEUR)

111.    Roberts repeats and realleges the allegations contained in paragraphs 1 through 110 as though fully set forth herein.

23

112.     The offer in the Employment Agreement to give Roberts an initial 15% equity ownership interest in TriPlanet, plus the offer of the 10% Additional Ownership Interest, qualify as offers for the "purchase or sale" of securities under Section 10(b) of the Exchange Act.

113.     Both Sophien Bennaceur and Imed Bennaceur knowingly made false, manipulative and deceptive statements, as set forth above, concerning Roberts' right to the initial 15% equity ownership interest in TriPlanet.  Sophien Bennaceur and Imed Bennaceur, also knowingly made false, manipulative and deceptive statements, as set forth above, concerning Roberts' right to the 10% Additional Ownership Interest in TriPlanet upon his reaching the objective goals in his PMP.  Sophien Bennaceur and Imed Bennaceur made these materially false statements and misrepresentations to Roberts for the purpose of inducing Roberts to leave his lucrative position with The Hartford and work for TriPlanet.

114.     Despite representations to Roberts regarding his equity ownership interest in TriPlanet and the Defendants' contractual obligations to Roberts regarding the equity ownership interest, Imed Bennaceur knew that the Defendants had no intention of honoring their commitment to Roberts.

115.     Roberts actually relied on these false representations and omissions to his detriment.

116.     Sophien Bennaceur's conduct violates Section 10(b) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder.

117.     As a direct result of Sophien Bennaceur's conduct, Roberts has suffered damages.

118.     Imed Bennaceur's conduct violates Section 10(b) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder.

119.     As a direct result of Imed Bennaceur's conduct, Roberts has suffered damages.

120.     Sophien Bennaceur and Imed Bennaceur are each jointly and severally liable to Roberts for the damages suffered as a result of their respective violations of Section 10(b) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder.

**COUNT VII**
**BREACH OF FIDUCIARY DUTIES**
**(against SOPHIEN BENNACEUR and IMED BENNACEUR)**

121.     Roberts repeats and realleges the allegations contained in paragraphs 1 through 120 as though fully set forth herein.

122.     Pursuant to the terms of the Employment Agreement, Roberts initially received a 15% equity ownership interest in TriPlanet.  In February 2011, pursuant to the terms of the Employment Agreement and after reaching the objective goals set forth in his PMP, Roberts earned the 10% Additional Ownership Interest in TriPlanet, bringing his total equity ownership interest in the Company to 25%.

123.     Sophien Bennaceur, as TriPlanet's Chief Executive Officer, a majority owner and a manager who acted with full management authority over the affairs of TriPlanet, confirmed Roberts' 25% equity ownership interest in TriPlanet.

124.     As TriPlanet's Chief Executive Officer, a majority owner and manager who acted with full management authority over the affairs of TriPlanet, Sophien Bennaceur owed Roberts the fiduciary duties of loyalty and care.

125.     Roberts placed a very particular and special trust in Sophien Bennaceur, in his position as Chief Executive Officer, majority owner and manager who acted with full management authority over the affairs of TriPlanet, to oversee and protect Roberts' 25% equity ownership interest in TriPlanet.

126.    Imed Bennaceur, as a majority owner and a manager who acted with full management authority over the affairs of TriPlanet, confirmed Roberts' equity ownership interest in TriPlanet.

127.    As a majority owner and a manager who acted with full management authority over the affairs of TriPlanet, Imed Bennaceur owed Roberts the fiduciary duties of loyalty and care.

128.    Roberts placed a very particular and special trust in Imed Bennaceur, in his position as a majority owner of TriPlanet and a manager who acted with full management authority over the affairs of TriPlanet, to oversee and protect Roberts' 25% equity ownership interest in TriPlanet.

129.    Imed Bennaceur knowingly and willfully breached his fiduciary duties to Roberts by denying Roberts his 25% equity ownership in TriPlanet.

130.    As a direct and proximate result of the breach of their fiduciary duties by Sophien Bennaceur and Imed Bennaceur owed to Roberts, Roberts sustained significant damages, including but not limited to the value of his 25% ownership in TriPlanet along with the costs, expenses and attorneys' fees associated with prosecuting the instant litigation.

