UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

----------------------------------------------------------X

BENJAMIN ROBERTS,                         :
                                          :
            Plaintiff,                    :
                                          :        Index No. 3:12-CV-01222 (JAM)
            v.                            :
                                          :        **ECF CASE**
TRIPLANET PARTNERS, LLC,                  :        **ELECTRONICALLY FILED**
ET AL.,                                   :
                                          :
            Defendants.                   :        June 18, 2014
----------------------------------------------------------X

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN FURTHER
SUPPORT OF SANCTIONS FOR FAILURE TO COMPLY WITH DISCOVERY
AND DISCLOSURE ORDERS OF THE COURT**

Pursuant to the Court's request at a hearing held on May 28, 2014 ("May 28th Hearing"),

Plaintiff Benjamin Roberts ("Plaintiff"), by and through his undersigned counsel, respectfully

submits this Supplemental Memorandum in further support of his Motion for Sanctions (ECF

Doc. 122), dated November 12, 2013, in which Plaintiff seeks, *inter alia*, sanctions for

Defendants' repeated and consistent failure to comply with Court orders regarding disclosure of

assets and discovery.  Plaintiff submits herewith the Declaration of Brendan J. O'Rourke, Esq.,

dated June 18, 2014, and further, Plaintiff incorporates by reference the factual background, case

law and arguments set forth in his Motion for Sanctions, and in his Reply Memorandum (ECF

Doc. 139), dated December 13, 2013.

**I.    PRELIMINARY STATEMENT**

As detailed below, even faced with the ultimatum issued by this Court in its May 8, 2014

Ruling on Pending Motions ("May 8th Ruling"), that sanctions might against Defendants issue

for failure to comply with Court orders, and despite assurances to the contrary by Defendants'

counsel during the May 28th Hearing, Defendants' failure to produce documents and failure to make proper asset disclosure, as ordered by this Court, has continued, and in so doing, Defendants have prejudiced Plaintiff's ability to present his case on liability and damages. In short, the Court should not allow Plaintiff to be unfairly prejudiced by the Bennaceurs' evolving story, coupled with their limited and self-serving production of documents designed to obfuscate the relatively straightforward issues in this case: (1) how much was TriPlanet Partners' net profits for 2010-2012, and (2) why did over $30 million get paid to the Bennaceurs with only a fraction going to Plaintiff, in breach of the clear terms of his Employment Agreement with the Company? Accordingly, Plaintiff requests that this Court, pursuant to Fed. R. Civ. P. Rule 37(b)(2)(A), sanction Defendants for their persistent and flagrant violation of the Court's discovery and asset disclosure orders, with specific sanctions set forth herein.

With regard to the asset disclosure, notwithstanding records reflecting that Defendants made cash payments of at least $30 million to themselves, Defendants' disclosure of assets constitutes still further evasion of Court orders, culminating in the last element of their strategy, TriPlanet Partners' filing a Chapter 11 petition for bankruptcy protection, within hours after the Court's May 8th Ruling and with no prior indication of its imminence. For the reasons articulated in more detail below, Defendants' conduct warrants this Court's issuance of swift supplemental orders, compelling Defendants to bring assets into Connecticut to satisfy the outstanding prejudgment order of attachment for $8,858,949.00 ("PJR Order").

Significantly, Sophien Bennaceur ("Sophien"), who is the only Bennaceur brother who admits to residing in the United States, claims to have no assets available to him, even though he has interests in several business entities, including TriPlanet Consulting and Phoenicia Capital (*see* Transcript Excerpts, Sophien Bennaceur Deposition, May 27, 2014, appended hereto as

*Exhibit A*), and even though official records list him as a "managing member" – or an owner – of a Florida company called Alpha 22, LLC, which currently owns and operates La Maison restaurant in Miami.  Imed Bennaceur ("Imed"), on the other hand, has "disclosed" the one asset of value by the May 23 deadline set by the Court to "satisfy" the PJR Order, by producing certain limited statements from a Swiss bank account that contains £5,609,202.00.  *See* Barclays Bank Statement, 2014, Imed Bennaceur Geneva Account, appended hereto as *Exhibit B*.  By disclosing this one asset, the Bennaceurs are essentially daring this Court to attempt to order the attachment of a Swiss bank account.  In response, Plaintiff requests that, for the reasons set forth below, the Court enjoin Imed to bring those assets into the State of Connecticut.

The one thing that Imed's disclosure makes clear is that the Bennaceur brothers have sufficient cash assets outside of the United States, combined with the Manhattan Apartment that is currently attached in the related New York Action, to satisfy the outstanding PJR Order.[1] Particularly in light of the fact that Defendant TriPlanet Partners, LLC ("TriPlanet Partners" or the "Company") filed for bankruptcy protection literally hours after the Court's May 8th Ruling, in which this Court found that Plaintiff had not demonstrated "irreparable harm" to obtain injunctive relief, Plaintiff again renews his request for a preliminary injunction that Defendants bring not less than $6 million in cash assets into the State of Connecticut to be deposited with the Court pending resolution of Plaintiff's claims against them.

---

[1] As a result of the New York Action, <u>Roberts v. Bennaceur</u>, 14-CV-2838 (DAB), Plaintiff has attached Moez Bennaceur's Manhattan Apartment, located at 402 West Broadway, New York, New York, which is presently listed for sale at $4 million, although offers by potential buyers have been in the range of $3.5 million, and according to the title search, there are outstanding liens on the Manhattan Apartment in the amount of approximately $325,000, leaving just over $3 million in value to satisfy Plaintiff's PJR Order.  *See* Declaration of Brendan J. O'Rourke, at ¶3.

## II.    DEFENDANTS' CONTINUING FAILURE TO COMPLY WITH DISCOVERY ORDERS

The principal issue in this case, as Defendants have stated all along, and as Judge Underhill identified at the March 2013 PJR Hearing, is the amount of net profits that TriPlanet Partners earned between 2010 and 2012, and the percentage of those profits rightfully owed to Plaintiff based upon the terms of his Employment Agreement.  At the PJR Hearing on March 12, 2013, Defendants presented to the Court their own preliminary financial statements (Defendants' Exhibits A and B, appended hereto as *Exhibit C*), that Plaintiff utilized to revise his own calculations, concluding that he was entitled to at least $8,858,949.00 as his outstanding share of net profits.  The Court (Underhill, J.) accepted Plaintiff's calculation and entered the PJR Order for that amount.  This litigation should have resulted in document discovery by which the parties could refine or refute this figure and determine how much money TriPlanet Partners owes Plaintiff.  However, Defendants have intentionally sought to thwart and evade discovery orders.

After nearly two years of litigation, the following facts are known for certain:  (1) Plaintiff has conceded that he has been paid his 15% share of net profits for 2010, *see* Plaintiff's Exhibit 21 to the PJR Hearing, appended hereto as *Exhibit D*, and (2) Defendants, through their accountant, Glen Malings, of Raich Ende Malter & Co., Inc., have conceded that Plaintiff met his contractual targets in 2011 to earn not only the initial 15% equity payout, but also the additional 10% equity grant and profit payout for 2011, *see* Exhibit 7 to the Malings Declaration, February 21, 2014, appended hereto as *Exhibit E* (*filed under seal*).[2]  In other words, according to the agreed-upon terms of Plaintiff's Employment Agreement, he was entitled to receive, in

---

[2] In addition to the annual equity payout from net profits, Plaintiff also earned a total of 25% ownership interest of TriPlanet Partners, leaving the remaining 75% ownership interest with Defendant Imed Bennaceur.

addition to base salary, 25% of the net profits of TriPlanet Partners for 2011, which was

contractually required to be paid to Plaintiff by February, 2012.  No such payment was made.

