## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BENJAMIN ROBERTS, | : | |
|     Plaintiff, | : | |
| | : | |
|     v. | : | No. 3:12-cv-01222 (JAM) |
| | : | |
| SOPHIEN BENNACEUR, et al., | : | |
|     Defendants. | : | |

## ORDER ON PENDING MOTIONS

This case arises from a disintegrated business relationship between plaintiff Benjamin Roberts and defendants Sophien Bennaceur, Imed Bennaceur, and TriPlanet Partners LLC (TriPlanet). Sophien and Imed Bennaceur are brothers and managing members of TriPlanet. After defendants suddenly terminated plaintiff from his high-level financial services position at TriPlanet, plaintiff brought suit to recover millions of dollars in overdue equity payments and unpaid salary. Following the issuance of a prejudgment remedy in plaintiff's favor and in the midst of innumerable discovery disputes, TriPlanet filed for bankruptcy and was subject to an automatic bankruptcy stay. I now address plaintiff's second motion for sanctions and other pending motions only as to defendants Sophien and Imed Bennaceur. I conclude in principal part that the Court has personal jurisdiction over Sophien and Imed Bennaceur and that, in light of their flagrant abuses of the disclosure and discovery process, plaintiff's motions for sanctions should be granted and default judgment should enter against Sophien and Imed Bennaceur in the amount of $8,136,222.60.

### BACKGROUND

As this Court has described in prior rulings (Docs. #78, #184), plaintiff Benjamin Roberts was Vice President and Chief Information Officer at The Hartford Insurance Group in

1

Connecticut when he met Sophien Bennaceur while vacationing in Miami in April 2010. Sophien discussed a potential business venture with plaintiff, and over a period of several months he recruited plaintiff to work for a new consulting group that Sophien had formed with his brother Imed—TriPlanet Partners. In July 2010, Sophien offered plaintiff the following compensation package: over $500,000 as an annual salary, a 15% equity ownership interest in the company, an annual equity payment conditioned on his satisfaction of enumerated performance criteria, and the possibility of earning an additional 10% interest in the company pending satisfaction of additional performance goals. Plaintiff accepted that offer, left his position at The Hartford, and began working full time for TriPlanet in August 2010.

While working at TriPlanet, plaintiff provided financial services to TriPlanet's primary client, the Royal Bank of Scotland (RBS). Throughout 2011, both Sophien and Imed repeatedly assured plaintiff that he had been successful, that they were pleased with his performance, and that he was entitled to payment of a 15% equity interest for 2010 as well as a 25% equity interest for 2011 (based on his satisfaction of performance goals). But plaintiff never received any equity payment for 2010 or 2011. In June 2012, shortly after he inquired about the overdue equity payments, the company suddenly terminated him.

Two months later, plaintiff filed this lawsuit seeking compensation for his salary from May and June 2012 and his annual equity payments for 2010 and 2011. He alleged breach of contract, violation of the Connecticut wage statute, fraudulent inducement, common-law fraud, securities fraud, breach of fiduciary duties, and conversion, and he sought damages, an accounting, a constructive trust, and a declaratory judgment.[1] Defendants responded in

---

[1] On March 12, 2013, the Court dismissed a civil theft claim (Count IX). Doc. #61.

November 2012 with a motion to dismiss, alleging that the Court lacked personal jurisdiction over them (Doc. #21).

In October 2012, plaintiff moved for a prejudgment remedy (PJR) on his breach-of-contract and wage statute claims. *See* Docs. #14, #78 at 1–2 n.1. At a hearing on March 12, 2013, the Court (*Stefan R. Underhill*, J.) denied defendants' motion to dismiss based on the pleadings, but stated that defendants could raise the personal jurisdiction issue again after jurisdictional discovery. Doc. #80 at 4–8, 17, 28. The Court also heard evidence on plaintiff's motion for PJR, taking testimony from both plaintiff and Sophien. To estimate his damages, plaintiff calculated TriPlanet's 2010 and 2011 profits using underlying documentation of RBS invoices and staffing costs, as well as his personal estimates of operating expenses. *See* Pl.'s Exhs. 17, 21 (admitted at March 12, 2013 PJR hearing). Defendants submitted TriPlanet's financial spreadsheets, prepared internally, which tallied cash received, payroll costs, and other operating expenses. *See* Defs.' Exhs. A, B (admitted at March 12, 2013 PJR hearing). Neither Sophien nor Imed had first-hand knowledge of the spreadsheets' contents, and they submitted no supporting documentation; instead, Sophien assured the Court that they would provide that documentation to plaintiff at a later date.

In April 2013, defendants filed their answer to plaintiff's original complaint, asserting several affirmative defenses and one counterclaim for breach of contract, but omitting any claim that the Court lacked personal jurisdiction over them. Docs. #65, #66. In May 2013, the parties submitted a Rule 26(f) Planning Report indicating that they intended to engage in discovery regarding personal jurisdiction. Doc. #72 at 7.

On June 20, 2013, Judge Underhill awarded plaintiff a PJR, finding that defendants were more likely than not liable on both the contract and wage statute claims. Doc. #78 at 8, 10, 12.

The Court accepted plaintiff's claim that he had met his performance goals and found that he was probably entitled to equity payments, because Sophien voiced only weak opposition at the PJR hearing and had not reviewed the company's financials to verify whether the goals had been met. *Id.* at 7–8. Critically, the Court found that all defendants were likely to be liable under Count II—the wage statute—for both plaintiff's base salary and the unpaid equity distributions, because "the unpaid equity distributions constitute a form of bonus for which both the payment and the amount are nondiscretionary under the terms of the Employment Agreement." *Id.* at 10.

The Court also adopted plaintiff's revised damage calculation, which substituted plaintiff's own revenue and expense estimates with defendants' numbers to support a downward revision of his original damages estimate. *Compare* Pl.'s Exh. 17 *with* Pl.'s Exh. 21. It awarded $8,858,949 for plaintiff's contract claim, equal to a 15% share of TriPlanet's 2010 profits, a 25% share of 2011 profits (converted from pounds to U.S. dollars based on the 2011 average exchange rate), and unpaid salary for May and June 2012.[2] On the same day, the Court ordered defendants to disclose assets sufficient to satisfy the PJR.

About two weeks after the PJR hearing, on March 29, 2013, Sophien transferred his Manhattan loft apartment, worth millions of dollars, to his brother Moez Bennaceur for no money. On October 1, 2013, the Court granted plaintiff leave to amend his complaint to add claims against both Sophien and Moez for statutory fraudulent transfer (Count XII) and common law fraudulent conveyance (Count XIII),[3] and the amended complaint was filed the same day.

---

[2] The Court declined to include in the PJR an award of double damages or attorney's fees under the Connecticut wage statute, because plaintiff had not demonstrated at that time that defendants had acted in bad faith.

[3] Moez Bennaceur has not filed an appearance or an answer in this action. In the meantime, plaintiff brought an action against defendants including Moez Bennaceur in the U.S. District Court for the Southern District of New York (SDNY) seeking damages for fraudulent conveyance of the Manhattan apartment and an order of attachment against the apartment to effectuate plaintiff's PJR in this action. Moez also failed to appear in the SDNY action, but after finding that Moez had deliberately avoided service of process, Judge Batts issued an order of

Docs. #110, #113 at 3. Two weeks later, defendants filed their answer to the amended complaint, repeating their affirmative defenses and counterclaim, but now without asserting a defense of lack of personal jurisdiction. Doc. #114.

Discovery and disclosure disputes have since ensued. The Court has issued several orders, and in November 2013, plaintiff filed his first motion for sanctions. *See* Doc. #121. This case was transferred to my docket on March 24, 2014. On May 8, 2014, I dismissed the sanctions motion without prejudice to renewal, noting that I intended to impose sanctions if defendants did not comply with a new order compelling them to produce enumerated documents. Doc. #184 at 11. The following day, TriPlanet filed for bankruptcy, resulting in an automatic stay in these proceedings against the company pursuant to 11 U.S.C. § 362(a).

The Court held a hearing on May 28, 2014, to ascertain the state of the parties' discovery compliance, at which it declined to stay proceedings against the individual defendants, and at which plaintiff represented that defendants had not complied with discovery orders. Subsequently, plaintiff renewed his motion for sanctions. Doc. #199. On August 15, 2014, the Court scheduled a hearing on the renewed motion in light of the evidence discussed at length below, and instructed the parties to prepare to "address defendants' compliance with . . . court orders" and "whether an appropriate sanction should be default judgment for plaintiff against the individual defendants in the amount of $8,858,949." Doc. #228. At the sanctions hearing on September 4, 2014, plaintiff appeared represented by counsel and withdrew his fraudulent inducement claim (Count III). *See* Doc. #239 at 85–86. Neither defendant was present, and their

---

attachment as well as an order prohibiting the sale or transfer of the apartment. *See Roberts v. Bennaceur*, No. 1:14-cv-2838-DAB, ECF No. 4 (S.D.N.Y. Apr. 22, 2014); *id.* ECF No. 30 (S.D.N.Y. continuing order May 1, 2014). The action was soon stayed pending the resolution of TriPlanet's bankruptcy court proceedings, *id.* ECF No. 48 (S.D.N.Y. Oct. 17, 2014), and on February 5, 2015, Judge Batts vacated her prior orders when the bankruptcy court approved a settlement agreement between Moez and TriPlanet Partners providing for the transfer of the Manhattan apartment from Moez to TriPlanet. *See id.* ECF No. 51 (S.D.N.Y. Feb. 5, 2015).

attorney indicated that neither Sophien nor Imed had responded to counsel's emails alerting them of the hearing date and the prospect of sanctions as sought by plaintiff.