131.    Sophien Bennaceur and Imed Bennaceur are each jointly and severally liable to Roberts for the damages suffered as a result of their respective breaches of fiduciary duties.

132.    By reason of the foregoing, Roberts should be awarded compensatory and punitive damages in an amount to be determined at trial, together with his costs, expenses and reasonable attorney's fees associated with prosecuting the instant action, together with such other legal and equitable relief as may be just and proper.

## COUNT VIII
## CONVERSION
### (against ALL DEFENDANTS except MOEZ BENNACEUR)

133.   Roberts repeats and realleges the allegations contained in paragraphs 1 through 132 as though fully set forth herein.

134.   By reason of the foregoing, the Defendants have intentionally, wrongfully and without authorization taken, exercised dominion and control over, interfered with, retained and converted to their own use and benefit Roberts' property to the exclusion of Roberts' rights and to Roberts' detriment.

135.   Upon information and belief, the Defendants each intended to convert Roberts' equity ownership interest in TriPlanet in order to enhance their own financial interests at the expense of Roberts' interests.

136.   The Defendants have no right, title or valid interest in Roberts' equity ownership interest in TriPlanet, or to any part thereof.

137.   As a direct and proximate result of the Defendants' actions, Roberts has sustained significant damages.

138.   The Defendants, and each of them, are jointly and severally liable to Roberts for the damages that he has sustained.

139.   Accordingly, Roberts should be awarded compensatory and punitive damages in an amount to be determined at trial, together with such other legal and equitable relief as may be just and proper.

## COUNT IX
## CIVIL THEFT (Conn. Gen. Stat. § 52-564)
## (against SOPHIEN BENNACEUR AND IMED BENNACEUR)

### *DISMISSED PURSUANT TO THIS COURT'S*
### *DECISION AND ORDER OF MARCH 12, 2013*

140.    Roberts repeats and realleges the allegations contained in paragraphs 1 through 139 as though fully set forth herein.

141.    By reason of the foregoing, Sophien Bennaceur and Imed Bennaceur have intentionally, wrongfully and without authorization taken, exercised dominion and control over, interfered with, retained and converted to their own use and benefit Roberts' property to the exclusion of Roberts' rights and to Roberts' detriment.

142.    Upon information and belief, Sophien Bennaceur and Imed Bennaceur each intended to take Roberts' equity ownership interest in TriPlanet in order to enhance their own financial interests at the expense of Roberts' interests.

143.    Sophien Bennaceur and Imed Bennaceur have no right, title or valid interest in Roberts' equity ownership interest in TriPlanet, or to any part thereof.

144.    Sophien Bennaceur's and Imed Bennaceur's theft of Roberts' equity ownership interest in TriPlanet constitutes larceny under Conn. Gen. Stat. §§ 53a-119(2), (3), and constitutes civil theft in violation of Conn. Gen. Stat. § 52-564.

145.    As a direct and proximate result of the Defendants' actions, Roberts has sustained significant damages for which Sophien Bennaceur and Imed Bennaceur are jointly and severally liable.

146.    As a result of the foregoing, Roberts is entitled to treble damages pursuant to Conn. Gen. Stat. § 52-564.

## COUNT X
## ACCOUNTING
### (against ALL DEFENDANTS)

147.     Roberts repeats and realleges the allegations contained in paragraphs 1 through 146 as though fully set forth herein.

148.     Sophien Bennaceur and Imed Bennaceur, as majority owners and managers of TriPlanet with full management authority over the affairs of TriPlanet, are obligated to maintain TriPlanet's books and records, and to provide reasonable access to those books and records to Roberts as an equity owner of TriPlanet.

149.     The business relationship created by the Employment Agreement granting Roberts an equity ownership interest in the Company involves a necessary degree of confidence and trust that Roberts' interests will be protected by the Defendants.

150.     By their conduct in terminating Roberts, in breach of the Employment Agreement, and the Defendants' refusal and/or failure to recognize Roberts' 25% equity ownership interest in TriPlanet, Sophien Bennaceur and Imed Bennaceur have prevented access to TriPlanet's books and records.

151.     As a direct result of the Defendants' conduct, Roberts has no way of determining the value of his equity ownership interest in TriPlanet, and he has no way of ascertaining the exact amount of the Annual Equity Payments due him for 2010 and 2011.