The critical issue of the amount of net profits earned by TriPlanet Partners for 2011

remains obfuscated by Defendants, yet the following and significant facts are known:

1) The Royal Bank of Scotland ("RBS) paid to TriPlanet Partners, in 2010 and 2011, a

total of GBP £56,890,317.31, of which approximately £7 million constituted

reimbursement by RBS for TriPlanet Partners' payment of VAT to the UK taxing

authorities, resulting in gross revenues to TriPlanet Partners from the RBS contract

alone of nearly £50 million (approximately $82 million) for services rendered by

TriPlanet Partners in 2010 and 2011, *see* RBS Statement of Payables, TPP 000001-

12, appended hereto as ***Exhibit F***; and

2) Based on the bank records that have been produced by Defendants, albeit incomplete,

the Bennaceur brothers received payments to themselves of at least $30 million

between 2010 and 2014, even though both Sophien and Imed Bennaceur testified at

their depositions that TriPlanet Partners had not generated substantial revenues from

business after the RBS contract ended in 2011.  In other words, from the £50 million

(or $82 million) in revenues obtained by TriPlanet Partners as a result of the RBS

project, it appears that as much as $30 million was paid to the Bennaceurs.[3]

Clearly, if the Bennaceur brothers, who purport to have employment agreements entitling them

to significant compensation tied into the profits of TriPlanet Partners that justify receipt of $30

---

[3] This sum reflects only transactions involving payments out of TriPlanet Partners' accounts to a Bennaceur brother, or payments into accounts held by a Bennaceur brother.  It does not reflect several hundreds of thousands of dollars spent by the Bennaceurs, directly from TriPlanet Partners' bank accounts, on their personal expenses, including approximately $2,750,000.00 used to purchase two Manhattan cooperative apartments at 402 West Broadway.

million in compensation, then Plaintiff's claim of entitlement to 25% of net profits for 2011 falls well in line with the $8,858,949 PJR Order.

For over a year, Plaintiff has sought documentary evidence regarding TriPlanet Partners' income and expenses, and regarding the substantial payments made to the Bennaceur brothers, in order to substantiate his claim to approximately $9 million in unpaid wages and annual equity distributions.  However, in an obvious attempt to thwart Plaintiff, Defendants have flouted Court orders compelling production of documents that would show the amounts and source of funds paid to the Bennaceurs, and the basis for such payments.  In furtherance of their strategy to obfuscate, Defendants have spent the last fifteen months trying to recreate financial statements to reflect significantly lower net profits, spinning elaborate stories of purported financial obligations including, among other things, (i) that the brothers were purportedly owed millions of dollars in back salary or in repayment of loans made to TriPlanet Partners, (ii) that several million GBP are owed to the UK government in back taxes, and (iii) that exorbitant personal charges by both Sophien and Imed Bennaceur were legitimate business expenses.

However, the only backup presented to substantiate their claims are four dubious "employment agreements," bearing dates that go back to 2007, which were produced over a year after the litigation was commenced, and with no reference to the computer-based metadata to verify when such agreements were actually created.  Moreover, Defendants' accountant, Mr. Malings, issued what are termed "compilation statements" that simply regurgitate self-serving financial data provided to him by the Bennaceurs.  Mr. Malings appended his accountant's letter to the compilation statements in which he disavows any opinions as to the accuracy or reliability of the information contained in the documents.  Further discrediting the Bennaceurs' efforts to recast TriPlanet Partners' finances, Mr. Malings testified at his deposition that he had essentially

6

no professional knowledge of the purported existence of a "potential" UK tax liability of several million dollars that the Bennaceurs have now injected into the litigation to further reduce the amount of net profits. Mr. Malings also had no knowledge, in preparing the compilation statements, of the specific terms of any "related party transactions" between and among TriPlanet Partners and the Bennaceur brothers. *See* Transcript Excerpts, Malings Deposition, appended hereto as ***Exhibit G***.

Ultimately, Defendants had the audacity to claim that Plaintiff had been *overpaid* by $26,000, despite obvious and unrefuted evidence that the Bennaceur brothers paid themselves millions of dollars from TriPlanet Partners' bank accounts. Meanwhile, absolutely nothing has been produced to justify the substantial payments made to the Bennaceurs during those years. Given such background, it is no surprise that the Bennaceurs now seek a new venue to tell their story in the hope of finding a safe haven in the bankruptcy court. Thankfully, the Bennaceur brothers remain subject to this Court's rulings and orders.

In its May 8th Ruling, the Court mandated that Defendants produce all documents responsive to Plaintiff's document requests, as set forth at pages 10-11 of Plaintiff's Memorandum of Law in Support of His Renewed Motion for Preliminary Injunction and Motion for Sanctions. The following sets forth what discovery Plaintiff requested from Defendants (that was thereafter Court-ordered), what Defendants produced, what Defendants failed to produce despite Court orders, how Plaintiff's case is prejudiced by this failure to produce, and what remedy/sanction is appropriate under Fed. R. Civ. P. Rule 37(b)(2)(A) for Defendants' noncompliance that would minimize prejudice to Plaintiff's case. In particular, as set forth below, the Court should consider the sanction of "prohibiting the disobedient party from

supporting or opposing designated claims or defenses, or from introducing designated matters in

evidence" based on the following noncompliance:

| Plaintiff's Discovery Requests | Documents Produced | Documents Not Produced |
|---|---|---|
| **Request No. 12:**<br><br>All financial statements, including without limitation, income statements, profit and loss statements, balance sheets and cash flow statements for TriPlanet Partners, LLC, including audited and unaudited preliminary and final, monthly, quarterly, or annual of each. | • TPP Barclays Bank statements for 2008-2010, Feb 2011 through July 2012<br><br>• TPP "general ledger"<br><br>• Bennaceur brothers' Employment Agreements<br><br>• Raich financial compilations | • TPP Barclays Bank statements for January 2011 and from August 2012 to the present.<br><br>• Extensive communications given to Raich by Karen Harris and Vin Od of Sovereign Accountants (*See **Exhibit G***, Transcript Excerpts of Malings Deposition)<br><br>• Malings and Sovereign work papers (Id.)<br><br>• Expense backup 2010 to 2013<br><br>• Contract between TriPlanet Partners and TriPlanet Consulting<br><br>• Metadata pertaining to the Bennaceur brothers' purported Employment Agreements |

| Request Nos. 13 and 14: | | |
|---|---|---|
| Copies of tax returns of Sophien Bennaceur and Imed Bennaceur, from 2009 to the present, filed in any country, state, province, municipality or city, including, but not limited to, the United Kingdom, Tunisia, the United States, New Jersey, New York State and New York City. | • 2010 and 2012 Sophien US/NJ returns<br><br>• 2012 Sophien US Req for Ext for 2012<br><br>• 2012 Imed US/NJ returns<br><br>• 2013 Imed US Req for Ext for 2013 | • 2011 Sophien US/state/foreign tax returns<br><br>• 2013 Sophien US/state/foreign tax returns<br><br>• 2011 Sophien US Req for Ext<br><br>• 2013 Sophien US Req for Ext<br><br>• 2010 Imed US/state/foreign tax returns<br><br>• 2011 Imed US/state/foreign tax returns<br><br>• 2013 Imed US/state/foreign returns |
| **Request No. 15:**<br><br>Copies of all 1099s, W-2s, K-1s, and Form 941s issued to, or prepared for, Sophien Bennaceur and Imed Bennaceur, for calendar years 2009 to the present. | ***NOTHING PRODUCED*** | • 1099s (per testimony of Sophien at PJR Hearing and 5/27/14 deposition)<br><br>• K-1/W-2s/941s<br><br>• Filings/communications with any UK taxing authority |
| **Request No. 16:**<br><br>Copies of all K-1s, W-2s, 1099s and Form 941s issued by TriPlanet Partners, LLC for calendar years 2009 to the present. | ***NOTHING PRODUCED*** | • 1099s (per testimony of Sophien at PJR Hearing and 5/27/14 deposition)<br><br>• K-1/W-2s/941s |