On September 25, 2014, the Bankruptcy Court for the Southern District of New York (*Robert D. Drain, J.*) issued an order extending the bankruptcy stay specifically to Counts I, V, VIII (as to only TriPlanet), X, XI (as to only TriPlanet), XII, and XIII. The court reserved decision as to Count II and declined to extend the stay to the individual defendants as to Counts III, IV, VI, VII, VIII, and XI. Doc. #261-1 at 2–3. At a subsequent hearing on October 15, 2014, the bankruptcy court issued a decision declining to extend the stay as to Count II. Doc. #263 at 3–5.

On October 31, 2014, defendants filed a motion to dismiss plaintiff's amended complaint for lack of personal jurisdiction. Doc. #265.

I now describe in detail the record of non-compliance by defendants Sophien and Imed Bennaceur with the Court's asset disclosure and discovery orders.

### Asset Disclosure

To effectuate the PJR, the Court required all defendants to disclose property. First, in June 2013, the Court ordered defendants to "disclose to Roberts money or property in which they have an interest, or debts owing to them, sufficient to provide security in the amount of $8,858,949." Doc. #78 at 12; *see* Conn. Gen. Stat. § 52-278n. In July 2013, several days after the response deadline, Sophien and Imed filed a response indicating that "Defendants do not have assets or property in Connecticut in which they have any interest, or debts owing to them, sufficient to provide security in the amount of $8,858,949," along with supporting affidavits executed by the individual defendants. Docs. #86, #86-1, #87-1.

After a telephonic hearing in October 2013, the Court clarified its order to require all defendants to engage in the following disclosure:

> [T]o disclose, collectively and individually, their assets within the United States. If these assets are sufficient to meet Plaintiff's Prejudgment Remedy (PJR) amount of $8,858,949, then no additional disclosure is required. . . . If the Defendants' assets within the United States are insufficient to secure the amount set in the PJR ruling, then the Defendants must also disclose, collectively and individually, sufficient assets held worldwide to secure the PJR amount.

Doc. #113 at 2–3. Two weeks later, Sophien, Imed, and TriPlanet collectively disclosed a bank account at Banque Internationale Arabe de Tunisie containing 350,000 dinar (a Tunisian dinar is about half a U.S. dollar). The disclosure did not list the bank account holder, account number, or the location of the account.[4]

On May 8, 2014, the Court granted defendants yet one more opportunity to comply with its asset disclosure order. Doc. #184 at 6–7. The Court ordered that "*each* one of the defendants TriPlanet, Sophien Bennaceur, and Imed Bennaceur shall individually and with specificity disclose tangible, marketable assets" that are held "in each of their individual names," are located within the United States, and are "sufficient individually to meet the prejudgment remedy amount of $8,858,949." *Id.* at 7, 11 (emphasis in original). The Court also ordered the following:

> For each of defendants' disclosures, these assets must bear the ownership name of each defendant, must have their specific location disclosed, and must have a readily determinable market value and without impediment or cloud to their attachment upon additional process. If any of the defendants do not have sufficient marketable assets within the United States, then such defendant(s) shall disclose in the manner indicated above any marketable assets that they hold worldwide in their name in an amount that suffices as to each of them to satisfy the prejudgment remedy order of $8,858,949.

*Id.* at 11–12.

---

[4] Defendants also disclosed "Intellectual property" owned by TriPlanet that they valued at $10 million.

Defendants responded with their third disclosure, which separately lists the assets of each defendant. Doc. #199-1 at 137–38. Imed's line item contains one category, "2 Apartments in Tunis," valued as follows: "Purchased for approximately TND 250K and TND 520K. Present value is unknown." *Id.* at 38. Sophien's line item states only "N/A." *Ibid.* The disclosure also contains a footnote stating: "The supplemental list includes tangible assets owned by each Defendant not included in bank statements Defendants have produced separately." *Id.* at 137 n.1.

At a hearing at the end of that month held to assess the state of outstanding document requests and asset disclosures, the Court asked defendants if they were confident that all assets—particularly Sophien's assets—had been disclosed. Counsel repeatedly affirmed that all of Sophien's assets had been disclosed, but later in the hearing, disclosed a Tunisian bank account, an apartment held in Sophien's name, a BMW owned by Sophien, and Sophien's interest in two companies—Phoenician Capital (15%) and TriPlanet Consulting (33%). To date, neither Sophien nor Imed has ever disclosed these assets in writing.

During the September 2014 sanctions hearing, plaintiff produced documents revealing that Sophien, Imed, Phoenician Capital, and TriPlanet Consulting all have substantial claims pending against TriPlanet in the company's ongoing bankruptcy proceedings. *See* Docs. #237-3 (voluntary bankruptcy petition), #237-4 (schedules for bankruptcy petition), #237-6 (Sophien Bennaceur proof-of-claim), #237-7 (Phoenicia [sic] Capital proof-of-claim). Sophien filed a claim for over $13 million, and Phoenician Capital filed a claim for over $4.6 million. Neither defendant had disclosed those claims in this proceeding.

## Discovery Production

Throughout this litigation, the Court has ordered defendants to produce documents in discovery that would allow plaintiff to ascertain his damages by determining TriPlanet's

financial condition, including profits and liabilities. In view of the fact that plaintiff's measure of damages principally stems from defendants' failure to make equity distributions, it is obviously vital for plaintiff to have broad access to financial documents relating to the valuation of TriPlanet during the years in question.

At the March 2013 PJR hearing, the Court asked Sophien whether he would disclose to plaintiff the "underlying . . . bookkeeping information" that TriPlanet used to produce its internal financial statements (Defs.' Exhs. A & B) and that accountants were using to audit TriPlanet's finances. Doc. #80 at 108. Sophien replied, "One hundred percent." *Ibid.* When asked about what financial information he was willing to share with plaintiff, Sophien stated:

> [W]e'll be happy to start sharing the . . . systems we have. I'm ready. We're an open book. . . . Ben [plaintiff] didn't know what my compensation is. . . . I would love to tell him about that. But he didn't know what the loan is that Imed made to the company in order to start the company. He wasn't aware of that. We're happy to tell him what that is and show it to him.

*Id.* at 114. Sophien verified that he would have TriPlanet's backup financial documents available within days, and that he would produce TriPlanet's financial statements, audited and compiled by accounting firm KPMG, by mid June 2013. *Id.* at 104.

Months later, in June 2013, the Court ordered defendants to produce "all non-privileged underlying financial documents that were provided to by [sic] the defendants' accounting firm(s) to enable those firms to prepare financial statements" and "all documents in their possession relating to the employment agreements, loans, and other compensation issues raised at the March 12, 2013 hearing." Doc. #79. Several months after that, in October 2013, after adopting a confidentiality agreement to resolve a discovery stalemate, the Court again ordered defendants "to produce discovery as required in . . . previous orders." Doc. #113 at 3.

At a hearing in April 2014, plaintiff represented that defendants had not produced individual tax returns, cash flow statements, documentation of TriPlanet's outgoing payments, many requested bank statements and expense account statements, or documentation of loans. Accordingly, the Court gave defendants one more chance to comply. In May 2014, the Court ordered them to disclose by May 23, 2014, "all remaining records in response to [plaintiff's] specific itemized discovery demands," Doc. #184 at 12, which included:

- All financial statements, including without limitation, income statements, profit and loss statements, balance sheets and cash flow statements for TriPlanet Partners, LLC, including audited and unaudited preliminary and final, monthly, quarterly, or annual of each;

- Copies of tax returns of Sophien Bennaceur and Imed Bennaceur, from 2009 to the present, filed in any country, state, province, municipality or city, including, but not limited to, the United Kingdom, Tunisia, the United States, New Jersey, New York State and New York City;

- Copies of all 1099s, W-2s, K-1s, and Form 941s issued to, or prepared for, Sophien Bennaceur and Imed Bennaceur, for calendar years 2009 to the present;

- Copies of all K-1 s, W-2s, 1099s and Form 941s issued by TriPlanet Partners, LLC for calendar years 2009 to the present;

- Bank statements and cancelled checks for each bank account, including checking, savings, money market or other investment account, held by (a) Sophien Bennaceur, (b) Imed Bennaceur, and (c) TriPlanet Partners, LLC, or on behalf of any or all of the Defendants, from January 2009 to the present; and

- Copies of all promissory notes or documents sufficient to demonstrate all loans made to TriPlanet Partners, LLC by (a) Sophien Bennaceur, and (b) Imed Bennaceur, including documents regarding the repayment of all such loans.

Doc. #121-1 at 10–11.

The record now shows—and Sophien and Imed Bennaceur do not contest—that they still have not produced many of those documents. Plaintiff has enumerated documents he alleges are still missing from production and in defendants' possession. *See* Docs. #199 at 8–10, #237-1.

Defense counsel has not substantively challenged many of the allegations (as discussed in more detail below).