152.     Indeed, despite an obligation under United States law, the Defendants have failed to provide Roberts with either an IRS Tax Form W-2 or 1099 for wages earned in calendar year 2011, despite Roberts' repeated requests for such documentation.

153.     For calendar year 2010, Roberts was initially provided with an IRS Tax Form W-2. However, he was subsequently provided by TriPlanet with a handwritten 1099 for all of the

29

wages earned in 2010, suggesting that TriPlanet had not withheld any state and/or federal income tax on Roberts' behalf for 2010.  Upon questioning by Roberts, he was told to disregard the 1099.

154.    Moreover, upon information and belief, Sophien Bennaceur and Imed Bennaceur have wrongfully transferred significant sums of capital out of TriPlanet bank accounts held at Barclays Bank and into either their personal accounts or accounts related to other entities wholly owned by the Bennaceur family.

155.    Roberts is entitled to a full accounting with regard to TriPlanet's revenues, profits and overall value, and such an accounting is necessary to value and protect Roberts' equity ownership interest in TriPlanet.

156.    Roberts also is entitled to a full accounting with regard to the wages already paid to Roberts, including specific documentation regarding any and all local, state and/or federal taxes withheld by TriPlanet purportedly on Roberts' behalf.

157.    Based on the foregoing, the equitable remedy of an accounting is necessary and should be made available to Roberts.

## COUNT XI
## CONSTRUCTIVE TRUST
### (against ALL DEFENDANTS)

158.    Roberts repeats and realleges the allegations contained in paragraphs 1 through 157 as though fully set forth herein.

159.    As a result of the foregoing, the Defendants have wrongfully acquired and/or retained lawful title in Roberts' equity ownership interest in TriPlanet.

160.    The Defendants, by their conduct, have unjustly acquired and/or retained lawful title in Roberts' equity ownership interest in TriPlanet.

161.    Based on the foregoing, the Defendants would be unjustly enriched should they be permitted to retain lawful title in Roberts' equity ownership interest in TriPlanet.

162.    Accordingly, equity requires that a constructive trust be created and imposed in order to protect Roberts' equity ownership interest in TriPlanet.

## COUNT XII
## VIOLATION OF CONNECTICUT'S UNIFORM FRAUDULENT TRANSFER ACT
### (Defendants SOPHIEN BENNACEUR AND MOEZ BENNACEUR)

163.    Roberts repeats and realleges the allegations contained in paragraphs 1 through 162 as though fully set forth herein.

164.    The original Complaint in this action, setting forth claims of upwards of $15million against Defendants, was filed on or about August 21, 2012.  Defendants were properly served and entered appearances in September 2012.

165.    On information and belief, Sophien Bennaceur purchased a Manhattan apartment, located at 402 West Broadway, New York, New York, in or around October 2012 for over $1.9 million.  Sophien Bennaceur was listed on the tax records for the City of New York as the sole owner of the Manhattan apartment.

166.    At the March 12, 2013 Hearing on Roberts' Application for Prejudgment Remedy, the Court indicated its inclination to grant a prejudgment remedy in favor of Roberts. On June 20, 2013, the Court, in fact, entered a prejudgment remedy in favor of Roberts in the amount of $8,858,949.00, which remains unsatisfied.

167.    Roberts became aware in July 2013, through examination of the tax records for the City of New York, that Sophien Bennaceur had recently transferred ownership of the Manhattan apartment to his brother, Moez Bennaceur, who is an insider, for zero consideration, when the apartment is valued at not less than $1.9 million.

168.     In fact, based upon the tax records and a title search of the Manhattan apartment,

it appears that the transfer occurred on or about March 29, 2013, within two weeks of the hearing

on Roberts' Application for Prejudgment Remedy.

169.     Given the proximity of the transfer to the March 12, 2013 Hearing, and the zero

consideration for an apartment worth at least $1.9 million, it can be reasonably inferred that such

transfer was intentional and in violation of CUFTA, Conn. Gen. Stat. §§ 52–552a to § 52–552l.

170.     Financial records produced to Roberts by Barclays Bank PLC, in compliance with

a subpoena duces tecum, indicate that Sophien Bennaceur and TriPlanet Partners continue to pay

for contractors to renovate the Manhattan apartment after the fraudulent conveyance to Moez

Bennaceur, suggesting that despite the conveyance, Sophien Bennaceur remains in possession or

control of the Manhattan apartment.