| Request No. 18: | | |
|---|---|---|
| Bank statements and cancelled checks for each bank account, including checking, savings, money market or other investment account, held by (a) Sophien Bennaceur, (b) Imed Bennaceur, and (c) TriPlanet Partners, LLC, or on behalf of any or all of the Defendants, from January 2009 to the present. | • Sophien Chase Account (ch/sav/ch plus) February 2011 to May 2014 ($28,169.00)garnished)<br><br>• Sophien Barclays Account July 2008-Feb 2014 (GBP - 51.68 balance)<br><br>• Imed Barclays Geneva Account 1/12 to 5/14 (***GBP £5,609,202.00***)<br><br>• Imed Barclays Private Client Int'l 1/13 to 4/14 (GBP 41,115.90)<br><br>• Imed Barclays Savings 3/13 to 12/13 (GBP 0.23)<br><br>• Imed Barclays Wealth Rewards 1/13 to 10/13 (GBP 0.00)<br><br>• Imed Wells Fargo Account June 2013 to Sept 2013 ($9,630.00 garnished)<br><br>• TriPlanet Partners Barclays Account, 2008-Dec 2010; Feb 2011 – July 2012 | • Sophien Chase Account 2009 to January 2011<br><br>• Imed Barclays Private Client Int'l Accounts, 2010, 2011, 2012<br><br>• Imed Barclays Savings Account, 2010, 2011, 2012 and Jan-Feb 2013<br><br>• Imed Barclays Wealth Rewards Account, 2010, 2011, 2012<br><br>• Imed Wells Fargo Account, 2010, 2011, 2012, Jan-May 2013<br><br>• Banque Int'l Arabe de Tunisie Accounts (Imed/Sophien/TPP)<br><br>• Credit Suisse AG (Imed) Acct No. xxxxx32210000<br><br>• TriPlanet Partners Barclays Account, January 2011, August 2012 to present<br><br>• Alpha 22, LLC bank account (on behalf of Sophien) |
| **Request No. 19:**<br><br>Copies of all promissory notes or documents sufficient to demonstrate all loans made to TriPlanet Partners, LLC by (a) Sophien Bennaceur, and (b) Imed Bennaceur, including documents regarding the repayment of all such loans. | ***NOTHING PRODUCED*** | • All loan documents relating to any other TPP, Sophien, Moez Bennaceur or Imed loans, as testified to by S Bennaceur at PJR Hearing and deposition |

A.   ***All financial statements, including without limitation, income statements, profit and loss statements, balance sheets and cash flow statements for TriPlanet Partners, LLC, including audited and unaudited preliminary and final, monthly, quarterly, or annual of each.***

At the April 18, 2014 hearing, Attorney Andrew Goldenberg, on behalf of Defendants, represented to the Court that, "[w]e feel we've fully complied with the Court's orders." *See* Transcript Excerpt, April 18, 2014 Hearing, appended hereto as ***Exhibit H***.  As reflected in the above table, however, Defendants have produced only the following material financial documents:   (i) the bank statements for TriPlanet Partners' Barclays accounts (*except for the critical months of January 2011 and everything after July 2012*), (ii) the self-serving general ledger for TriPlanet Partners that merely parrots TriPlanet Partners' Sage accounting statements compiled by Defendants, and purports to allocate expenses and payments without any reference to backup documentation, (iii) employment agreements for Plaintiff and the four Bennaceur brothers, however, without any metadata as to their computer origins, and (v) the financial compilation reports prepared by the Raich firm that Mr. Malings confirmed, during his deposition, lacked any independent verification and reliability.  No backup documentation relating to any expenses has ever been produced.  No backup documentation substantiating the tens of millions of dollars in payments to the Bennaceur brothers has ever been produced.

In addition, Mr. Malings testified, at his deposition on May 16, 2014, that he had had several communications with Sophien, and with both Karen Harris and Vin Od, the UK accountants with Sovereign Associates, Ltd, who purportedly maintained the general ledger for TriPlanet Partners.  Mr. Malings also claimed to have received work papers from Sovereign Associates that have never been produced.  According to Mr. Malings, Vin Od assisted Malings in the preparation of the financial compilations produced for this Court and engaged in email communications during which Mr. Od took the initial steps of converting TriPlanet Partners'

books from a cash method to an accrual method, and that additional work papers were exchanged via email that were never produced to Plaintiff. *See* Malings Transcript Excerpts, appended hereto as ***Exhibit G***. In fact, Attorney Jared Stamell agreed, on the record at the deposition, that Defendants would produce all of Mr. Malings' email exchanges and work papers. Id. Those documents, which Mr. Malings indicated were on his computer that he brought with him to his deposition (id.), have never been produced to Plaintiff. Thus, despite document requests, subpoenas and court orders, those underlying documents relating to TriPlanet Partners' finances remain outstanding, prohibiting Plaintiff from properly assessing Mr. Malings' statements, including his calculation of TriPlanet Partners' purported net profits for 2010 and 2011.

Of significant concern, Sophien testified at his deposition about a written agreement that TriPlanet Partners has with its affiliate, TriPlanet Consulting, which is purportedly a Tunisian entity operated by Defendant Moez Bennaceur ("Moez"), and owned jointly by Imed, Sophien and Moez Bennaceur and TriPlanet Partners. According to Sophien, "we have an ongoing agreement with TriPlanet Consulting that TriPlanet Partners made a commitment to them since 2007 that we would be paying them a certain amount of money every year whether we did business or not." *See* Transcript Excerpt of Sophien Bennaceur, May 27, 2014 Deposition, at 113, appended hereto as ***Exhibit A***. In seeking to explain why such agreements and related documents were never produced, Sophien made the dubious claim that Moez refuses to provide a copy of this written agreement to anyone because he became angry with Sophien when Moez was named a defendant in this action. Id.

Undermining the credibility of this contention, however, is the fact that Sophien also testified that Moez Bennaceur cooperated and gave him copies of all the Bennaceur brothers' employment agreements that were produced to Plaintiff on October 23, *several months after*

*Plaintiff sought leave to amend the Complaint to add Moez, and several weeks after the Amended Complaint was filed.* In other words, the Defendants have stated under oath that Moez was too angry to produce the one written document that purports to back up millions of GBP paid to him and to TriPlanet Consulting, but he was not too angry to transmit the purported employment agreements under which the Bennaceur brothers claim to have been entitled to millions of GBP in salary and profit distributions.

## PREJUDICE TO PLAINTIFF:

Given that Defendants have intentionally and willfully failed to produce (i) any credible backup documentation to support the millions of dollars paid to the Bennaceur brothers, (ii) any communications between, and work papers of, Mr. Malings and Vin Od, (iii) any backup documentation regarding the expenses charged to TriPlanet Partners, and (iv) any documents demonstrating a purported written agreement between TriPlanet Partners and TriPlanet Consulting that obligates TriPlanet Partners to pay substantial sums to TriPlanet Consulting even for zero work, and (v) no credible documentation of a potential UK tax liability purportedly owed by TriPlanet Partners, Plaintiff is left with the self-serving TriPlanet Partners general ledger and Raich firm financial compilation reports as providing the only insight into the reliability of Defendants' calculation of the Company's profit margin and net profits for 2010, 2011 and 2012. In addition, Plaintiff is left with no documentation to justify any of the expenses that Defendants claim were "properly" deducted from the revenues of the Company and included in calculating the net profit for the Company. As a result, Plaintiff is unable to properly ascertain the net profits of the Company for purposes of determining his damages.