Defendants have not produced "[a]ll financial statements," as ordered. In October 2013, Imed Bennaceur, in his capacity as TriPlanet's managing partner, engaged accountant Glen Malings at the New York accounting firm of Raich Ende Malter & Co. LLP (Raich) to compile TriPlanet's financial documents into a report. At a deposition in May 2014, Glen Malings testified that when compiling the report, he relied on work papers and emails received from Vin Od and Karen Harris, two of TriPlanet's accountants in the United Kingdom, as well as Malings's own "journal entries." Doc. #199-1 at 74–75, 78–82. The same day, defense counsel agreed to produce those documents. Although defendants have now submitted several affidavits from Malings, they have not produced those communications and journal entries.

Defendants produced the Raich report to document TriPlanet's financials, but the engagement agreement with Raich states that TriPlanet management—Sophien and Imed— "elected to omit substantially all of the disclosures and the statement of cash flows required by accounting principles generally accepted in the United States of America," and it notes that the firm did not examine or inspect source documents like cancelled checks or bank images to detect errors or fraud. Docs. #133-4 at 2–3; #137 at 4–7; #157-2 at 1–6; *see also* Doc. #136 (Benjamin Roberts Compensation Summary Worksheet). Rather, Raich relied on defendants to fairly and accurately prepare and present financial statements, apply accounting principles, and detect fraud. Doc. #133-4 at 2–3. Malings attested that Raich recommended a compilation in part because Raich lacked "a Statement of Cash Flows and disclosures," which would be required to conduct an audit. Doc. #157-2 at 2. Malings also noted that Raich "did not prepare annual balance sheets because that would require more time and documentation," *id.* at 3, and that the

firm calculated TriPlanet's tax liability based on TriPlanet's submitted balance sheets because defendants' internal financial statements "did not include an accrual of income taxes"—a figure necessary to calculate plaintiff's compensation under his profit sharing employment agreement. *Id.* at 6; *see also* Doc. #199-1 at 72–73.

Defendants still have not produced complete documentation of TriPlanet's tax liability, in spite of the fact that they claim that they should be able to deduct their estimated liability from the profit calculation subject to equity distribution. They have not produced any tax forms issued by TriPlanet that would show employees' taxable income. Defendants asserted that they engaged counsel and accountants to determine TriPlanet's U.K. tax liability, and that TriPlanet "filed tax returns and has paid more than £7.6 million, or $13 million, in [Value-Added Tax (VAT)] to [Her Majesty's Revenue & Customs Office (HMRC)]"—the U.K. equivalent of the IRS. Docs. #202 at 4, #206 at 1–2.

Defendants suggest that tax documentation "exists in the form of taxes paid to date, UK tax estimates . . . and the discussions with HMRC and the UK Insolvency Office," but they have not produced it and do not cite relevant record evidence. Doc. #206 at 1–2. Instead, defendants cite only their unaudited financial statements, an expert statement generally affirming that TriPlanet would owe U.K. taxes, and plaintiff's testimony that an accurate accounting of TriPlanet's profits would incorporate TriPlanet's tax liability. *See* Docs. #202 at 4–5, #206 at 1–2, #207.

During the September 2014 sanctions hearing, plaintiff presented several documents produced in TriPlanet's bankruptcy proceeding and signed by Sophien Bennaceur, indicating that Sophien had submitted a detailed accounting of TriPlanet's liabilities to the bankruptcy court but withheld similar information in this litigation. Docs. #237-3, #237-4. No satisfactory explanation

has emerged as to why new financial information would be presented to the bankruptcy court that had not been produced in response to plaintiff's preceding discovery demands and this Court's discovery orders.

Also absent from the record is documentation substantiating significant payments from TriPlanet funds to the individual defendants. Defendants have withheld bank statements from TriPlanet's primary Barclays bank account—most relevant here is a missing statement from January 2011. Plaintiffs have had to resort to subpoenaing these documents directly from Barclays itself, and these records suggest significant financial transactions. They show that TriPlanet transmitted payments of $42,495.05 to a Credit Suisse bank account held by Imed Bennaceur on January 5, 2010; over $500,000 to a J.P. Morgan Chase bank account held by Sophien Bennaceur between January 19, 2011, and April 15, 2013; $15,000 to an unnamed U.S. bank account in Imed Bennaceur's name on October 1, 2010; and nearly $400,000 to a Banque Int'l Arabe de Tunisie account in Sophien Bennaceur's name in mid-June 2011. Doc. #199-1 at 108–110.

Bank statements disclosed by defendants show additional substantial payments—millions of pounds—from TriPlanet to each of the individual defendants. *See, e.g.*, Doc. #160-1 at 69–76. Yet neither Sophien nor Imed have produced records reflecting their receipt of these payments. The limited bank statements from Sophien's J.P. Morgan Chase account do not reflect substantial payments from TriPlanet after May 11, 2011, and Sophien has not produced any records from his Banque Internationale Arabe de Tunisie account. Imed has produced no records from Credit Suisse or any other account that reflect those large payments.

Sophien and Imed have produced only limited tax records and have not produced records that would reflect their tax payments or income used as a basis for calculating payments. Still

missing are (1) any of Imed's 2010 tax returns from any jurisdiction, (2) Sophien or Imed's 2011 extension requests or tax returns from any jurisdiction, (3) Sophien's 2013 extension request or tax return from any jurisdiction, and (4) Imed's 2013 U.S. tax returns or an extension request for any state and/or foreign jurisdiction.

One missing set of tax documents stands out. TriPlanet's internal financial statement includes a line item for "Sophien Bennaceur-Director Revenue" indicating that £5,539,550.00 was paid from TriPlanet to Sophien in 2011, Defs.' Exh. B at 3, and Sophien confirmed during the PJR hearing that he had received that money. Doc. #81 at 5. But there is no other record documenting such a payment. For example, Sophien has not submitted any bank statement that reflects a deposit of that size. In addition, although he testified that he received an IRS Form 1099 from TriPlanet to document that payment, *id.* at 33–34, he has not produced any 1099s or similar records.

Additionally, although Sophien has testified about loans between Moez, Imed, and TriPlanet, and has indicated that some of the unsubstantiated transfers between defendants were loan repayments, defendants have not produced relevant promissory notes, repayment information, or other loan documents in a timely manner. Sophien produced the only document in this category—a promissory note to Moez Bennaceur—at the end of June 2014, over one month after the extended discovery deadline.

## DISCUSSION

### *Personal Jurisdiction*

Defendants have moved to dismiss on the ground that the Court lacks personal jurisdiction over them in this matter. Doc. #265. Facing an objection to personal jurisdiction, a plaintiff bears the burden of demonstrating that the Court has jurisdiction over a nonresident

defendant. *See Troma Entertainment, Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013). Personal jurisdiction by a federal court is governed in part by the law of the state in which the court sits. *See Spiegel v. Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010) (*per curiam*). Establishing personal jurisdiction over a foreign defendant requires a two-step inquiry: first, to determine whether the defendant is subject to jurisdiction under the law of the forum state— Connecticut; next, to evaluate whether asserting personal jurisdiction over the defendant is consistent with constitutional due process. *See Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014) (*per curiam*).

But personal jurisdiction can "be purposely waived or inadvertently forfeited." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 133 (2d Cir. 2011); *see also Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). Indeed, the Federal Rules specifically provide that personal jurisdiction must be raised by motion prior to a responsive pleading to the complaint or by means of a responsive pleading (the answer), *see* Fed. R. Civ. P. 12(b)(2), and a party waives any defense to personal jurisdiction if he fails to raise it in this manner. Fed. R. Civ. P. 12(h)(1). And even if a defendant addresses the issue by timely motion or in a responsive pleading, he forfeits his right to later move to dismiss for lack of personal jurisdiction if he participates in "'[c]onsiderable pretrial activity,'" and forgoes opportunities to make the motion earlier. *In re Rationis Enterprises, Inc. of Panama*, 261 F.3d 264, 268–69 (2d Cir. 2001) (alteration in original) (quoting *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61–62 (2d Cir. 1999)).

I first note that although defendants' initial responsive pleading moved to dismiss the case for lack of personal jurisdiction (Doc. #21), neither of their answers to plaintiff's first or amended complaints (Docs. #65, #66, #114) raised the defense at all. *See* Fed. R. Civ. P.

12(h)(1)(B)(ii). In fact, after they mentioned this defense in their May 2013 Rule 26(f) Report (Doc. #72 at 7), defendants waited over one year before they again mentioned it in passing in a June 2014 motion to compel plaintiff to produce documents (Doc. #198 at 2). In the interim, and subsequently, the parties engaged in significant motion practice and pretrial discovery, including discovery on the merits, without including the defense in responsive pleadings. *Cf. Zherka v. Ryan*, __ F. Supp. 3d __, 2014 WL 4928956, at *2 (S.D.N.Y. 2014) (finding that defendant had not waived jurisdictional defense where she had "consistently, in each of her filings before the court, challenged" jurisdiction). Defendants here did not file this motion until the final dispositive motion deadline. *See Burton v. N. Dutchess Hosp.*, 106 F.R.D. 477, 481 (S.D.N.Y. 1985) (noting that after engaging in jurisdictional discovery, "defendants should have moved at the earliest possible opportunity to dismiss the complaint" to avoid forfeiting defense to personal jurisdiction). In addition, the parties have appeared in court repeatedly without explicitly contesting personal jurisdiction. *See India S.S. Co. Ltd. v. Kobil Petroleum Ltd.*, 620 F.3d 160, 161 (2d Cir. 2010) (*per curiam*) (noting that party's "general appearance conferred on the district court jurisdiction that is general and *in personam*" and that defendant "therefore waived objection to jurisdiction over its person, asserted broadly").