171.     Roberts has sufficient indirect evidence that Moez Bennaceur, who is a brother of

Sophien Bennaceur, was complicit and acted with intent to defraud Roberts in participating in

the conveyance of the Manhattan apartment for zero consideration.

172.     Sophien Bennaceur's and Moez Bennaceur's intentional violation of CUFTA is a

clear attempt to hinder, delay and defraud Roberts with respect to his pursuing his claims.

173.     Because this Court has jurisdiction over Sophien Bennaceur and Moez

Bennaceur, pursuant to CUFTA, this Court may enjoin Sophien Bennaceur and Moez Bennaceur

to reverse the unlawful conveyance of the Manhattan apartment.

## COUNT XIII
## COMMON LAW FRAUDULENT CONVEYANCE
### (against SOPHIEN BENNACEUR AND MOEZ BENNACEUR)

174.     Roberts repeats and realleges the allegations contained in paragraphs 1 through

173 as though fully set forth herein.

175.    As set forth above, Sophien Bennaceur's and Moez Bennaceur's conduct in conveying, for zero consideration, the Manhattan apartment, after Roberts commenced this lawsuit against Defendants, and shortly after this Court's Hearing on the Roberts' Application for Prejudgment Remedy, creates a strong inference, under applicable common law, that the Manhattan apartment, valued at not less than $1.9 million, was fraudulently transferred with the intent to hinder, delay and defraud Roberts with respect to his pursuing his claims.

176.    Because this Court has jurisdiction over Sophien Bennaceur and Moez Bennaceur, pursuant to common law, this Court may enjoin Sophien Bennaceur and Moez Bennaceur to reverse the unlawful conveyance of the Manhattan apartment.

## JURY DEMAND

Plaintiff Benjamin Roberts respectfully demands a trial by jury with respect to all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Benjamin Roberts respectfully requests the following relief:

(1)    compensatory damages against ALL DEFENDANTS in an amount to be determined at trial;

(2)    double damages against ALL DEFENDANTS for violations of Connecticut's Wage Statute with respect to wages that were not paid by TriPlanet;

(3)    punitive damages against SOPHIEN BENNACEUR with respect to Counts III, IV and VII, and against IMED BENNACEUR with respect to Counts IV and VII, in an amount to be determined at trial;

33

(4)     a declaratory judgment against ALL DEFENDANTS that Roberts earned and

        is entitled to a 25% equity ownership interest in TriPlanet;

(5)     an accounting against ALL DEFENDANTS of TriPlanet's book and records

        to determine TriPlanet's revenues, after-tax profits and overall value;

(6)     injunctive relief against SOPHIEN BENNACEUR and MOEZ BENNACEUR

        to take steps necessary to reverse the fraudulent conveyance of the Manhattan

        apartment;

(7)     reasonable attorneys' fees and costs against ALL DEFENDANTS;

(8)     prejudgment interest against ALL DEFENDANTS; and

(9)     such other and further relief as the Court deems just and proper.

Dated:  New Canaan, CT                    O'ROURKE & ASSOCIATES, LLC
        October 1, 2013

                                          _____
                                          Brendan J. O'Rourke, Esq. (ct 00522)
                                          Lorey Rives Leddy, Esq. (ct 19297)
                                          O'ROURKE & ASSOCIATES, LLC
                                          27 Pine Street
                                          New Canaan, CT 06840
                                          Tel (203)966-6664
                                          Fax (203)-966-5710
                                          brendan@orourkeandassoc.com
                                          lorey@orourkeandassoc.com
                                          *Attorneys for Plaintiff Benjamin Roberts*

## CERTIFICATE OF SERVICE

      This is to certify that a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing, on this 1st day of October, 2013, and that the following parties, by operation of the Court's CM/ECF system, shall be served electronically.

Jared B. Stamell, Esq.
Andrew R. Goldenberg, Esq.
Stamell & Schager, LLP
One Liberty Plaza 35th Floor
New York, NY 10006-1404
Tel:    (212) 566-4047
Fax:    (212) 566-4061
stamell@ssnyc.com
goldenberg@ssnyc.com
*Attorney for the Defendants*

 

_____
Lorey Rives Leddy