> **B.**   *Copies of tax returns of Sophien Bennaceur and Imed Bennaceur, from 2009 to the present, filed in any country, state, province, municipality or city, including, but not limited to, the United Kingdom, Tunisia, the United States, New Jersey, New York State and New York City.*
>
> **C.**   *Copies of all 1099s, W-2s, K-1s, and Form 941s issued to, or prepared for, Sophien Bennaceur and Imed Bennaceur, for calendar years 2009 to the present.*
>
> **D.**   *Copies of all K-1s, W-2s, 1099s and Form 941s issued by TriPlanet Partners, LLC for calendar years 2009 to the present.*

The Defendants' individual tax returns are essential to Plaintiff for purposes of tying out the income and profit distributions purportedly earned and received by them from TriPlanet Partners between 2009 and 2014.  This Court agreed that discovery of those tax returns was not only relevant, but necessary, thus including the tax returns in the May 8th Ruling.

In response, Sophien produced only his 2010 and 2012 United States and New Jersey income tax returns.  He produced no 2011 tax returns, testifying at his deposition that 2011 "was very complicated." Id.  He testified that "tax lawyers and accountants are figuring it out" for him. Id.  Conveniently, 2011 is the year in which Sophien may have taken as much as GBP £5.5 million from TriPlanet Partners.  Specifically, the preliminary financial statements presented as evidence by Defendants at the PJR Hearing indicate payments to Sophien of over £5,500,000.00 for 2011 that remains unaccounted for.[4]  What Plaintiff has been able to discern from the Barclays Bank spreadsheet and TriPlanet Partners bank statements is that, at a minimum, Sophien received in 2011 at least £1,090,482.00 from TriPlanet Partners, much of which *is not reflected* as having been deposited in any of the bank accounts disclosed by Sophien.  *See*

---

[4] Despite representations by Attorney Jared Stamell, made to this Court at the May 28th Hearing, that Exhibit B shows an "accrual" of £5,500,000 in Sophien Bennaceur's favor, *see* Transcript Excerpt from May 28th Hearing, appended hereto as *Exhibit I*, Mr. Malings, Defendants' accountant, testified quite clearly that the statements produced at the PJR Hearing were prepared on a cash basis, and that he and Vin Od had to convert the books to an accrual method in order to determine purported net profits for the Company.  *See* Transcript Excerpt of Malings Deposition, May 16, 2014, appended hereto as *Exhibit G*.

Barclays Bank Statements, Defendants' Exhibit 1 to the Declaration of Karen Harris, dated February 21, 2014 *(filed under seal)*.

With respect to his 2010 and 2012 returns, Sophien testified at his deposition that the income claimed in 2010 reflected income that he "didn't really earn it here, I earned it elsewhere, but I wanted to file some type -- a portion of what I believe I earned in the U.S." *See* Transcript Excerpt of Sophien Bennaceur Deposition, May 27, 2014, appended hereto as *Exhibit A*.  In other words, by inference from his own testimony, Sophien earned additional income that he elected not to report on his United States tax returns for those years, yet he has provided no documentary evidence to demonstrate exactly how much he was paid.  In fact, as set forth below, the limited range of TriPlanet Partners bank statements produced to Plaintiff makes clear that Sophien received payments from TriPlanet Partners, between 2010 and 2011 that are unaccounted for as having been deposited in the accounts that he has disclosed, strongly suggesting that other accounts exist in Sophien's name that have never been disclosed or for which no statements have been produced.

Similarly, Imed produced only his 2012 United States and New Jersey income tax returns, along with a Request for Extension with respect to his 2013 federal income tax return. In the returns, Imed claimed nearly $200,000 in taxable interest income, but he did not declare any taxable wages or salary.  In 2011, TriPlanet Partners' bank statements indicate that payments of not less than £7,325,000.00 were made to Imed.  Further, as set forth in further detail below, Imed's bank statements from 2012 to 2014 indicate that Imed received not less than an additional £2,500,000.00 in 2012, £7,000,000.00 in 2013 and £1,000,000.00 through May 15, 2014, even though Imed testified at his deposition that TriPlanet Partners ceased generating any substantial

revenues in mid-2012, which followed the termination of the RBS contract. *See* Declaration of Brendan J. O'Rourke, Esq., dated June 18, 2014, at ¶5.

Plaintiff also requested that Defendants produce copies of all 1099s, W-2s, K-1s and 941s issued to, or prepared for, any of the individual Defendants, and issued by TriPlanet Partners, from 2009 to the present.  This request was premised on the testimony of Sophien at the PJR Hearing where he stated, under oath, that he received a 1099 from the Company in 2011 for payments of £5,500,000.00.  *See* Transcript Excerpts, March 12, 2013 Hearing, appended hereto as *Exhibit J*.  At the May 28th Hearing, Defendants' counsel, Attorney Jared Stamell, confirmed that no such documents had been produced, and thereafter attempted to "correct" Sophien's testimony by suggesting that Sophien, a sophisticated businessman who operated a consulting firm that generated nearly $100,000,000.00 in revenues from the RBS project alone, did not understand what a 1099 represents.  *See* Transcript Excerpt, May 28th Hearing, appended hereto as *Exhibit I*.

Attorney Stamell's efforts, however completely contradict the testimony that Sophien provided *the day before at his deposition,* on May 27, 2014, at which Sophien testified, under oath, that he received a 1099 from TriPlanet Partners in 2010 for the $250,000 declared on his 2010 tax returns, and that each of the Bennaceurs was issued a 1099 for subsequent years.  In fact, Plaintiff's counsel specifically inquired about Sophien's understanding of what a 1099 represented:

> Q.     In terms of the payments that were made to you, were they reflected in 1099s, do you know?
>
> A.     Yes.
>
> Q.     There were 1099s?

A.      I was always 1099.

Q.      Were there any W-2s issued to you in connection with compensation paid

to you?

A.      No.

Q.      Who was responsible for producing the 1099s?

A.      Admin.

Q.      That's that staff that you referred to?

A.      Yes.

Q.      Did they in fact produce 1099s when you were compensated?

A.      Yes.

Q.      Did Hazem receive 1099s?

A.      Yes.

Q.      Did Moez receive 1099s?

A.      Moez is a Tunisian citizen.

Q.      So the answer is no?

A.      "No."

Q.      Did Imed receive 1099s?

A.      Yes.

Q.      Did any of your brothers receive W-2s?

A.      No.

Id.  To clarify that Sophien was not confusing 1099s with his federal tax returns, Form 1040s,

Plaintiff's counsel specifically inquired:

Q.      Mr. Bennaceur, do you know what a 1099 is?

A.     Yes….

Q.     Am I correct in saying that I heard your testimony earlier today to say that TriPlanet issued 1099s to each of your brothers except for Moez?

A.     I believe that.

Q.     That's what you said, right?

A.     Correct.

Id.  Accordingly, despite Attorney Stamell's efforts to portray Sophien as confused about the nature or purpose of a 1099, his testimony the day before the May 28th Hearing makes clear that he not only understood what a 1099 represented, but that 1099s had been issued to him, Imed and Hazem.  Sophien also confirmed that Plaintiff had been issued a 1099 by TriPlanet in 2011 (which document was produced *not by Defendants*, but by Plaintiff), as well as a W-2 for 2010 (again, which Plaintiff produced).  In short, despite Court orders to produce these essential documents that would assist in the calculation of the Company's net profits, and Plaintiff's damages, no such documents have been produced, and no credible explanation has been provided as to why they have not been produced.