        I am further persuaded that defendants have waived their jurisdictional defense because they availed themselves of the opportunities afforded by Connecticut law by seeking a prejudgment remedy against plaintiff. *See Grammenos v. Lemos*, 457 F.2d 1067, 1070 (2d Cir. 1972) ("If a party enters a case, . . . and asks the court to act on its behalf in some substantive way, it will be held to have waived further objection."); *Indymac Mortgage Holdings, Inc. v. Reyad*, 167 F. Supp. 2d 222, 233–34 (D. Conn. 2001) (providing that defendant waived jurisdictional defenses because she "attended a prejudgment remedy hearing" and "sought

affirmative relief by filing a permissive counterclaim"). Accordingly, I deny defendants' motion to dismiss for lack of personal jurisdiction.

### Sanctions for Disclosure and Discovery Abuses

Federal Rule of Civil Procedure 37(b)(2)(A) empowers this Court to issue discovery sanctions in its discretion "[i]f a party . . . fails to obey an order to provide or permit discovery." Sanctions may be imposed to serve any or all of the following purposes: (1) "to protect other parties to the litigation from prejudice resulting from a party's noncompliance with discovery obligations" and/or restore those parties to where they would have been absent the discovery violation; (2) to "ensure that a party will not benefit from its own failure to comply" by, among other things "placing the risk of an erroneous evaluation of the [absent evidence] on the [violating] party"; (3) "to obtain compliance with the particular order issued"; or 4) "to serve a general deterrent effect on the case at hand and on other litigation." *Chin v. Port Auth. of N.Y & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012) (internal citation omitted), *cert. denied*, 133 S. Ct. 1724 (2013); *S. New England Tel. Co. (SNET) v. Global NAPs Inc.*, 624 F.3d 123, 149 (2d Cir. 2010) (discussing purpose of sanctions in connection with order affirming default judgment for discovery sanctions).

Courts may impose sanctions as severe as default judgment for violating discovery orders where violations were due to "willfulness, bad faith, or any fault." *Guggenheim Capital, LLC v. Birnbaum*, 722 F.3d 444, 451 (2d Cir. 2013); *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 135 (2d Cir. 2007) (same). In evaluating whether it is appropriate to impose such an extreme remedy, courts consider the degree of willfulness, the duration of noncompliance, whether lesser sanctions would effectively resolve the specific problems caused by a lack of discovery, and whether the non-compliant party was given notice of the possibility that he would

face such a sanction and an opportunity to comply with outstanding orders. *See Guggenheim Capital, LLC*, 722 F.3d at 451 (citing *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009) (*per curium*)). The factors are not exclusive and they "need not each be resolved against" the noncompliant party to justify default judgment. *SEC v. Razmilovic*, 738 F.3d 14, 25 (2d Cir. 2013), *as amended* (Nov. 26, 2013) (quoting *SNET*, 624 F.3d at 144), *cert. denied*, 134 S. Ct. 1564 (2014). If default judgment is an appropriate sanction, the Court may dispose of all claims related to the discovery violation at issue. *See Shcherbakovskiy*, 490 F.3d at 140 ("[T]he . . . sanction must be commensurate with the non-compliance.")

The Second Circuit has recognized a range of behaviors as willful, ranging from repeated tacit non-production, inadequate production, and delays in production, *see Guggenheim Capital, LLC*, 722 F.3d at 447–48, 451; *Minotti v. Lensink*, 895 F.2d 100, 102–03 (2d Cir. 1990); *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1064–65, 1068 (2d Cir. 1979), to misrepresentations of available documents, *SNET*, 624 F.3d at 141–43, 147–48, to outright and unambiguous defiance of court orders, *see Razmilovic*, 738 F.3d at 21, 26 (finding that defendant demonstrated willfulness when he notified opposing party that he would not be attending in-person deposition, in spite of court order to do so). The district court in *Guggenheim Capital* granted default judgment against a defendant who repeatedly failed to comply with discovery orders in spite of receiving multiple extensions and warnings and who refused to answer any questions during his deposition, in direct violation of court orders. 722 F.3d at 451, 454. Similarly, in *Minotti*, the plaintiff did not comply with court orders to produce documents after the court overruled his objections to requests for production, ordered him to produce the documents, and granted him several extensions. When he indicated that he had

complied, in spite of evidence that he had not, the court found his behavior to be willful and dismissed his claim. 895 F.2d at 102–03.

The facts of *SNET* and *Cine Forty-Second St. Theatre Corp.* resemble those in this case. In *SNET*, the plaintiff SNET's claim was premised on a theory of alter-ego liability that would allow him to pierce the defendant corporation's veil and hold its officers individually liable. SNET sought discovery on the structure of the defendant corporation and its affiliated companies. The case, like this one, involved several rounds of discovery disputes and court orders to produce enumerated financial documents. Although the defendants produced some documents in response, their production was duplicative and incomplete. The defendants assured the court that some documents could not be found, although later discovery revealed that documents had been intentionally destroyed or were in the hands of third parties, from whom the defendants could have easily accessed them. The Second Circuit affirmed the district court's default judgment against all defendants, finding that they had acted willfully, intentionally, and in bad faith. *SNET*, 624 F.3d at 147–49.

In *Cine Forty-Second St. Theater Corp.*, the plaintiff theater company delayed answering the defendants' interrogatories bearing on its alleged damages, and many of its late-filed answers "were bare, ambiguous cross-references to general answers elsewhere in the responses. Highly specific questions concerning the design of Cine's theater were answered with architectural drawings that did not even purport to show the dimensions requested." 602 F.2d at 1064. The plaintiff then complained to the court that the interrogatories were intended to harass, but the plaintiff never moved to strike them. It filed supplemental similarly non-responsive answers and failed to obey additional court orders compelling discovery. The plaintiff delayed retaining a damages expert and declined to file an interim response ordered by the court. Finally, it filed two

deficient answers two months late with information unrelated to the relevant time period, which
"failed to provide any indication as to the method of calculating a major portion of the alleged
damages." *Ibid.* Finding that the actions of plaintiff and its attorney were grossly negligent, the
Second Circuit directed the court to preclude the plaintiff from presenting evidence of its
damages—a sanction "tantamount to a dismissal"—noting that such harsh sanctions were
justified even absent evidence that they had willfully intended to evade court orders. *Id.* at 1065,
1068.

In the midst of the discovery disputes that ensued over the last year, this Court has issued
four orders requiring defendants—TriPlanet, Sophien, and Imed—to disclose assets sufficient to
satisfy the prejudgment remedy, to produce documents relevant to the calculation of TriPlanet's
profits, or both. Docs. #78, #79, #113, #184. Sophien and Imed's repeated failures to comply
with court orders, their misrepresentations, and their inadequate explanations for their actions
have demonstrated their bad faith throughout these proceedings. *See Guggenheim Capital, LLC*,
722 F.3d at 450–51.

Sophien and Imed Bennaceur have regularly promised to produce documents and later
provided spurious explanations for their failure to do so. Although Sophien assured the Court
during the March 2013 PJR hearing that he would freely and promptly produce TriPlanet's
underlying financial documents and financial statements audited by accounting firm KPMG,
defendants did not produce the Raich report—an unaudited compilation statement—until mid-
December 2013. Sophien attributed that delay to his inability to conclude an engagement
agreement with KPMG and more generally to "civil disorder in Tunisia . . . as well as a month of
Ramadan," but did not explain how Tunisian conditions affected his ability to close a deal with

KPMG—by his own account, a "worldwide accounting firm" with offices in New York and Virginia. Doc. #133 at 1–2; *see also* Doc. #131-2.

Similarly, although defendants have repeatedly stated that the missing bank statements "are either not in Defendants' possession or do not exist," Doc #202 at 16, they have since belatedly produced some of those statements, negating their own claim. *See* Doc. #237-1. Moreover, although defense counsel indicated during the May 2014 hearing that Imed could not access his Wells Fargo account statements without "branch office authorization," which he could not get when he was in Tunisia, counsel next stated that Imed was staying in the New York area at that time. Doc. #196 at 31. They did not explain why Imed was unable to access those documents while he was in New York.

Nor can I credit Sophien's explanation for missing tax documents. In the March 2013 PJR hearing, Sophien was asked how he had declared the aforementioned £5.5 million payment from TriPlanet on his tax returns. Sophien replied: "It's a 1099. . . . [I]t's treated as a 1099, not as a W-2." To clarify, the Court conducted a further colloquy:

| | |
|---|---|
| THE COURT: | [A]t the end of the year the firm's accountants or the firm itself had to send you something to declare for your income. |
| [SOPHIEN]: | 1099. |
| THE COURT: | You got a 1099 for this. |
| [SOPHIEN]: | 1099. Same thing we gave Mr. Roberts. |

Doc. #81 at 33–34.

Over one year later, at a hearing in May 2014, defense counsel conferred with Sophien before stating that Sophien's PJR testimony had been a mistake. He explained that Sophien "came from speaking a different language in this country," and that "when you refer to

somebody's 1099 or W-2, [Sophien is] using it to describe someone who is an independent contractor and gets miscellaneous income, not to the document 1099." Doc. #196 at 69–70. This belated explanation is far from convincing and borders on the incredible in light of Sophien's prior testimony and extensive business experience. Still no satisfactory documentation has been produced to explain the £5.5 million payment. And defendants have not explained the other missing tax filings.