**PREJUDICE TO PLAINTIFF:**

Given that Defendants have intentionally and willfully failed to produce any reliable documents from which Plaintiff can accurately calculate TriPlanet Partners' net profits, the only two reliable sources of information regarding monies received by, and paid out by, TriPlanet Partners are (i) the payables summary from RBS indicating that TriPlanet Partners received a total of £50 million in gross revenues for work performed between September 2010 and December 2011, and (ii) the limited bank statements produced by Defendants and separately, by Barclays Bank, PLC, that reflect payments received by the Bennaceur brothers between 2010

and May 2014.  By failing to produce tax returns, or any other tax-related documentation either

for the individual Defendants or the Company, Defendants have prevented Plaintiff from

ascertaining how much money the Bennaceurs have received from TriPlanet Partners either as

salary or profit distributions.  Absent this information, Plaintiff is unable to properly ascertain the

net profits of the Company for purposes of determining his damages.

> **E.**   ***Bank statements and cancelled checks for each bank account, including
> checking, savings, money market or other investment account, held by (a)
> Sophien Bennaceur, (b) Imed Bennaceur, and (c) TriPlanet Partners, LLC, or
> on behalf of any or all of the Defendants, from January 2009 to the present.***

Complete sets of bank statements for TPP, Sophien and Imed for the relevant time period

would presumably permit Plaintiff to trace payments out of TPP's accounts and into the

Bennaceur brothers' accounts so that Plaintiff could account for all of the funds paid to the

Bennaceurs, match these payments with corresponding Employment Agreements, and more

accurately ascertain the net profits of TriPlanet Partners, and calculate Plaintiff's damages.

Without complete records, however, Plaintiff is left to speculate where and to whom funds went.

The most useful bank records were not actually produced by Defendants.  Instead, certain

spreadsheets were produced by Barclays Bank PLC in response to Plaintiff's subpoena *duces

tecum*. The spreadsheets, however, are limited and reflect only those transfers, from 2009 to

2013, out of TriPlanet Partners' account that were either in US dollars or to a US bank account.

TriPlanet Partners, in response to Judge Underhill's October 10, 2013 order compelling

production in response to document requests, produced a segment of the corresponding Barclays

bank statements for TriPlanet Partners from January 2008 to December 2010, and from February

2011 to July 2012.  Missing are account statements for January 2011, and for every month after

July 2012.  Although incomplete, the Barclays spreadsheets coupled with the TriPlanet Partners

bank statements indicate the transfer of substantial sums of money out of the TriPlanet Partners'

account to Sophien, Imed and Moez Bennaceur through July 2012. There are no bank statements for TriPlanet Partners from which Plaintiff can ascertain payments made after July 2012.

The critical link in Plaintiff's analysis of his damages remains the ability to trace payments made from TriPlanet Partners to the Bennaceur brothers, which requires production of complete bank statements from Sophien, Imed and Moez Bennaceur, for each and every bank account either held in their names or for their benefit. As the tangled recitation of missing bank statements and unaccounted-for, multi-million dollar transactions below demonstrates, Defendants have simply failed to respond to Plaintiff's document requests, and this Court's May 8th Ruling, and Judge Underhill's October 10, 2013 Order, by producing a hodgepodge of statements that raise more questions than answers.

Sophien produced partial bank statements for two accounts held in his name: (1) JP Morgan Chase bank statements for an account in the U.S., for the period of February 2011 through May 2014. He produced no records for January 2009 to January 2011. The statements that were produced reflect receipt by Sophien of at least $935,676.00 between February 2011 and July 2013. This account was garnished by Plaintiff, in partial satisfaction of the PJR Order in October 2013, securing approximately $28,000.00.

Sophien also produced statements for a UK Barclays Bank account in his name for the period of July 2008 through February 2014. The account currently reflects a near zero balance. The statements reflect payments to Sophien that correspond with payments from TriPlanet Partners' Barclays account, from December 2009, through the last payment of £500,000.00 on May 11, 2011, for a total of £625,000.00 (or approximately $937,500.00).

Here is where the trail ends, however. TriPlanet Partners' Barclays records show that Sophien was paid directly at least an additional £366,550.00 (approximately $550,000.00), but

these payments are not reflected in any corresponding bank statements produced by Sophien.

Nor is there any record of the £5,500,000.00 payment about which Sophien testified at the PJR

Hearing, which payment is reflected in TriPlanet Partners' own preliminary financial statements

introduced by Defendants at the March 2013 PJR Hearing.

     At the very least, Sophien testified about another account in his name, at Banque

Internationale Arabe de Tunisie, to which the Barclays spreadsheets reflect payments of

approximately $400,000.00. *See* Barclays Bank spreadsheet, appended hereto as ***Exhibit K.***

According to the untimely "Supplemental Disclosure of Assets," dated May 27, 2014, Sophien

admits to having such an account, although he claims there is only TND 10,000.00 in the account

presently. Needless to say, without statements from this account, or from any other account of

Sophien's, Plaintiff is unable to determine with any reasonable accuracy how much Sophien has

been paid by TriPlanet Partners since September 2010 to the present. Despite the failure to

produce his bank statements, as ordered by the Court, Sophien nevertheless claims in the Chapter

11 Case to be owed nearly $13 million by TriPlanet Partners. In sum, Plaintiff can only surmise

from the inadequate production by Defendants that, since September 2010, Sophien has received

£5,500,000.00, as reflected in TriPlanet Partners' preliminary financial statements produced by

Defendants at the PJR Hearing, plus an additional sum of approximately $2,303,000 reflected, in

part, in the Barclays and Chase statements. This, of course, does not include the transfer of

$2,750,000.00 in August 2011, on behalf of Sophien, to Ahmad Alavian for the purchase of two

cooperative apartments in Manhattan, namely the fourth and fifth floors of 402 West Broadway,

New York, New York.

     With respect to Imed, the bank statements produced are even more paltry; however, what

little was produced reflects a shocking series of transactions worth tens of millions of dollars that

can only have come from TriPlanet Partners.  Specifically, Imed has produced scant records from

a Wells Fargo account in his name in the U.S. The Wells Fargo account, for which Imed

produced only four months of statements, from June to September 2013, contained less than

$7,000.00 when it was garnished by Plaintiff in October 2013.  However, Imed has failed to

produce any Wells Fargo records for any time between 2009 and May 2013, making it

impossible for Plaintiff to track payments made to Imed by TriPlanet Partners through this

account.

Imed also produced a limited range of statements for four bank accounts in his name at

Barclays Bank, including three interrelated wealth management accounts in London, and an

international investment account in Geneva, Switzerland.  Of the three London Barclays

accounts, Imed produced the following records:  (i) January 2013 to April 2014 for one account

currently containing approximately £41,115.90; (ii) March 2013 to December 2013 for a savings

account with a current balance of zero; and (iii) January 2013 to October 2013 for a rewards

account with a zero balance.  Imed has produced no records for the London account from 2009

through at least January 2013, begging the question of accounting for the millions of GBP that

appears to have been paid to Imed from TriPlanet Partners' Barclays account between 2010 and

2014.

Specifically, the TriPlanet Partners Barclays records reflect payments to Imed, in 2011

alone, of £7,325,000.00 (approximately $11 million).  Plaintiff has been provided with no

corresponding bank statements for Imed to track those payments.  (Nor has Imed produced any

tax documents reflecting those payments).  The Barclays Swiss bank account statements

produced, for only 2012, 2013 and 2014, reflect substantial sums of additional funds paid to

Imed, including £2,500,000.00 in 2012 (approximately $3,750,000.00), £3,000,000.00 in 2013

(approximately $4,500,000.00), and £1,000,000.00 through May 15, 2014 (approximately $1,500,00.00).