Defendants' limited production of loan documents is one more example of their selective compliance and affirmative efforts to conceal by means of misrepresentation. Sophien indicated that he was unable to obtain some of the loan documents because Moez Bennaceur had them, and Moez cut off communication with Sophien and Imed after he was named as a defendant in this lawsuit. Doc. #199-1 at 12–14. But the Court initially ordered defendants to produce all loan documents before July 8, 2013—months before plaintiff joined Moez as a defendant in October 2013. Docs. #79, #110. Had defendants responded to the order in a timely manner, nothing would have barred them from retrieving the required documents. Moreover, in response to plaintiff's default judgment motion against Moez, Sophien strategically produced a promissory note executed by him for Moez Bennaceur's benefit. Doc. #210-3.[5] In the context of the other delays and excuses, this strategic production is evidence that Sophien previously had access to this document, but was skirting the discovery order.

Sophien and Imed Bennaceur also repeatedly exceeded the deadlines for document production. At the May 2014 hearing, one week after the deadline for each defendant to disclose assets, defense counsel stated three separate times that Sophien had no additional assets beyond

---

[5] Although this note appears at face value to recognize a private loan between Sophien and Moez, it was intended to partially satisfy a debt owed to Moez from TriPlanet Partners. Doc. #210-1 at 1. Accordingly, it was within the scope of the discovery order. Doc. #184 at 12 (incorporating documents enumerated in Doc. #121-1 at 10–11).

the "N/A" in the written disclosure, before stating, "[T]here is also a Tunisian bank account [that belongs to Sophien]. . . . [T]here was another apartment that was disclosed previously to plaintiff that's held in Sophien's name." Doc. #196 at 31–33. Defense counsel again indicated that "we provided full disclosure of all of Sophien Bennaceur's assets," but later in the hearing, after consulting with Sophien at the Court's explicit direction, revealed that Sophien also owned a BMW and an interest in two companies. *Id.* at 33, 70–71. Sophien did not disclose his pending claims against TriPlanet in the bankruptcy court, or the claims of companies in which he had an interest—assets which came to light only by virtue of plaintiff's detective work.

Defendants have not taken advantage of the many opportunities they have had to respond and supplement the record. At the May 2014 hearing, following plaintiff's detailed oral accounting of missing documents, defense counsel indicated that with such a "spew of numbers and things," he preferred to respond to plaintiff's claims in writing. But the individual defendants' follow-up brief merely refers to defense counsel's representations at the May 2014 hearing, and indicates generally that all of the documents alleged to be missing "are either not in Defendants' possession or do not exist." Doc #202 at 16.

Nor can it be said that defendants were not on notice that sanctions would result from their willful violation of the Court's order. In spite of the Court's notice that it was considering imposing sanctions, the individual defendants did not respond to their attorney's emails in advance of the September 2014 sanctions hearing, were not in touch with him, and did not appear at the hearing. At the hearing itself, defense counsel did not challenge plaintiff's contention that the enumerated documents had not been produced.

Defendants have made several final attempts to respond. They submitted a post-hearing brief that, again, does not dispute that documents have not been produced, but again asserts that

23

the missing documents were not in defendants' possession, custody, or control. Doc. #235.

Although parties cannot be sanctioned for failing to produce documents that are not in their

"possession, custody, or control," the Court need not credit a non-compliant party's statement

that he lacks access to requested documents without a fact-based explanation or supporting

evidence, particularly where it would be common sense to presume that he would have access.

Fed. R. Civ. P. 34(a)(1), 37(a)(3)(B)(iv), 37(b)(2)(A); *see also Shcherbakovskiy*, 490 F.3d at

138–39 (noting that evaluating such claims "may involve a finding as to [a party's] credibility");

*Sigety v. Abrams*, 632 F.2d 969, 975 (2d Cir. 1980). Notably, Sophien and Imed offer no credible

explanation for why they lacked access to *their own* bank statements and tax filings.[6] They assert

that they could not access accountant Malings' work papers before they were requested in May

2014, but do not explain why the papers have not been produced since then.

Months later, in October and November 2014, defense counsel submitted letters

purportedly updating the Court on the ongoing bankruptcy proceedings and "request[ing] that the

Court conduct a hearing to determine the reason for [defendants'] delay [in producing

documents] and if Plaintiff has been prejudiced by the delay." Doc. #271 at 2. But the letters do

not state any "reason for the delay" and they give no explanation for defendants' inability to

provide a reason at the September 2014 hearing. One of the letters also references financial

documents that have "recently shipped from Tunisia," Doc. #262 at 2, with no explanation why

these financial documents had not been produced for this litigation many months ago, when

---

[6] The court accords little weight to Sophien's attached affidavit statement indicating "I deny Plaintiff's claims that Defendants have not produced . . . requested . . . tax documents and bank statements. Defendants have produced all such documents that they have. The documents Plaintiff requests either do not exist or are not in Defendants' possession, custody or control." Doc. #235-1 at 1. This statement asserts a legal conclusion rather than precise facts or explanations with regard to specific documents. *See Wyler v. United States*, 725 F.2d 156, 160 (2d Cir. 1983) (indicating that an affidavit "which does not contain specific facts or is not based on first-hand knowledge is not entitled to any weight."). Moreover, Sophien declined to appear at the Court's sanctions hearing, foregoing the opportunity to testify or face cross-examination regarding his access to the requested documents.

required. Absent a credible explanation or evidence excusing their discovery violations continuing for over a year, I will not credit defendants' assertions that they do not have the documents at issue, and I find that their actions are at least grossly negligent and far more likely the product of intentional bad faith in an effort to obstruct these proceedings.

The severity and nature of the violations by Sophien and Imed warrant a sanction of default judgment against them. Plaintiff cannot prove his claims and damages without complete evidence of TriPlanet's transactions and of financial transactions between the individual defendants—evidence that lies in defendants' sole possession. The *SNET* court, for example, upheld default judgment entered against the individual corporate officers, thereby piercing the corporate veil, because the defendants withheld evidence that would allow the plaintiff to prove its alter ego theory of liability, and because that information was in the defendants' sole control. 624 F.3d at 147.

To support its conclusion, the *SNET* court relied on *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982), in which the Supreme Court upheld the discovery sanction of default judgment against an individual and stated that because a court can presume "the bad faith and untruth of an answer begotten from the suppression or failure to produce the proof ordered," it may conclude "that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense." *Id.* at 705 (quoting *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 351 (1909)); *see also Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1368 (2d Cir. 1991) (finding that "[h]ad [the defendant] not intentionally frustrated the discovery process, an adjudication on the merits would have been possible" and that "the district court justifiably entered an order taking as

established the claim whose proper adjudication [the defendant] deliberately endeavored to frustrate").

It is readily apparent that the information suppressed by defendants is key to this case. Plaintiff's claims under Count II (violation of Connecticut's wage statute), Count VII (breach of fiduciary duty), Count VIII (conversion), and Count XI (constructive trust) all require proof that defendants illegally withheld money to which plaintiff was entitled. He can only prove his wage statute claim if he proves that defendants were "withhold[ing] or divert[ing] any portion of [his] wages," which include the non-discretionary equity payments denoted in his employment agreement. Conn. Gen. Stat. Ann. § 31-71e; *Datto Inc. v. Braband*, 856 F. Supp. 2d 354, 371 (D. Conn. 2012). He can prove that defendants, as TriPlanet partners, breached their fiduciary duty to him as an equity stakeholder if he shows that they misappropriated payments to which he was entitled. *See* Conn. Gen. Stat. § 34-338(a) ("The only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care . . . ."); *Williams v. Bartlett*, 189 Conn. 471, 482–83 & n.8, 457 A.2d 290 (1983). Likewise, his common law claims for constructive trust and conversion both rely on his ability to prove that defendants took or withheld property to which they were not entitled. *See Cadle Co. v. Mangan*, 316 B.R. 11, 18 (D. Conn. 2004), *aff'd sub nom. In re Flanagan*, 503 F.3d 171 (2d Cir. 2007); *Deming v. Nationwide Mut. Ins. Co.*, 279 Conn. 745, 770–71, 905 A.2d 623 (2006). Plaintiff cannot prove these claims without evidence regarding his allegation that Sophien and Imed illegally withheld equity payments of TriPlanet's profits. Without evidence of TriPlanet's liabilities including payroll, administrative, and overhead expenses, he cannot ascertain TriPlanet's profits and the amount to which he would be entitled under his employment agreement in order to determine whether defendants improperly withheld any money.

Similarly, plaintiff cannot prove that Sophien and Imed committed statutory or common law fraud (Counts IV and VI) without demonstrating a discrepancy between what he was actually paid and what Sophien and Imed promised him—which, again, depends on proof of TriPlanet's profits. Plaintiff's securities fraud claim requires proof that defendants used "any manipulative or deceptive device" when offering plaintiff equity in the company and accompanying equity distributions during employment negotiations. *See* Securities Exchange Act of 1934, § 10(b) (codified at 15 U.S.C. § 78j(b)); *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009); 17 C.F.R. § 240.10b–5 (Rule 10b-5). His common law fraud claim requires proof that defendants falsely represented a statement of fact—the equity payment to which he was entitled. *See Sturm v. Harb Dev., LLC*, 298 Conn. 124, 142, 2 A.3d 859 (2010). Once again, absent evidence of TriPlanet's actual profits, plaintiff cannot verify whether defendants in fact made false statements.