Because Defendants have failed to produce corresponding TriPlanet Partners bank statements for these periods of time, however, Plaintiff is unable to connect payments received by Imed with payments made from a TriPlanet Partners bank account or with Company funds. Since TriPlanet Partners stopped generating substantial new revenues in mid-2012, thus suggesting that the deposits into Imed's Swiss account at Barclays, for 2014 to 2014, possibly came from unaccounted-for TriPlanet Partners funds.

Also with respect to Imed, the spreadsheets produced by Barclays Bank reflect payments of approximately $60,000.00 to an account in Imed's name at Credit Suisse, AG, Account No. XXXX32210000. *See* Barclays Bank Spreadsheets, appended hereto as ***Exhibit K***. Plaintiff subpoenaed records from Credit Suisse for this account, but the bank refused to comply with the subpoena, citing Swiss banking laws and Second Circuit case law involving subpoenas directed to New York branch banks of Swiss entities. Despite document requests and Court orders, however, Imed has never produced any records with respect to this account.

Lastly, Plaintiff requested (and the Court ordered production of) bank statements not only for accounts held by TriPlanet Partners, Sophien and Imed Bennaceur, but also for any accounts held on behalf of any Defendant. This request plainly seeks discovery of bank records for accounts held in the name of third parties used for the benefit of one or more of the Defendants. At Sophien's deposition, he testified that he is the "manager" of a Florida limited liability company called Alpha 22, LLC, which owns La Maison Miami restaurant in Miami, Florida. Sophien testified that Alpha 22, LLC is owned by his brother, Hazem Bennaceur, along with two

other individuals. He denied owning any interest in Alpha 22, LLC, which he and his counsel also denied before this Court at the May 28th Hearing.

However, records filed with the Florida Secretary of State indicate that, although Hazem Bennaceur was the initial managing member of Alpha 22, LLC, in October 2013, amendments were filed eliminating Hazem as the managing member, and replacing him with Sophien. *See* Florida Secretary of State Filings, appended hereto as *Exhibit L*.   Under applicable Florida law when Alpha 22, LLC was formed in 2013, a "managing member" of an LLC, like Sophien, is a member/owner of the LLC who has also been tasked with managing the LLC's affairs. *See* Florida Stat. § 605.0102 (2013).[5]  Accordingly, despite Sophien's protestations, under Florida law, as a "managing member," he is deemed to have an ownership interest in Alpha 22, LLC.

That Sophien has any ownership interest in Alpha 22, LLC is more consistent with the deposition testimony of Imed, in which Imed confirmed that he has transferred hundreds of thousands of dollars to Sophien through Alpha 22, LLC, in order to pay Sophien's expenses in the U.S. while avoiding having those funds attached by Plaintiff. *See* Declaration of Brendan J. O'Rourke, Esq., at ¶6.   In other words, the bank account of Alpha 22, LLC is a conduit for Sophien to receive funds from Imed's Barclays Swiss bank account, and as such, it is clearly a bank account held, at least in part, on behalf of Sophien.  As a result, the bank records for Alpha 22, LLC bank accounts utilized by Sophien for his personal expenses should have been produced by Defendants by the May 23, 2014 deadline, pursuant to the Court's May 8th Ruling. The disclosure of the account(s) of Alpha 22, LLC, also would be required under this Court's

---

[5] Florida amended its Revised Limited Liability Company Act effective January 1, 2014, and eliminated the designation of a "managing member" for all newly-formed LLCs.  Existing limited liability companies that were previously managed under the auspices of a managing member, are now deemed to be "member-managed."

disclosure orders, as addressed below, regarding Bennaceur assets in the U.S. that could be
attached by Plaintiff in further satisfaction of the PJR Order.

**PREJUDICE TO PLAINTIFF**:

Given that Defendants have produced only selective records for selective periods of time
for only some bank accounts, while producing no documents for other bank accounts, Plaintiff is
again left with random and wholly incomplete information from which to determine the net
profits of TriPlanet Partners. Even if Plaintiff provided the incomplete production of bank
statements, plus the financial and tax records addressed above, to his own expert witness, it
would be impossible to discern Plaintiff's damages with any accuracy. Between the bank
statements and the deposition testimony of Sophien and Imed Bennaceur, Plaintiff has been able
to determine only one thing: the Bennaceur brothers have paid themselves at least $30 million
from TriPlanet Partners funds between 2010 and 2014, while Plaintiff, who was entitled to 25%
of the net profits of the Company for 2011, received only $750,000 in addition to his base salary.

**F.**     ***Copies of all promissory notes or documents sufficient to demonstrate all loans
made to TriPlanet Partners, LLC by (a) Sophien Bennaceur, and (b) Imed
Bennaceur, including documents regarding the repayment of all such loans.***

At the March 2013 PJR Hearing, Defendants presented documents indicating that Imed
had outstanding loans to the Company of over £7,000,000.00. *See* Defendants' Exhibits A and
B, appended hereto as ***Exhibit C***. Sophien testified during the hearing that Imed had purportedly
made loans to TriPlanet Partners that required repayment before calculation of the Company's
net profits. *See* Transcript Excerpts, March 12, 2013 Hearing, appended hereto as ***Exhibit J***. As
a result, from that PJR Hearing, Plaintiff first requested, and Defendants promised, production of
all loan documents regarding any loans made by Sophien or Imed to TriPlanet Partners. The
Court has subsequently issued orders compelling production of such documents. Particularly

given the often repeated refrain that TriPlanet Partners owes Sophien and Imed millions of dollars for monies loaned to the Company or for capital provided to the Company since 2003, documents establishing the existence of such loans would be critical for Plaintiff to consider in calculating his damages.

At his deposition, Sophien testified further about the existence of such loans, but incredibly, he again claimed that Moez refuses to produce any of the loan documentation because Moez is angry with Sophien about this lawsuit.  Although, as set forth above, Moez did manage to produce to Sophien documents that are favorable to the Bennaceurs, including their purported Employment Agreements, Sophien now contends that, at the same time, Moez failed to produce documents that might confirm the legitimacy of millions of dollars in purported loans by or to TriPlanet Partners.  Conveniently, those documents remain in Tunisia with Moez.  As a result, Defendants have not produced a single document evidencing loans from Sophien or Imed to TriPlanet Partners, despite Court orders to do so.

**PREJUDICE TO PLAINTIFF:**

Defendants have sought to assert the existence of "loans" and "agreements" to account for millions of dollars paid to the Bennaceur brothers between 2010 and 2014, but, as with the purported agreement with TriPlanet Consulting, Defendants have produced no documents to substantiate any such loans or agreements.  Plaintiff is left with the unsubstantiated testimony of Sophien and Imed, and the self-serving "general ledger" of TriPlanet Partners as the only "evidence" of the existence or legitimacy of such loans or agreements.  Again, absent such documentation, Plaintiff is entirely unable to ascertain the net profits of the Company or to calculate his damages.