Defendants' violations have also prevented plaintiff from proving his actual damages. His complaint seeks compensatory damages as well as double-damages under Connecticut's wage statute, Conn. Gen. Stat. § 31-72. Doc. #110 at 33. However, a large portion of these claims are based on the overdue equity payments he claims he is owed, which, again, can be calculated only with evidence of TriPlanet's actual financial condition. *See Cine Forty-Second St. Theatre Corp.*, 602 F.2d at 1065.

Lesser sanctions are unlikely to redress the harm to plaintiff or to have any effect here. The Court's multiple attempts to encourage discovery compliance through lesser means—issuing very specific instructions, extending deadlines, and warning about the possibility of sanctions— have been to no avail. *See Guggenheim Capital, LLC*, 722 F.3d at 451; *Minotti*, 895 F.2d at 103. Any belated production that Sophien and Imed have turned over is overshadowed by their long

pattern of obstruction; to the extent they did produce additional responsive documents, they did so only after receiving numerous warnings, and after plaintiff uncovered and investigated references to missing documents within existing document production in this proceeding and in TriPlanet's concurrent bankruptcy proceeding. *See SNET*, 624 F.3d at 147–49. It is unlikely that anything less than default judgment will persuade Sophien and Imed to comply with court orders because they continue to insist, without credible support, that they lack access to the enumerated missing documents. *See Razmilovic*, 738 F.3d at 27.

The bankruptcy stay does not preclude plaintiff from seeking sanctions against the individual defendants' for discovery violations, even violations relevant to claims that are stayed. I am entitled to "'continue to . . . consider whether the defendant[s]'" may be sanctioned as a result of their failure "'to comply with a prior discovery order'" as long as the sanction does not have the effect of "securing assets protected by the stay or harassing" the debtor. *In re Bloom*, 875 F.2d 224, 226 (9th Cir. 1989) (quoting *David v. Hooker, Ltd.*, 560 F.2d 412, 418 (9th Cir. 1977) (providing extensive analysis of discovery sanctions in the context of a bankruptcy stay)); *Serio v. Black, Davis & Shue Agency, Inc.*, 2006 WL 176983, at *1 (S.D.N.Y. 2006) (acknowledging the ongoing authority of the court, in the midst of a bankruptcy stay, to decide contempt motions designed to "to punish the debtor for contumacious conduct against the dignity of either the state or federal court." (internal quotations marks and citation omitted)); *see also In re Long*, 318 F. App'x 891, 894 (Fed. Cir. 2008) (noting that court may enter sanction of contempt while bankruptcy stay is pending, but may not "further impose discovery requirements" or enforce a money judgment against debtor); *In re Berg*, 230 F.3d 1165 (9th Cir. 2000) (concluding that court may award attorney's fees as a sanction for Rule 38 violation in

spite of bankruptcy stay); *Alpern v. Lieb*, 11 F.3d 689 (7th Cir. 1993) (finding Rule 11 sanctions exempt from bankruptcy stay).

### Default Judgment

Based on Sophien and Imed Bennaceur's repeated violations of disclosure and discovery orders, I will enter default judgment against them on all adequately pleaded claims. Fed. R. Civ. P. 37(b)(2)(A)(vi); *see also Fed. Mar. Comm'n v. S. Carolina State Ports Auth.*, 535 U.S. 743, 758 (2002) (noting in dicta that "a party failing to obey discovery orders . . . is subject to a variety of sanctions, including the entry of default judgment"); *Luft v. Crown Publishers, Inc.*, 906 F.2d 862, 865 (2d Cir. 1990) ("[T]he decision to impose [default judgment as a discovery sanction] is committed to the sound discretion of the district court . . . .").

A default judgment entered as a sanction for discovery violations "on well-pleaded allegations in a complaint establishes a defendant's liability." *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014) (quoting *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 69 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973)); *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995) (same). I apply the same standard to assess the propriety of default judgment as I would apply to a motion to dismiss; in other words, I must accept as true all factual matter alleged in the complaint and draw all reasonable inferences in a plaintiff's favor. *See Steginsky*, 741 F.3d at 368; *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013); *Montblanc-Simplo GmbH v. Colibri Corp.*, 692 F. Supp. 2d 245, 253 (E.D.N.Y. 2010) ("[The principle that] a party's default is . . . deemed an admission of the plaintiff's well-pleaded allegations of fact pertaining to liability. . . . applies regardless of whether default is entered as a discovery sanction or for failure to defend." (internal citations omitted)); *see also* 10A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 3d* § 2688 (1998) ("Even after default,

however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law."). But, in the context of a discovery sanction, the Court will only enter default judgment if "'a complaint . . . contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Montblanc-Simplo GmbH*, 692 F. Supp. 2d at 253 (citing cases).

A court assessing default judgment may also "find[ ] an allegation not to be 'well pleaded'" in additional circumstances, including where allegations "are contrary to facts of which the court will take judicial notice, or which are not susceptible of proof by legitimate evidence, or which are contrary to uncontroverted material in the file of the case." *Trans World Airlines, Inc.*, 449 F.2d at 63 (internal quotation marks and citation omitted).

> "[O]nly indisputable facts"—facts which could not possibly be rebutted if the non-defaulting party were permitted a trial—may be judicially "noticed" to rebut factual material otherwise admitted by a default. . . . Matter introduced by [a defaulting party] to disprove or mitigate damages which only *tends* to contradict the allegations of the complaint has no legal effect [as to liability] . . . unless it could not conceivably have been refuted and disproved by [the non-defaulting party] had there been a trial and thus is "indisputable."

*Ibid*; *cf. Silge v. Merz*, 510 F.3d 157, 161–62 (2d Cir. 2007) (limiting damages award to amount claimed in the complaint where defaulting party never appeared and did not have notice of any change to the claimed damages).

Under this standard, I find that all but one of plaintiff's live claims against the individual defendants are well pleaded and that both individual defendants are liable under Counts II, III, IV, VI, VII, and VIII of the amended complaint (Doc. #110). Count XI is improperly pleaded as a cause of action where, in fact, it is a remedy, and I decline to grant default judgment as to that

count. Defendants have not challenged the sufficiency of the pleadings even after receiving notice that the Court was considering entering default judgment.

> *Count II (Violations of Connecticut Wage Statute, Conn. Gen. Stat. § 31-71a et seq.)*

Plaintiff's claim under Count II is that Sophien and Imed improperly withheld a 2010 equity payment in violation of Connecticut's wage statute, Conn. Gen. Stat. § 31-71a, *et seq*.

> To make out a *prima facie* case under Conn. Gen. Stat. § 31-72, the plaintiff must demonstrate that (1) the defendant is an employer; (2) the amount sought to be recovered qualifies as a wage under § 31-71a(3); and (3) the employee is entitled to monies that were withheld wrongfully by the defendant employer.

*Henwood v. Unisource Worldwide, Inc.*, 2006 WL 2799589, at *18 (D. Conn. 2006), *aff'd*, 282 F. App'x 26 (2d Cir. 2008). Even where a plaintiff's employer is a corporation, an individual may be liable if he "is the ultimate responsible authority to set the hours of employment and to pay wages and is the specific cause of the wage violation." *Butler v. Hartford Technical Inst., Inc.*, 243 Conn. 454, 458–64, 704 A.2d 222 (1997).

Under the terms of plaintiff's employment agreement, as set out in the complaint, plaintiff was entitled to receive a portion of TriPlanet's annual profits—an "equity distribution"—once he satisfied a series of enumerated performance goals. For the reasons stated by Judge Underhill in his PJR decision, I agree that "the unpaid equity distributions constitute a form of bonus for which both the payment and the amount are nondiscretionary under the terms of the Employment Agreement. Accordingly, those amounts . . . qualify as 'wages' under the statute." *See* Doc. #78 at 10 (citing *Datto Inc.*, 856 F. Supp. 2d at 371; *Ass'n Res., Inc. v. Wall*, 298 Conn. 145, 176, 2. A.3d 873 (2010)). Plaintiff adequately pleaded that Sophien and Imed were each a majority owner and a manager of TriPlanet "who acted with full management authority over the affairs of TriPlanet," and each was also "a person authorized by TriPlanet to pay wages to TriPlanet's employees, including Roberts . . . ," establishing the individual

defendants' authority to set and pay wages. Doc. #110 at 17–18. He also alleged that "[d]espite Roberts' demand to be paid the full amount of his 15% Annual Equity Payout for 2010 . . . Sophien Bennaceur and Imed Bennaceur refused to pay Roberts . . . ," indicating that the Bennaceurs caused the violation at issue. *Id.* at 15.

Because defendants do not challenge, and the record does not contradict, plaintiff's allegation that he satisfied the terms of his contract in 2011, and was entitled to an equity payment for that year, I conclude that plaintiff was entitled to the 25% equity distribution allotted for that year and that his claim regarding 2011 wages is well pleaded. *See id.* at 11.