26

**PROPOSED SANCTIONS:**

Plaintiff has repeatedly requested Defendants' financial documents, bank and tax records in order to properly litigate his claims and determine his damages, and has become more and more frustrated with Defendants' lack of compliance.  The Court has repeatedly ordered Defendants to produce such documents.  Defendants have nevertheless flouted these orders.  The only reasonable inference that can be drawn, based upon Defendants' intentional refusal to produce these documents, is an inference adverse to the Defendants' claims – either that the documents do not exist, or that the documents would actually support Plaintiff's claims and his damages calculation.  *See* Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 106-107 (2d Cir. 2002); Morales v. Cancun Charlie's Restaurant, 3:07 CV 1836 (CFD), 2009 WL 3682449, at *5 (D. Conn. Oct. 30, 2009)(*quoting* Handwerker v. AT&T Corp., 211 F.R.D. 203, 209 (S.D.N.Y. 2002)); *see also* Penthouse Int'l, Ltd., v. Playboy Enters., Inc., 663 F.2d 371, 388 (2d Cir. 1981) (willfulness established based upon non-compliant party's "prolonged and vexatious obstruction of discovery with respect to . . . highly relevant records").  In short, Defendants' representations to the Court have imploded, brought down further by the sheer lack of any credible documentation to support those representations, and accordingly, Defendants' assertions that the over $30 million paid to the Bennaceur brothers was justified or for legitimate purposes do not deserve a scintilla of credibility.

Based on the documents produced by Defendants, produced by third parties in response to subpoenas, and based on the calculations set forth in Plaintiff's Exhibit 21 as presented to the Court during the PJR Hearing, Plaintiff was able to utilize Defendants' own documents to ascertain TriPlanet Partners' net profits, gross revenues, cost of sales and SG&A expenses for 2010 through 2012.  Comparing Plaintiff's calculations with TriPlanet Partners' data from three

different sources, appended hereto as *Exhibit M*, Plaintiff's estimate of gross revenues closely equates the figures in TriPlanet Partners' data. Not surprisingly, the most significant discrepancies are between the figures included for SG&A (expenses), and the overall net profits for TriPlanet Partners, where Defendants have worked diligently to create the impression that the Company's net profits are significantly lower than determined by Plaintiff.

However, Plaintiff more than amply demonstrated, at the PJR Hearing, how he derived at the sums included in his calculations, as captured in Plaintiff's Exhibit 21, utilizing uncontroverted data from Defendants' own documents. The data provided by Defendants, on the other hand, is not only inconsistent between three different purported financial statements, but also includes absolutely no reliable backup documentation, as demonstrated by the analysis of Defendants' noncompliance with discovery orders.

Accordingly, as sanctions for failing to produce these documents in violation of Court orders, Plaintiff proposes that the Court consider a sliding scale of sanctions designed to "prohibit[] the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." Fed. R. Civ. P. Rule 37(b)(2)(A)(ii). Specifically, Plaintiff requests that the Court adopt one or more of the following findings as an undisputable fact for purposes of trial, based on the credible evidence that is available to the parties, and enter further orders preventing Defendants from offering at trial any testimony or evidence to rebut such findings. Plaintiff has listed the proposed findings of fact in the order of significance, recognizing that adoption by the Court of the first proposed finding may well suffice to constitute a significant sanction for Defendants' abhorrent behavior. The proposed findings of fact are as follows:

1. TriPlanet Partners' Net Profits for 2010 through 2012 shall not be less than *£25,752,592.00,*, but Plaintiff may demonstrate that Net Profits are, in fact, higher than this sum;

2. Plaintiff satisfied all the criteria set forth in his Employment Agreement for both 2010 and 2011, entitling him to 15% of net profits of TriPlanet Partners for 2010, and 25% of net profits for 2011;

3. Defendants may not rely upon or admit any evidence or testimony regarding any purported arrangements or agreements between TriPlanet Partners and TriPlanet Consulting, by which TriPlanet Partners was obligated to remit any payments to TriPlanet Consulting, including the £6,505,000.00 remitted to Moez Bennaceur in 2012;

4. Defendants may not rely upon or admit any evidence or testimony regarding any purported loans or promissory notes between and/or among any of the Defendants, or any third party, the repayment of which would negatively impact the total Net Profits for TriPlanet Partners, as set forth above;

5. Defendants may not rely upon or admit any evidence or testimony regarding any purported UK tax liability or obligations, or any other tax liability or obligation for any other taxing authority;

6. The sum of £6,505,000.00 paid by TriPlanet Partners to Moez Bennaceur in 2012, either personally or on his behalf, represents a portion of the net profits of the Company to be included in calculating Plaintiff's damages;

7. Imed Bennaceur received not less than £10,000,000.00 in TriPlanet Partners funds between 2010 and 2014, either personally or on his behalf, which sum represents a

portion of the net profits of the Company to be included in calculating Plaintiff's damages;

8.   TriPlanet Partners' Gross Revenues for 2010 through 2012 shall not be less than *£48,753,939.00*, but Plaintiff may demonstrate that Gross Revenues are, in fact, higher than this sum; and

9.   TriPlanet Partners' Cost of Sales for 2010 through 2012 shall be not more than *£25,565,235.00*, but Plaintiff may demonstrate that Cost of Sales is, in fact, lower than this sum.

In addition to the findings of fact as set forth above, Plaintiff respectfully requests that, as an additional sanction, Defendants be ordered to pay Plaintiff's reasonable attorneys' fees and costs incurred as a result of Defendants' willful failure to comply with the Court's Orders, in an amount to be determined by the Court either based upon an Affidavit of Fees to be submitted forthwith, or after an evidentiary hearing regarding same.

## III.   DEFENDANTS HAVE FAILED TO PROPERLY DISCLOSE ASSETS

Nearly a year ago, Judge Underhill ordered Defendants to disclose assets sufficient to satisfy the PJR Order of $8,858,949.00.  A year later, Plaintiff has garnished deposits in U.S. bank accounts for approximately $33,000, and has attached the Manhattan Apartment that is valued at approximately $3.5-4.0 million, leaving a substantial shortfall.  Defendants' history of flouting the Court's disclosure orders includes the following:

| Date | Order | Defendants' Response |
|------|-------|---------------------|
| June 20, 2013 PJR Order | "Within 30 days of this order, the defendants shall disclose to Roberts money or property in which they have an interest, or debts owing to them, sufficient to provide security in the amount of $8,858,949." | Response to Ruling, dated July 22, 2013 (ECF #86) (**Exhibit N**): <br><br> • "Defendants do not have assets or property in Connecticut." |
| October 10, 2013 Order | "The Defendants are ordered to disclose, collectively and individually, their assets within the United States. If these assets are sufficient to meet Plaintiff's Prejudgment Remedy (PJR) amount of $8,858,949, then no additional disclosure is required. Ruling on P.'s Appl. for Prejudgment Remedy, at 12 (doc. 78). If the Defendants' assets within the United States are insufficient to secure the amount set in the PJR ruling, then the Defendants must also disclose, collectively and individually, sufficient assets held worldwide to secure the PJR amount." | Defendants' Second Disclosure of Assets, dated October 15, 2013 (ECF #115) (**Exhibit O**): <br><br> • Intellectual Property of TriPlanet Partners, LLC ($10,000,000) <br><br> • Banque Int'l Arabe de Tunisie bank account with TND 350,000. |
| May 8, 2014 Order | "[T]he Court orders that on or before Friday, May 23, 2014, *each one of the defendants TriPlanet, Sophien Bennaceur, and Imed Bennaceur shall individually and with specificity* disclose tangible, marketable assets in the United States that are sufficient individually to meet the prejudgment remedy amount of $8,858,949. For each of defendants' disclosures, these assets must self-evidently bear the ownership name of each defendant, must have their specific location disclosed, and must have a readily | Defendants' Supplemental Disclosure of Assets, dated May 27, 2014 (**Exhibit P**): <br><br> • Computer equipment of TPP <br><br> • BMW owned by TPP in Tunisia <br><br> • Two (2) apartments in Tunisia owned by Imed and Sophien Bennaceur <br><br> • BMW owned by Sophien |

| | |
|---|---|
| | determinable market value and without impediment or cloud to their attachment upon additional legal process. If any of the defendants do not have sufficient marketable assets within the United States, then each defendant shall disclose marketable assets that they hold worldwide in an amount sufficient to satisfy the prejudgment remedy order" (emphasis added). | Bennaceur (no location provided)<br><br>• Barclays Bank Geneva account held by Imed Bennaceur, containing £5,609,202.00 |

These disclosures of assets are indicative of the evasive maneuvering in which they engage to prevent Plaintiff from satisfying the outstanding PJR Order, and ultimately, from satisfying any judgment against them. Initially, Defendants simply denied having any assets within the State of Connecticut. After motion practice, Defendants submitted the wholly incredible Second Disclosure of Assets, identifying the intellectual property of TriPlanet Partners, which has since filed for bankruptcy protection, as sufficient to satisfy the outstanding PJR Order. Plaintiff took it upon himself to file the related New York Action, after it became crystal clear that Defendants had no intention of disclosing attachable assets, in order to obtain an attachment on the Manhattan Apartment in partial satisfaction of the PJR Order.