Likewise, I find that plaintiff adequately alleged that he satisfied his 2010 obligations under the Agreement—specifically that TriPlanet achieved an "annual run rate revenue of £20 million . . . as of December 2010"—and that plaintiff is therefore entitled to a 15% equity distribution for that year. *Id.* at 8. The claim is sustained by plaintiff's allegation that he "performed—and even exceeded—all of his contractual obligations as set forth in the Employment Agreement." Doc. #110 at 16. If the parties intended to extrapolate the annual run rate revenue based on the revenue earned during the average work day in the month of December 2010—a plausible interpretation of the Agreement phrase "annual run rate revenue . . . as of December 2010"—the allegation that plaintiff met "and even exceeded" the run rate goal is not contradicted by the record evidence and is sufficient to support his claim to recover unpaid wages. *Ibid*; *see* Doc. #259 at 1–2 (citing Doc. #80 at 59–66). Accordingly, I grant default judgment as to plaintiff's claim that defendants violated the Connecticut Wage Statute (Conn. Gen. Stat. § 31-71a *et seq.*).

*Count IV (Fraud) and Count VI (Securities Fraud):*

Plaintiff has pleaded sufficient allegations to permit default judgment on his claims of securities fraud and common law fraud (Counts IV and VI).

> The essential elements of an action in common law fraud . . . are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury.

*Simms v. Seaman*, 308 Conn. 523, 548, 69 A.3d 880 (2013) (internal quotation marks and citation omitted). The Second Circuit has held that a claim for Rule 10b-5 securities fraud is held to the same standard but with the additional requirement that a false representation or omission be made "in connection with the purchase or sale of securities." *SEC v. DiBella*, 587 F.3d 553, 563 (2d Cir. 2009); *see also* 17 C.F.R. § 240.10b-5. Rule 10b-5, a regulation promulgated under § 10(b) of the Securities Exchange Act of 1934, prohibits fraud "in connection with a securities *transaction.*" *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (emphasis added). This may include "[e]mployment contracts promising shares [of the employer company] as compensation" for specific work, and not automatically provided to employees. *Ibid*; *Datto Inc.*, 856 F. Supp. 2d at 383; *see also Dubin v. E.F. Hutton Grp. Inc.*, 695 F. Supp. 138, 142–147 (S.D.N.Y. 1988) (providing an extensive analysis of equity compensation plans that may constitute securities regulated by § 10(b) and Rule 10b-5). In fact, even where the specific work was not performed, the agreement is still subject to regulation under the Securities Act. *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 559 (2d Cir. 1985).

A plaintiff alleging either statutory or common law fraud must also comply with Rule 9(b) of the Federal Rules of Civil Procedure, which requires that plaintiff state the circumstances constituting fraud "with particularity." Fed. R. Civ. P. 9(b); *Lundy v. Catholic Health Sys. of*

*Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013); *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001). Accordingly, the complaint must "specify the statements [plaintiff] claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Lundy*, 711 F.3d at 119 (internal quotations marks and citation omitted); *see also Suez Equity Investors, L.P.*, 250 F.3d at 95 (citation omitted). Though a plaintiff may generally plead the requisite fraudulent intent, he must allege facts that give rise to a "'strong inference' of fraudulent intent," which may include "either (a) . . . facts . . . show[ing] that defendants had both motive and opportunity to commit fraud, or (b) . . . facts . . . constitut[ing] strong circumstantial evidence of conscious misbehavior or recklessness." *Suez Equity Investors, L.P.*, 250 F.3d at 99–100.

To support his common law fraud claim, plaintiff alleges that at several meetings shortly after he met Sophien on vacation in Florida, Sophien falsely promised plaintiff that plaintiff would receive a 15% ownership interest and other residual benefits upon joining TriPlanet, that plaintiff would be entitled to an equivalent annual equity payment based on his ownership interest, and that his ownership interest and payout could increase by ten percent if plaintiff met additional performance goals the following year. Doc. #110 at 6, 19. Plaintiff states that he later learned that Sophien exaggerated his own professional experience, and that Sophien made these promises regarding plaintiff's compensation "knowing them to be false [and] having no intention of honoring" them. *Id.* at 19. Plaintiff further alleges that while he was working at TriPlanet, both Sophien and Imed continued to falsely maintain the same promises regarding plaintiff's ownership interest and anticipated equity payments to induce plaintiff to continue working at TriPlanet, although neither intended to pay him the promised equity payments and both knew

that plaintiff's ownership interest had not been formalized. *Id.* at 20–22. The complaint refers to several dinner meetings in 2011 where the brothers both assured plaintiff that he had met the requisite performance goals and was entitled to the accompanying bonus payments. It also states that, although Sophien and Imed stated that the company had documents on file formalizing plaintiff's ownership interest, they declined to give plaintiff a copy, and plaintiff's own investigation revealed documents that "made clear that [plaintiff's] equity ownership interest had never been formalized." *Id.* at 12. Plaintiff further alleges that, relying on the brothers' promises, he remained at TriPlanet, although the company "never paid [him] the 2010 and 2011 Annual Equity Payouts, and . . . has failed to recognize or acknowledge [plaintiff's] 25% equity ownership interest in the Company." *Id.* at 22. With these allegations, plaintiff has adequately stated a claim for common law fraud.

For many of the same reasons, plaintiff has also adequately stated a claim for securities fraud. The equity ownership interest in the company that plaintiff was promised constitutes a security within the definition of Rule 10b-5 because Sophien's promises of a 15% equity ownership interest in the company were specific to plaintiff and contingent upon his leaving his prior job and beginning work with TriPlanet, *see Mills*, 12 F.3d at 1175; *Dubin*, 695 F. Supp. at 142–47, and the additional increased equity ownership interest was promised to plaintiff in exchange for plaintiff's satisfaction of specific performance goals. Accordingly, Count VI is also adequately pleaded to support default judgment.

*Count VII: Breach of Fiduciary Duties*

Plaintiff's claim against both individual defendants for breach of fiduciary duty (Count VII) is likewise adequately pleaded. To plead a breach of fiduciary duty under Connecticut law, the complaint must allege the following:

> 1. That a fiduciary relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, (b) an obligation on the part of the defendant to act in the best interests of the plaintiff, and (c) an obligation on the part of the defendant to act in good faith in any matter relating to the plaintiff;
> 2. That the defendant advanced his or her own interests to the detriment of the plaintiff;
> 3. That the plaintiff sustained damages; [and]
> 4. That the damages were proximately caused by the fiduciary's breach of his or her fiduciary duty.

Thomas B. Merritt, 16 Conn. Prac., Elements of an Action § 8:1. A general partner of a corporation "occupie[s] a fiduciary position with respect to the [other partners], whom he owe[s] 'the duty of rendering true accounts and full information about everything which affects the partnership.'" *See Williams*, 189 Conn. at 482 n.8 (citation omitted); *see also* Conn. Gen. Stat. § 34-338(a) (noting that partners owe a duty of loyalty and care to other partners).

The Uniform Partnership Act, which has been adopted and codified in Connecticut, defines a partnership as "the association of two or more persons to carry on as co-owners a business for profit . . . , whether or not the persons intend to form a partnership." Conn. Gen. Stat. § 34-314(a). "In determining whether a partnership is formed . . . [a] person who receives a share of the profits of a business is presumed to be a partner in the business . . . ." *Id.* §34-314(c). A complaint adequately states the existence of a partnership if its "allegations contain the essential terms of the partnership agreement," including "how the partnership was to divide its income and what specific labor each partner was to contribute." *Forino v. Forino*, 2007 WL 1600032, at *2 (Conn. Super. Ct. 2007).

Plaintiff alleges that Sophien Bennaceur was TriPlanet's Chief Executive Officer, and that both Sophien and Imed were "majority owner[s] and . . . manager[s] who acted with full management authority over the affairs of TriPlanet." Doc. #110 at 25–26. Sophien was the Chief Executive Officer and a manager, while Imed was Chief Technology Officer and manager. *Id.* at

4. The complaint states that plaintiff agreed that he would occupy a position "referred to as 'Engagement Partner,' responsible for providing business and information technology consulting and related services to TriPlanet's clients." *Id.* at 7–8. The terms of the Employment Agreement, as alleged in the complaint, clearly state plaintiff's entitlement to profit sharing. *Id.* at 7–9. With these allegations, plaintiff adequately pleaded the existence of a partnership. Accordingly, the majority owners Sophien and Imed had a fiduciary duty with respect to plaintiff. Finally, the complaint states that Imed breached his duties to plaintiff "by denying [plaintiff] his 25% equity ownership" interest in the company. *Id.* at 26.[7]

Accordingly, plaintiff's factual allegations within this Count are sufficient to show that the individual defendants, as managing partners, had a fiduciary relationship with respect to plaintiff. He alleges that they had full management authority over the company—a power plaintiff was not granted, though they were all to share the company's profits, making plaintiff a limited partner in the company. Accordingly, they owed plaintiff a fiduciary obligation to apprise him of his own partnership status and of the financial health of the company. *See Williams*, 189 Conn. at 482 n.8. And although the allegation that Imed "denied [plaintiff's] . . . equity ownership" is a bit vague, the allegations that "Sophien . . . and Imed Bennaceur represented . . . that papers evidencing [plaintiff's] equity ownership interest were on file in TriPlanet's New York Office," but declined to give plaintiff a copy, and that the individual defendants both

---

[7] One might read plaintiff's allegation that he "had not been formally granted an equity ownership interest in TriPlanet," Doc. #110 at 21, to contradict this claim that plaintiff was a partner of Sophien and Imed. But this is not fatal to either claim. First, any alleged failure to "formally" make plaintiff a partner is not fatal to plaintiff's claim that he was a partner nonetheless, and therefore the allegations are not mutually exclusive. *See, e.g.*, *Kafafian v. Young*, 2011 WL 4006707, at *3 (D. Conn. 2011) ("Even a de facto controlling partner may defraud a business and his partners."), *aff'd*, 477 F. App'x 762 (2d Cir. 2012); *Brennan v. Brennan Assocs.*, 2012 WL 6786241, at *18 (Conn. Super. Ct. 2012) (acknowledging that a "de facto member of the partnership" owes a fiduciary duty of loyalty). In addition, the Federal Rules entitle a plaintiff to plead alternative allegations within distinct claims, regardless of their consistency. Fed. R. Civ. P. 8(d)(2), (3); *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 585 (2d Cir. 2005) (*per curiam*).