Even now, in the face of the ultimatum in the Court's May 8th Ruling, Defendants persist in the cat and mouse tactics that have defined these proceedings by identifying assets in Tunisia, and cash deposits held in a Swiss bank account, none of which is "attachable" for purposes of satisfying the PJR Order. Only when questioned by the Court during the May 28th Hearing did Sophien finally admit that he owns a vehicle in the United States but, not surprisingly, Plaintiff still has no information with which to locate that vehicle. Clearly, even this belated "disclosure" of assets is intended to frustrate Plaintiff's efforts to attach assets, and is not in compliance with the Court's May 8th Ruling.

At his deposition, Imed made clear that he utilizes the millions of GBP held in the Swiss account to pay his and Sophien's living expenses in the United States. Indeed, the Barclays Bank statements for the account indicate hundreds of thousands of dollars transferred with notations that such payments are made on behalf of Imed or Sophien. Notably, many of the transfers have been to the account for Alpha 22, LLC, the Florida limited liability company "managed" by Sophien. As set forth above, despite Sophien's denial that he has any ownership interest in Alpha 22, LLC, Florida law makes clear that, as the entity's "managing member," Sophien is deemed to have an ownership interest in the entity, and presumably, in its bank account deposits. According to Imed, the Alpha 22, LLC bank account into which funds are transferred is used by Sophien in order to avoid having those assets frozen, much like the Chase and Wells Fargo accounts that Plaintiff garnished in October 2013. In other words, the Bennaceurs have now created a complex network of entities and bank accounts that are fed monies from a Swiss bank account specifically to evade attachment by Plaintiff.

The Court should no longer countenance Defendants' audacity in taking such obvious steps to flout the Court's disclosure orders. Accordingly, given Defendants' willful and intentional failure to comply with the Court's disclosure orders, Plaintiff respectfully renews his Motion for Preliminary Injunction.

## IV.  RENEWED MOTION FOR PRELIMINARY INJUNCTION

In the May 8th Ruling, the Court denied Plaintiff's Motion for Preliminary Injunction on the grounds that Plaintiff had not demonstrated "irreparable harm," noting that, "[i]t is true that an exception may exist for 'monetary injury situations involving obligations owed by insolvents' or otherwise 'where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously

occupied,' <u>Brenntag Int'l Chemicals, Inc. v. Bank of India</u>, 175 F.3d 245, 249–250 (2d Cir. 1999), but the facts of this case do not remotely suggest that defendants are insolvent or on the brink of bankruptcy." Within four hours of the Court's issuing the May 8[th] Ruling, however, TriPlanet Partners filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.[6]

Given this turn of events, Plaintiff firmly believes that there is a strong likelihood one or more of the individual Defendants will also seek bankruptcy protection, particularly since Plaintiff has recently filed an exceptionally strong Motion to Dismiss the Chapter 11 Case filed by TriPlanet Partners. Under these circumstances, and in light of the inadequate disclosure of assets available for attachment to satisfy the PJR Order, Plaintiff renews his Motion for Preliminary Injunction against Sophien and Imed Bennaceur, and requests that this Court enter an order enjoining these Defendants to bring cash assets of not less than $6 million into the State of Connecticut to deposit with the Court in satisfaction of the PJR Order. Plaintiff incorporates herein by reference all pleadings previously submitted in support of his Motion for Preliminary Injunction, including ECF Doc. Nos. 95, 108, 121, 123, and 139.

---

[6] At the hearing on April 18, 2014 before this Court on the pending motions that were decided in the May 8th Ruling, Attorney Andrew Goldenberg, on behalf of Defendants, argued against the issuance of a preliminary injunction, emphasizing that only one exception exists to the general rule that a party seeking a preliminary injunction cannot demonstrate irreparable harm where that party may be fully compensated by money damages: "There's only one exception to this rule and it's if the party is insolvent." *See* Transcript Excerpt, April 18, 2014 Hearing, appended hereto as *Exhibit H*. Attorney Goldenberg opted to speak on the issue of insolvency without being fully candid with the Court about the fact that TriPlanet Partners had already engaged bankruptcy counsel to advise on possibly filing a Chapter 11 petition. *See* Rules of Professional Conduct, Rule 3.3.

In fact, in the Declaration of A. Mitchell Greene, Esq., of Robinson Brog Leinwand Greene Genovese & Gluck, P.C., dated May 30, 2014, Attorney Greene seeks the appointment of his firm as TriPlanet Partners' bankruptcy counsel, and confirms the following facts: "In October 2013, the Debtor [TriPlanet Partners] first engaged Robinson Brog to provide counsel with respect to a potential restructuring. In April 2014, the Debtor once again sought Robinson Brog's counsel to assist it in the preparation and filing of the [Chapter 11 petition]." *See* Declaration of A. Mitchell Greene, at ¶5, appended hereto as *Exhibit Q*.

34

## V.     CONCLUSION

For all the foregoing reasons, and for the reasons previously set forth in Plaintiff's Motion for Preliminary Injunction and Motion for Sanctions, Benjamin Roberts respectfully requests that this Court (a) enter sanctions against Defendants Sophien and Imed Bennaceur, as set forth above, including an award of Plaintiff's reasonable attorneys' fees and costs, (b) grant Plaintiff a preliminary injunction enjoining Sophien and/or Imed Bennaceur to forthwith bring into the State of Connecticut cash assets of not less than $6 million to be placed in the Court's registry in satisfaction of the PJR Order, and (c) grant such other and further relief as this Court deems just and proper.

Dated:        June 18, 2014
              New Canaan, CT

                                         O'ROURKE & ASSOCIATES, LLC

                                         *Lorey R Leddy*

                                         Brendan J. O'Rourke, Esq. (ct 00522)
                                         Lorey Rives Leddy, Esq. (ct 19297)
                                         O'ROURKE & ASSOCIATES, LLC
                                         27 Pine Street
                                         New Canaan, CT 06840
                                         Tel (203) 966-6664
                                         Fax (203) 966-5710
                                         brendan@orourkeandassoc.com

                                         Irve J. Goldman (ct 02404)
                                         PULLMAN & COMLEY, LLC
                                         850 Main Street, P.O. Box 7006
                                         Bridgeport, CT 06601-7006
                                         Tel (203) 330-2213
                                         Fax (203) 576-8888

                                         *Attorneys for Plaintiff Benjamin Roberts*

35

## CERTIFICATION

This is to certify that, on June 18, 2014, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all persons and counsel of record, as listed below, by operation of the Court's electronic filing system, or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

Andrew R. Goldenberg, Esq.
Jared Stamell, Esq.
Stamell & Schager, LLP
One Liberty Plaza 35th Floor
New York, New York 10006-1404

Lorey Rives Leddy