"refused to pay [plaintiff] and refused to recognize or acknowledge his 25% equity ownership interest" are sufficient to state a claim that the duty was breached. Doc. #110 at 12, 15, 26.

Finally, although plaintiff's alleged harm from the expense and difficulty of engaging in this litigation may alone be insufficient to support his claim, *see Ravenswood Const., LLC v. F.L. Merritt, Inc.*, 2004 WL 2397568, at *4 (Conn. Super. Ct. 2004), the complaint adequately pleads an injury in stating that the deprivation of plaintiff's ownership interest further deprived him of annual equity payments. Accordingly, this claim is adequately pleaded, along with plaintiff's fraud claims, and will support default judgment.

*Count VIII (Conversion)*

I further find that plaintiff's claim of conversion—a "common law tort of great antiquity"—against the individual defendants is well pleaded. *See Kopperl v. Bain*, 23 F. Supp. 3d 97, 101 (D. Conn. 2014). Under Connecticut law, a person commits the tort of conversion when "without authorization, [he] assumes and exercises ownership over property belonging to another," either "permanently or for an indefinite time," "to the exclusion of the owner's rights," and causing the owner harm. *Deming*, 279 Conn. at 770 (citations omitted). To support this claim, plaintiff sets forth the same allegations, including that the individual defendants have "refused to pay [plaintiff] and [have] refused to recognize or acknowledge his 25% equity ownership interest," and thereby states that the individual defendants, without authorization, "[took], exercised dominion and control over, interfered with, retained and converted to their own use and benefit" plaintiff's equity ownership interest in TriPlanet, "to the exclusion of [plaintiff's] rights and to [his] detriment." Doc. #110 at 15, 27. He incorporates his allegations that Sophien and Imed had exclusive control over the company's finances, and that plaintiff's

damages include "the value of his 25% ownership in TriPlanet." *Id.* at 26. I conclude that this claim for conversion is adequately stated.

### Count XI (Constructive Trust)

Count XI of plaintiff's complaint pleads a claim of "Constructive Trust" against both individual defendants. But "there is no separate cause of action under Connecticut law for constructive trust." *Cendant Corp. v. Shelton*, 474 F. Supp. 2d 377, 383 (D. Conn. 2007); *see also Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 623 n.3, 804 A.2d 180 (2002). Rather, it is a remedy the Court may consider if liability is established. *Cendant Corp.*, 474 F. Supp. 2d at 383; *Macomber*, 261 Conn. at 623 n.3. Accordingly I will not grant default judgment as to Count XI.

### Damages for Default

Based on my finding of liability on Count II, plaintiff is entitled to a 15% equity stake of TriPlanet's 2010 profits and a 25% stake of 2011 profits. Therefore, I award damages compensating him for 15% of 2010 profits, 25% of 2011 profits, and a portion of unpaid salary from 2012. Plaintiff has waived other claims for monetary damages. *See* Docs. #220 at 36, #239 at 85–86.

As the Second Circuit has stated,

> [w]hile a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages. . . . There must be an evidentiary basis for the damages sought by plaintiff, and a district court may determine there is sufficient evidence . . . upon a review of detailed affidavits and documentary evidence.

*Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors Inc.*, 699 F.3d 230, 234 (2d Cir. 2012) (internal quotation marks and citations omitted); *see also* Fed. R.

Civ. P. 55(b)(2) (preserving district court's discretion to hold an evidentiary hearing in the case of one party's default).

To assess the proper measure of damages for a violation of the Connecticut Wage Statute under circumstances where "'the employer's records are inaccurate or inadequate,'" courts apply a burden shifting test whereby an employee satisfies his burden "'if he produces sufficient evidence to show'" what he is owed "'as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount'" that the employee is owed "'or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.'" *Schoonmaker v. Lawrence Brunoli, Inc.*, 265 Conn. 210, 239–40, 828 A.2d 64 (2003) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946), *superceded by statute on other grounds*).

> Connecticut law does not require a party claiming damages to prove them with exactitude or precision. Indeed, a party seeking damages must only "afford a basis for a reasonable estimate by the trier, court or jury, of the amount of that [party's] loss. From the very nature of the situation, the amount of loss cannot be proved with exactitude and all that can be required is that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation which will enable the trier to make a fair and reasonable estimate."

*Id.* at 241 (emphasis in original) (citation omitted).

On August 15, 2014, the Court scheduled a hearing for which it ordered the parties to address the question of "whether an appropriate sanction should be default judgment for plaintiff against the individual defendants in the amount of $8,858,949"—the amount of the PJR. Doc. #228. At that hearing on September 4, 2014, plaintiff responded by lowering his damages estimate to $8,136,222.60, which he arrived at by using the same data on TriPlanet's overhead costs that he had presented at the PJR hearing along with new direct-source data on TriPlanet's

revenue that he received after the PJR hearing. *Compare* Pl.'s Exhs. 17, 21 *with* Doc. #220 at 7–8, 36. Defense counsel was unable to respond in any substance at that hearing. After the hearing, defendants filed a brief denying liability, but did not address the calculation of damages. *See* Doc. #235. A short time later, defendants filed another brief stating that plaintiff's damages calculation was erroneous, and presenting an alternative calculation of 2011 revenue, but they continued to rely exclusively on the Raich report, which I have already discounted for the reasons stated above. *See* Doc. #240 at 4; *see also* Doc. #257 at 4. Months later, in December 2014, defendants submitted the affidavit of a new accountant, Ira Spiegel of EisnerAmper LLP, who was retained by TriPlanet Partners in the ongoing bankruptcy court proceedings and who disputes plaintiff's damages calculation. *See generally* Doc. #273-1. But defendants filed this affidavit to inform this Court about the progress of the bankruptcy court proceedings, and not as evidence going to the merits of plaintiff's motion for sanctions. *See* Doc. #275 at 1. Accordingly, I see no need to address Spiegel's claims on the merits, and I have no basis to conclude that his calculations are correct.[8]

Defendants assert that "at an evidentiary hearing, [they] would show that Plaintiff's $8.1 million damage claim must be rejected." Doc. #240 at 4; *see also* Doc. #271 at 2 (requesting a hearing on sanctions). But in view of defendants' flagrant and willful failure to produce documents that bear on damages, I see no reason to believe that an evidentiary hearing would illuminate any remaining questions about plaintiff's losses that have otherwise been established adequately on the basis of evidence adduced by plaintiff.

---

[8] I would give little evidentiary weight to this submission because it (1) appears to challenge the individual defendants' liability for 15% and 25% equity payments, which has already been established by virtue of their default, and (2) its analysis relies on documents that are the subject of defendants' discovery violations. *See id.* at 1–2, 5–6. I will not allow defendants to benefit at this stage of proceedings from their prior violations. *See SNET*, 624 F.3d at 149.

The evidence underlying Judge Underhill's PJR calculation, supplemented by the additional revenue data obtained by plaintiff subsequently, supports a "just and reasonable inference" supporting plaintiff's damages calculation of $8,136,222.60, and defendants have failed to rebut that inference with competent evidence. *See Schoonmaker*, 265 Conn. at 239.

### CONCLUSION

Defendants' motion to dismiss for lack of jurisdiction (Doc. #265) is DENIED. Plaintiff's renewed motion for sanctions (Doc. #199) is GRANTED as it applies to Sophien and Imed Bennaceur, and DENIED as it applies to TriPlanet, but without prejudice to renewal in the event that the bankruptcy stay is lifted. Both plaintiff's and defendants' motions to adjust the Rule 26(f) scheduling order (Docs. #224, #220) are DENIED as moot. Defendants' motion to seal (Doc. #258) is GRANTED. Plaintiff's motion for a protective order (Doc. #212) is DENIED without prejudice to renewal in the event that the bankruptcy stay is lifted as to defendant TriPlanet. Plaintiff's motion to preclude and strike defendant's letter (Doc. #274) is DENIED.

IT IS ADJUDGED AND ORDERED THAT default judgment shall enter in favor of plaintiff and against both Sophien and Imed Bennaceur as to Counts II (violation of the Connecticut Wage Statute), IV (Fraud), VI (Violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5), VII (Breach of Fiduciary Duties), and VIII (Conversion). Count XI (Constructive Trust) is converted into a request for relief. Plaintiff is awarded default damages in the amount of $8,136,222.60.

It is so ordered.

Dated at Bridgeport, Connecticut this 31st day of March 2015.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge